**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| CHRIS PARTRIDGE, | Case No. 4:26-cv-10821 |
| Plaintiff, | Hon. Shalina D. Kumar |
| v. | |
| UNIVERSITY OF MICHIGAN; UNIVERSITY OF MICHIGAN BOARD OF REGENTS; SANTA ONO, in his official and individual capacities; WARDE MANUEL, in his official and individual capacities; and TONY PETITTI; | |
| Defendants. | |

| | |
|---|---|
| Elizabeth K. Abdnour (P78203) | Brian M. Schwartz (P69018) |
| Mitchell D. Sickon (P82407) | D. Kyle Bierlein (P78278) |
| ABDNOUR WEIKER LLP | MILLER, CANFIELD, PADDOCK, & STONE, P.L.C. |
| 325 E. Grand River Ave., Ste. 250 | 150 W. Jefferson, Ste. 2500 |
| East Lansing, MI 48823 | Detroit, MI 48226 |
| (517) 994-1776 | (313) 963-6420 |
| liz@education-rights.com | schwartzb@millercanfield.com |
| mitch@education-rights.com | bierlein@millercanfield.com |
| | |
| Mark A. Weiker (P85381) | *Attorneys for Defendants* |
| Jessica N. Moore (OH: 0101098) | |
| ABDNOUR WEIKER LLP | |
| 262 S. Third St. | |
| Columbus, OH 43215 | |
| (614) 745-2001 | |
| mark@education-rights.com | |
| jessica@education-rights.com | |

*Attorneys for Plaintiff*

1

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff CHRIS PARTRIDGE, by and through his attorneys ABDNOUR WEIKER LLP, hereby files the following Amended Complaint alleging violations of his Constitutional rights in violation of the First and Fourteenth Amendments, 42 U.S.C. § 1983, and Michigan law against Defendants as captioned above.

## INTRODUCTION

1. This lawsuit arises from a conspiracy between University of Michigan Athletics Director Warde Manuel and Big Ten Commissioner Tony Petitti, the University's breach of a written employment agreement between the University and Chris Partridge, the University's failure to provide Partridge with due process prior to terminating his employment and its retaliatory motive for doing so, and the subsequent devastation to Partridge's outstanding reputation as a college football coach. Patridge's termination was wholly unjustified and without legitimate cause, which was confirmed by a National Collegiate Athletic Association ("NCAA") investigation report issued on August 15, 2025. Contrary to misinformation communicated by the University's Athletics Department following Partridge's termination, Partridge was not fired for destroying evidence or interfering with the NCAA's "sign-stealing" investigation. Nor was Partridge fired for telling a player to be dishonest in an NCAA interview.

2

2.  Chris Partridge is a seasoned and accomplished football coach with his career spanning over a decade. Partridge's contributions both on and off the field are indisputable, both significantly elevating the teams he coached while nurturing the talents of numerous student-athletes under his guidance.

3.  Prior to his employment with the University of Michigan, Partridge served as the head coach at New Jersey's Paramus Catholic High School where he coached and mentored more than thirty Division I football players.  Over the course of three years, Partridge revitalized a struggling football program from one of the worst in the state to become top team in New Jersey, also rising to the rank of #4 nationally in this span.

4.  Partridge also served as co-defensive coordinator and safeties coach at the University of Mississippi. Partridge achieved remarkable milestones, including tying the University of Mississippi record for most wins in a season and producing a defensive unit that saw significant improvement year after year. Partridge's ability to maximize the potential of his players at the University of Mississippi was underscored by the record number of players drafted into the National Football League ("NFL") during his tenure.

5.  While at the University of Michigan, Partridge served diligently in various capacities, including as the Director of Player Personnel and Special Teams Coordinator. Partridge's leadership, strategy, and insight were pivotal in the success

of the University of Michigan football program, evidenced by its top-tier rankings in national defense and numerous individual awards earned by his players.

6. Partridge's impact extended beyond the field: his recruiting expertise brought him national recognition, earning him the Scout.com National Recruiter of the Year award in 2016 and the 247Sports National Recruiter of the Year in 2017. Partridge's efforts at the University of Michigan not only enhanced the defensive roster but also helped build a culture of excellence within the football program. Partridge was also instrumental in the initiation of the MPower program, devoted to aligning corporate sponsors with the football program athletes for name, image, and likeness ("NIL") sponsorship opportunities.

7. However, despite Partridge's unwavering commitment and success, the University of Michigan unjustly terminated Partridge's employment and spread false and damaging information regarding his professional conduct, tarnishing Partridge's hard-earned reputation and inflicting irreparable harm on to his career and personal well-being. In addition to damages, this lawsuit seeks to clear Partridge's name and restore his otherwise stellar reputation.

8. Following termination by the University of Michigan, Partridge was able to leverage his talents in the NFL, reaching and winning Super Bowl LX as the Outside Linebackers Coach for the Seattle Seahawks. Partridge was thereafter promoted to Run Game Coordinator for the team. Nonetheless, Partridge's reputation has been

4

significantly and unnecessarily damaged by the University of Michigan, which has prevented him from securing another position in college football.

## JURISDICTION AND VENUE

9. This action is brought pursuant to the First and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983.

10. Subject matter jurisdiction is based on 28 U.S.C. § 1331, which grants district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

11. The events giving rise to this lawsuit occurred in Washtenaw County, Michigan, which sits in the Eastern District of Michigan.

12. Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

## PARTIES

13. At all relevant times, Plaintiff Chris Partridge was a resident of Washtenaw County, Michigan, and an employee of the University of Michigan.

14. Defendant University of Michigan (hereinafter "Michigan" or "University") was at all relevant times and continues to be a public educational institution in Washtenaw County, Michigan, organized and existing under the laws of the state of Michigan.

15. The University of Michigan Board of Regents ("Board of Regents") is the governing body for Defendant University of Michigan.

16. Defendant Michigan and Defendant Board of Regents are hereinafter collectively referred to as the Michigan Defendants.

17. At all material times, Defendant Santa Ono ("Ono"), in his official capacity, working within Washtenaw County, State of Michigan, was an agent and/or employee of the University, acting or failing to act within the scope, course, and authority of his employment and his employer.

18. At all material times, Ono was the President of the University.

6

19. At all material times, Defendant Warde Manuel ("Manuel"), in his official capacity, working within Washtenaw County, State of Michigan, was an agent and/or employee of the University, acting or failing to act within the scope, course, and authority of his employment and his employer.

20. At all material times, Manuel was the Director of Athletics of the University.

21. At all material times, Defendant Tony Petitti ("Petitti") was the Commissioner of the Big Ten Conference (the "Big Ten").

## FACTUAL ALLEGATIONS

### *Overview of the Lawsuit*

22. Contrary to misinformation communicated by the University's Athletics Department and at least one member of the Board of Regents about the reasons for Partridge's termination, Partridge was not fired for destroying evidence or interfering with the NCAA's "sign-stealing" investigation.[1] Nor was Partridge fired for telling a player to be dishonest in an NCAA interview.

23. Instead, as confirmed in writing in a letter dated March 8, 2024, from the University Review Committee that heard Partridge's grievance regarding his termination, the grounds for terminating Partridge's employment were as follows:

---

[1] "Sign-stealing" in athletics "is the act of decoding an opponent's signs that are used to communicate that opponent's upcoming plays." Under NCAA rules, stealing an opponent's signs is only illegal if the stealing team uses electronic equipment to decipher an opponent's signs during a live game. *See* Joshua A. Winneker & Ian Silfies, *The Ethics of Sign Stealing in College Football*, 22 MARQ. SPORTS L. REV. 425, 434 (2022).

contrary to unwritten instructions given to the Michigan football coaching staff "not to communicate with a student-athlete during an investigation," Partridge told the player that he should "get an attorney."

24. Partridge does not dispute that this is what he told the player.

25. As benign an offense as that may seem, even the University Review Committee got it wrong. There was never any directive given to the football coaching staff "not to communicate with a student-athlete during an investigation."

26. Any such directive would have been met with vigorous resistance from every member of the football coaching staff, because the Michigan football program would have come to a screeching halt if none of the coaches could talk to any of the players until the NCAA investigation was concluded.

27. In fact, as further described below, the directive was a command not to discuss with others the matters that were being investigated by the NCAA in its "sign-stealing" investigation, which was given three weeks after those discussions had already started.

28. The directive that Partridge and other members of the football coaching staff were given occurred in a meeting held on November 13, 2023, the Monday after Michigan and former head football coach Jim Harbaugh ("Harbaugh") filed a lawsuit against the Big Ten and its Commissioner, Petitti.

29. The meeting with the football coaching staff was called by Michigan Senior Assistant General Counsel Debra Kowich ("Kowich"), who was accompanied by Athletics Director Manuel's Executive Assistant, Doug Gnodtke ("Gnodtke"), Chief of Staff of Michigan Athletics, and Elizabeth Heinrich ("Heinrich"), Executive Senior Associate Athletic Director, Senior Woman Administrator, and Chief Student Development and Compliance Officer.

30. The apparent purpose of the meeting was to give directions to the football coaching staff about a Big Ten/NCAA investigation of an alleged elaborate "sign-stealing" program at Michigan that violated an NCAA rule.

31. The NCAA "sign-stealing" investigation was first reported three weeks earlier and became the most scandalous college sports story in several years.

32. For reasons unknown to Partridge, neither Kowich nor anyone else in the Office of General Counsel or Manuel's office gave any guidance or directions to the football coaching staff or the Michigan football players in the previous three weeks.

33. During the previous three weeks, without any guidance or direction from anyone at the University, both the coaching staff and players had been openly discussing what they had heard and what they thought about the ongoing "sign-stealing" investigation.

34. Kowich conducted the November 13th meeting.

35. While Gnodtke was present, he said very little and deferred to Kowich.

9

36. Harbaugh was present during the entire meeting, along with most, if not all, members of the football coaching staff.

37. At the outset of the meeting, and without commenting or inquiring about the conversations that had already taken place during the previous three weeks, Kowich cautioned those in attendance not to discuss the matters being investigated by the NCAA with anyone.

38. During the meeting, Harbaugh mentioned that members of the football team would likely seek answers or information about the investigation from their coaches.

39. Kowich responded that employees should not respond and should direct student athletes to speak with her, Gnodtke, or Heinrich.

40. Partridge and the other coaches were confused about this blanket directive due to the nature of their close relationships with student athletes, which required them to provide support to them and help them through challenging circumstances.

41. Partridge and his colleagues knew that it would be impossible for them to tell the student-athletes with whom they worked every day that they could not talk with them at all, because it would violate the deep trust the student athletes had in their coaches and make it impossible for them to perform their job duties.

42. More than once during the meeting, Harbaugh asked Kowich to put her "directive" in writing for the sake of clarification and to send it to the student athletes and their families if they had questions or concerns.

43. Without explanation, Kowich refused to do so.

44. During the meeting, Harbaugh forcefully stated that anyone being interviewed by the NCAA should have a lawyer.

45. Kowich expressed her strenuous disagreement with Harbaugh, stating that players did not need to be represented by a lawyer.

46. Kowich and Gnodtke never mentioned during the meeting or otherwise informed the football coaching staff that one of the NCAA Bylaws specifically provides that anyone interviewed by the NCAA enforcement staff may be represented by a lawyer.

47. Upon information and belief, neither Michigan nor the NCAA wanted any student-athlete to retain a lawyer for the same reason that law enforcement officials prefer to conduct interviews without lawyers present—they can get the witness to say a lot more.

48. Upon information and belief, the NCAA had even stronger opinions about not wanting players to retain lawyers. After all, lawyers who represent players in NCAA cases routinely acquire limited immunity for the clients, which prevents the enforcement staff from intimidating players with threats of loss of scholarships and eligibility. Not surprisingly, that is precisely what the NCAA enforcement staff did when interviewing Michigan players during the sign-stealing investigation.

49. As instructed, Partridge never discussed the matters under investigation by the NCAA with anyone. Partridge did nothing wrong by telling a player who asked for his advice that he should talk with his father about getting a lawyer before being interviewed, exactly what his supervisor had told Kowich and Gnodtke. Nor was Partridge's statement to the player a violation of his employment agreement or any NCAA Bylaw.

50. Partridge was a scapegoat who was wrongly fired simply because he told a player he had the right to have counsel—something the University should have told the players themselves if it had been protecting their interests instead of trying to curry favor with the NCAA.

51. As further alleged in more detail below, the University's claimed justification and manner of terminating Partridge's employment using a false narrative constituted a clear violation of his Constitutional right to due process.

52. As alleged in further detail below, Michigan's unlawful dismissal of Partridge was based on pressure from Petitti, who used Partridge as a pawn in an eleventh-hour maneuver to force Michigan and Harbaugh to dismiss their lawsuit against the Big Ten, which was scheduled for a preliminary injunction hearing two days later.

53. Upon information and belief, Petitti informed Michigan that if the University and Harbaugh did not immediately dismiss their lawsuit, the Big Ten would make damaging revelations about Michigan's "sign-stealing" during the hearing on

Friday, including that Partridge had "interfered with" the NCAA's ongoing investigation.

***Background Information***

54. Partridge was first hired by Michigan in January 2015 as the Director of Player Personnel.  On December 3, 2015, Michigan announced that Partridge would coach the linebackers for Michigan during the 2016 Citrus Bowl, after the departure of Michigan Defensive Coordinator and Linebackers Coach D.J. Durkin. Partridge then took over as full-time Linebackers and Special Teams Coach.  On February 8, 2017, Partridge was promoted to Special Teams Coordinator and continued as Linebackers Coach. Prior to the 2018 season, Partridge was invited to join the Alabama Crimson Tide football staff but chose to stay at Michigan. Weeks after, Partridge received a significant pay raise and new coaching duties. Partridge was assigned to coach safeties and continue as Special Teams Coordinator. Partridge was ranked a top five recruiter again in 2019 by 247Sports.

55. On January 2, 2020, University of Mississippi ("Ole Miss") Head Coach Lane Kiffin hired Partridge and soon named him Co-Defensive Coordinator alongside former Michigan assistant D.J. Durkin. In 2022, Partridge was promoted to defensive play caller while still serving as Co-Defensive Coordinator. In January 2023, Partridge and Ole Miss parted ways.

13

***Michigan's Knowledge of, and Failure to Address, Widespread Wrongdoing within the Athletic Department Prior to Partridge's Employment***

56. On January 20, 2023, the University terminated football co-offensive coordinator Matt Weiss after an investigation had revealed that Weiss gained unauthorized access to student athlete databases of more than 100 colleges and universities that were maintained by a third-party vendor.

57. After gaining access to these databases, Weiss downloaded the personally identifiable information and medical data of more than 150,000 athletes.

58. Using the information that he obtained from the student athlete databases and his own internet research, Weiss was able to obtain access to the social media, email, and/or cloud storage accounts of more than 2,000 target athletes.

59. Weiss also illegally obtained access to the social media, email, and/or cloud storage accounts of more than 1,300 additional students and/or alumni from universities across the country.

60. Once Weiss obtained access to these accounts, he downloaded personal, intimate digital photographs and videos that were never intended to be shared beyond intimate partners.

61. On or around January 5, 2023, a University employee reported Weiss's accessing of university email accounts without authorization to University police.

14

62. Upon information and belief, prior to terminating Weiss, the University had seized his electronic devices, which it found to be encrypted in violation of University policy.

63. Upon information and belief, the University had to hire forensic experts to break the encryption on Weiss's devices.

64. Upon information and belief, the University was able to break the encryption and access the devices sometime between January 5 and 17, 2023.

65. Upon information and belief, upon accessing the devices, the University found a massive amount of sexual material, which it turned over to the federal government.

66. Upon information and belief, along with the sexual material, the University found evidence of cheating, including the "sign-stealing" scheme, on Weiss's devices.

67. Upon information and belief, the University hired an outside law firm to investigate the evidence of cheating found on Weiss's devices.

68. Upon information and belief, the University did so to ensure that the law firm's investigation was privileged and therefore shielded from public knowledge, public records requests, and the NCAA.

69. Upon information and belief, Ono instructed the law firm not to put anything in writing about its investigation.

70. Upon information and belief, the investigation found evidence of an advanced scouting scheme that went beyond former football program staff member Connor Stalions ("Stalions") and involved one or more members of the football coaching staff.

71. Upon information and belief, the law firm presented the findings of its investigation orally to Ono and one or more members of the Office of the President and/or the Athletics Department, including Manuel.

72. Upon information and belief, Ono instructed those in attendance at the presentation that they were not permitted to take notes, use their cell phones, or record the presentation, and prohibited them from discussing it with anyone outside the room.

73. Upon information and belief, Ono's reputation as President of the University, and Manuel's reputation as Athletic Director, would have been seriously harmed if information about the advanced scouting scheme became public.

74. Upon information and belief, this presentation occurred sometime between January and September 2023.

75. Upon information and belief, neither Ono nor Manuel ever reported the evidence of cheating found on Weiss's computer, the law firm's involvement, or the results of the investigation to the Board of Regents, the Compliance Services Office, or the NCAA.

16

76. This is notable, given that Partridge's employment contract, discussed below, included the following language:

> It is important you understand that, as a team member of the Michigan Athletic Department, you agree to abide by and comply with the NCAA, Big Ten Conference, and University Rules. You will use maximum efforts to ensure compliance with these rules by student-athletes, coaches and staff. You will use maximum efforts to ensure compliance with these Rules by student-athletes, coaches and staff. If you become aware of or have reason to believe that violations of the NCAA, Big Ten, or University Rules may have taken place, you are obligated to report it promptly to the Athletic Director or the Compliance Services Office.

77. Upon information and belief, Ono never provided Manuel with any training, supervision, or monitoring to ensure that he supervised, disciplined, and/or terminated his subordinates in ways that did not infringe upon their Constitutional rights.

78. Upon information and belief, the University failed to hold itself accountable for the "sign-stealing" scheme, in violation of both its NCAA requirements.

***Partridge's 2023 Employment Contract with Michigan***

79. At Harbaugh's invitation, following Partridge's departure from Ole Miss, Partridge returned to Michigan's football staff for the 2023 season.

80. On or around February 7, 2023, instead of using a traditional long-form employment agreement, Manuel presented Partridge with a one-page Memorandum of Understanding ("MOU"), retroactively effective to February 3, 2023.

17

81. Harbaugh, Tiffany Raymond ("Raymond"), Assistant Athletic Director for Human Resources, and Gnodtke were listed as other recipients of the MOU.

82. Partridge's electronic signature and the date "2/7/23" were placed in the signature and date block at the bottom of the MOU.

83. There was no place on the MOU for Manuel or any other Michigan representative to sign the MOU, and it was never signed by a Michigan representative.

84. The MOU indicated that Partridge would receive an initial annual base salary, which would increase over three times should Partridge be assigned to a position that included on-field coaching duties.

85. The MOU also indicated: "Additionally, you may be eligible to receive a team performance bonus at the discretion of the Athletic Director."

86. The MOU began with the following statement:

> I am offering you the following terms for your appointment as a Defensive Analyst at the University of Michigan. Your employment is contingent upon the successful completion of the University's pre-employment requirements. This term is subject to your satisfactory performance of your duties as determined by the Head Football Coach and Athletic Director and your compliance with NCAA, Big Ten Conference and University rules and regulations, policies, interpretations and by-laws (collectively, "Rules").

87. The MOU also included a statement that confirmed Michigan's ability to terminate Partridge without cause on the condition that Michigan paid Partridge the

18

salary he was owed for the remainder of the contract term: "Your employment is at will and may be terminated with or without cause. In the event of a without cause termination, your base salary for the remainder of the Term will be paid to you in full."[2]

88. It is standard industry practice for collegiate coach contracts to give the university the option of: (a) terminating a coach's contract for any reason, or no reason, which is referred to as "termination for convenience," requiring the university to "buy out" the remainder of the coach's contract; or (b) terminating a coach's contract "for cause," as that term is defined in the contract, which relieves the university of any further financial obligation to the coach.

89. Most collegiate coach contracts have a reciprocal obligation on the part of the coach if they resign their position before the end of the contract term.

90. Consistent with that industry practice, the MOU also obligated Partridge to pay Michigan "100% of [his] annual base salary" if he resigned from his position at any time before the end of the contract term, which was defined as January 31, 2024.

91. Partridge began working at the University on or around February 8, 2023.

92. Shortly after Partridge and Michigan agreed to the terms of the MOU, Partridge was assigned on-field coaching responsibilities, which triggered an

---

[2] These provisions are contradictory and violate basic contract law principles, as an employee with a contract containing a termination "for cause" provision is, by definition, not an "at will" employee.

increase of his annual salary to over three times the initial base salary, and a title change to Linebackers Coach.[3]

93. Linebackers coaches are responsible for the supervision of the linebackers of a football team. Linebackers coaches play a critical role in the coaching, mentorship, correction, and development of student-athletes in this group. Linebackers coaches are responsible for fostering a culture of discipline, accountability, and high performance while supporting the academic and personal growth of student-athletes.

94. Industry standard for college football performance at Michigan's level requires that the coaching staff include a full-time linebackers coach.

95. In the 2023 NCAA Division I Football Bowl Subdivision ("FBS") football rankings Associated Press and Coaches Polls, Michigan ranked number three in Week 12, number two in Weeks 1 to 11 and 13, and number one in Weeks 14 and 15.

96. In the 2023 NCAA College Football Playoff ("CFP") rankings, Michigan ranked number three in Weeks 9 to 12, number two in Week 13, and number one in Week 14.

97. Upon information and belief, every 2023 team in both polls and the CFP employed a linebackers coach.

---

[3] The MOU was never amended to reflect the title change.

98. Linebackers coach is a regular, permanent position on the Michigan football coaching staff.

99. Michigan employed a full-time linebackers coach for years both before and after Partridge's term with the team.

### The Strained Relationship Between Manuel and Harbaugh

100.    In 2015, Harbaugh accepted an offer from interim Athletics Director Jim Hackett to become Michigan's head football coach.

101.    In January 2016, Manuel was named Michigan's Director of Athletics.

102.    By 2021, Michigan fans and certain boosters had become increasingly critical of Harbaugh based on the football team's failure to meet their high expectations and because of the team's disappointing performance during the shortened Covid-19 pandemic season.

103.    In January 2021, Manuel responded to this criticism by giving Harbaugh a four-year contract extension that reduced his base salary from $8 million to $4 million.

104.    After Harbaugh took the team to the College Football Playoffs in the 2021-22 season, Manuel reworked Harbaugh's contract on February 15, 2022, increasing his base salary and providing for several potential bonuses, but not matching the base salary he had been paid previously.

105.     The tension between Manuel and Harbaugh increased when NCAA enforcement staff accused Harbaugh of being dishonest during an October 2022 interview and threatened to charge Michigan and Harbaugh with a Level I infraction, the highest-level infraction in the NCAA's Bylaws.

106.     Upon information and belief, the University and Harbaugh entered negotiations with the NCAA enforcement staff in early 2023 that resulted in an agreement that Harbaugh would serve a four-game suspension in the 2023 season.

107.     For reasons unknown to Partridge, the NCAA Division I Committee on Infractions ("COI") rejected the proposed negotiated resolution and began moving the case forward towards a hearing.

108.     Upon information and belief, following the COI's rejection of the proposed settlement, Manuel self-imposed a three-game suspension against Harbaugh without consulting with Harbaugh.

109.     Upon information and belief, Manuel did not consult with Harbaugh before making this decision.

110.     Upon information and belief, Harbaugh was not happy about Manuel's unilateral decision to suspend him for three games and was disappointed that Manuel seemed more interested in resolving the NCAA case at whatever cost than showing support for Harbaugh in defending the allegations.

*The Big Ten and the NCAA "Sign-Stealing" Investigation*

111.     In October 2023, the NCAA opened an investigation into alleged violations in the Michigan football program, including allegations of a scouting scheme orchestrated and directed by Stalions and unrelated recruiting violations uncovered during the investigation.

112.     The "sign-stealing" scheme involved widespread cheating against numerous other high-ranking college football teams, which, upon information and belief, affected the outcomes of both individual games and teams' rankings, competitiveness, ability to recruit both coaches and players, championship potential, and just about every other aspect of the involved teams' football programs.

113.     College football is extremely popular.  It is reported to be the second-most popular sport in the country, with a 2020 National Football Foundation report finding that, in 2019, 145 million people attended college football telecasts and 47.5 people attended games.

114.     That same report found that Michigan led all Football Bowl Subdivision schools in attendance that year with an average of 111,459 fans per home game in 2019.  It also found that Michigan had also led the nation in attendance for 43 of the prior 45 seasons, playing before 100,000-plus fans for a record 293 straight home games, a streak that extended back to Nov. 8, 1975.

115. The NCAA's Public Infractions Decision on the matter, issued on August 15, 2025, ultimately found that the "sign-stealing" scheme affected at least 52 college football games. The decision found, "In fact, it is possible that even more instances of impermissible scouting could have been proven if not for the intentional withholding and destruction of devices in this case." The decision also found, "[T]he conduct at issue implicated critical pillars of integrity and fair play of college athletics. The scope and scale of the scheme are unlike any scouting cases previously encountered by the [NCAA Division I Committee on Infractions]."

116. On or around October 18, 2023, NCAA president Charlie Baker ("Baker") had a phone call with Petitti and Michigan senior officials, in which Baker stated that the NCAA had "highly credible evidence of a wide-ranging, multi-year in-person, off-campus scouting scheme orchestrated by a non-coaching staff member of the University's football program."

117. On or around this same date, the NCAA launched an investigation into these allegations.

118. On or around October 20, 2023, following Michigan's receipt of evidence of his involvement in the alleged "sign-stealing" scheme, Stalions, a non-coaching member of the Michigan football staff, was suspended with pay.

119. Stalions later resigned.

24

120.     On or around October 23, 2023, Gnodtke requested that all football program employees provide their work cell phones and iPads for forensic analysis in the NCAA investigation.

121.     Partridge immediately complied with this request by turning in his work cell phone and his personal iPad, which he used daily for his work.

122.     On or around October 25, 2023, Gnodtke texted Partridge and asked Partridge to also provide his personal cell phone for forensic analysis in the NCAA investigation.

123.     Partridge responded to Gnodtke, referring the matter to his agent, as he did not want to release his personal cell phone without a written directive describing the reason his phone was being searched and what safeguards would be used to protect private information that had nothing to do with the NCAA's investigation.

124.     Gnodtke responded that Kowich would contact Partridge to provide the information he requested.

125.     That same night, Partridge texted Gnodtke, advising that his agent had not received any information from Kowich and that Partridge wanted to be sure that he would not be accused of failing to comply with Gnodtke's directive.

126.     Gnodtke replied to Partridge, stating that he should not worry and that Kowich would be around for the next week to scan his personal cell phone.

25

127. On or around October 31, 2023, Gnodtke texted Partridge to ask whether Kowich had contacted Partridge or his agent.

128. Partridge responded that Kowich never contacted him or his agent. Gnodtke replied that Partridge should not worry and that the University had a responsibility to respond to his inquiry and inform him of the protocol in place, if any, to protect his personal information.

129. Neither Partridge nor his agent ever received any response from Kowich or any other University employee in response to Partridge's request.

130. On or around November 4, 2023, the Big Ten issued a notice stating that there was "uncontroverted" evidence regarding the in-person sign stealing scheme, that the University had violated the conference's sportsmanship policy, and that the violations were "pervasive" and "systemic."

131. On or around November 6, 2023, the NCAA began interviewing Michigan Athletics Department employees as part of its investigation.

*A University Lawyer Gives Untimely, Misguided Advice to Football Program Staff*

132. As alleged in paragraph 28, *supra*, on Monday, November 13, 2023, Kowich and Gnodtke held a meeting with all Michigan football program employees, including Partridge and Harbaugh.

133. At this meeting, Kowich told employees not to communicate with anyone, including Michigan football players, about the subject of the NCAA's "sign-stealing" investigation.

134. Assistant coaches began raising questions about how they could comply and still ethically perform their roles.

135. Harbaugh then suggested that Kowich put her directive in writing.

136. Kowich refused.

137. Coaches kept asking clarifying questions, Harbaugh again asked Kowich to put her directive in writing.

138. Again, Kowich refused.

139. During the meeting, Kowich also said Michigan administrative staff was aware that the NCAA interviews were being leaked to the media and other third parties, but they did not believe the disclosures were being made by anyone attending the meeting.

140. After the November 13, 2023 meeting, a Michigan football player approached Partridge, told him he was nervous about his upcoming interview with the NCAA, and asked for advice.

141. Partridge, in his individual capacity—in part because he had been directed by University counsel that he could not speak on the topic in his official

27

capacity—advised him to speak with his parents about getting a lawyer and to just be honest with the NCAA.

142. As instructed by the University's attorneys, Partridge did not discuss the matters being investigated by the NCAA.

143. Upon information and belief, other coaches were approached by student athletes and provided them with similar general support and advice.

144. Upon information and belief, none of those coaches were terminated or disciplined.

***Michigan and Harbaugh File a Lawsuit Against the Big Ten and Petitti***

145. On November 4, 2023, the Big Ten issued a notice stating that there was "uncontroverted" evidence regarding the in-person sign stealing, that Michigan had violated the conference's sportsmanship policy, and that the violations were "pervasive" and "systemic."

146. On November 8, 2023, Michigan and Harbaugh responded to the Big Ten's notice, saying they "did not deny" the existence of Stalions' scheme but argued that the Big Ten did not have the authority to discipline Michigan or any of its coaches until the NCAA completed its investigation.

147. Upon information and belief, on or around November 8, 2023, Harbaugh retained counsel in anticipation of filing a lawsuit against the Big Ten and Petitti.

148. Upon information and belief, Harbaugh's lawyers learned that Michigan had retained counsel and intended to sue the Big Ten.

149. Upon information and belief, at the suggestion of Michigan's General Counsel, Harbaugh's attorneys reached out to Michigan's attorneys to "coordinate litigation strategy."

150. Upon information and belief, Michigan's legal team agreed to work with Harbaugh's attorneys and worked together to prepare and file the lawsuit.

151. On November 10, 2023, Petitti sent a letter to Michigan rejecting its arguments that Petitti lacked the authority to act prior to the conclusion of the NCAA investigation.

152. The letter said that "the existence of the impermissible scheme [had been] proven" and that Harbaugh would be suspended for the next three games.

153. The letter went on to say:

> We impose this disciplinary action even though the Conference has not yet received any information indicating that Head Football Coach Harbaugh was aware of the impermissible nature of the sign-stealing scheme. This is not a sanction of Coach Harbaugh. It is a sanction against the University that, under the extraordinary circumstances presented by this offensive conduct, best fits the violation because: (1) it preserves the ability of the University's football student-athletes to continue competing; and (2) it recognizes that the Head Coach

29

embodies the University for purposes of its football program.[4]

154.     Later that day, Michigan and Harbaugh filed their lawsuit as co-plaintiffs in Washtenaw County Circuit Court.

***Petitti Uses False, Second-Hand Information About Partridge to Coerce the University to Dismiss the Lawsuit***

155.     Upon information and belief, until the afternoon of Wednesday, November 15, 2023, Harbaugh's lawyers were in close contact with Michigan's outside counsel and Michigan's General Counsel in preparation for an injunction hearing that was scheduled to begin on Friday, November 17, 2023.

156.     Upon information and belief, sometime in the afternoon or evening of November 15, 2023, Petitti presented Manuel with uncorroborated, second-hand, inflammatory, and false information about Partridge and threatened to embarrass Michigan by presenting this information in open court at the injunction hearing.

157.     Upon information and belief, Petitti also suggested to Manuel that the information was likely to result in the Washtenaw County Circuit Court denying Michigan and Harbaugh's request for an injunction.

158.     Upon information and belief, Michigan and Harbaugh's lawyers continued to work throughout the afternoon and evening to prepare for the injunction

---

[4] *Harbaugh, et. al. v. The Big Ten Conference, Inc., et. al.*, No. 23-001419-CB (Washtenaw Co. Cir. Ct. Mich. 2023).

hearing, oblivious to the threats that Petitti had made to Manuel to coerce him into believing that Michigan should call off the injunction hearing.

***Manuel Offers to Terminate Partridge and Dismiss the Legal Claims against Petitti and the Big Ten***

159.    Upon information and belief, at some point on November 15, 2023, Manuel offered to fire Partridge and to dismiss Michigan and Harbaugh's legal claims against the Big Ten and Petitti.

160.    Upon information and belief, Manuel made this offer to protect his own job, which would be at risk if Petitti made the information he shared with Manuel public.

161.    Upon information and belief, in exchange, Petitti agreed not to publicly disclose the sensationalized information he had shared with Manuel, to issue a positive public statement about the parties resolving their dispute, and to do nothing further regarding the NCAA's "sign-stealing" investigation.

162.    Upon information and belief, Petitti made this agreement to protect his own job, which would be at risk if the University's lawsuit against the Big Ten continued.

163.    On November 16, 2023, the University issued the following public statement:

> This morning, the University, Coach Harbaugh, and the Big Ten resolved their pending litigation. The Conference agreed to close its investigation, and the University and

31

Coach Harbaugh agreed to accept the three-game suspension. Coach Harbaugh, with the University's support, decided to accept this sanction to return the focus to our student-athletes and their performance on the field. The Conference has confirmed that it is not aware of any information suggesting Coach Harbaugh's involvement in the allegations. The University continues to cooperate fully with the NCAA's investigation.

*Manuel Unlawfully Fires Partridge and Begins Smearing His Reputation*

164.    On November 17, 2023, Gnodke asked Partridge to meet with him and Manuel.

165.    When Partridge arrived for the meeting, Manuel immediately said he was terminating Partridge from his position.

166.    Manuel then asked Partridge whether he was at the meeting with Kowich on November 13.

167.    Partridge said he was at the November 13th meeting.

168.    Manuel then told Partridge that he had been informed that Partridge had advised a certain football player not to be forthright with information regarding the NCAA investigation.

169.    Upon information and belief, Manuel had no idea if this was true or not.

170.    Partridge denied this and tried to correct Manuel, but Manuel refused to let him speak.

32

171.     Partridge asked Manuel how his termination would be portrayed to the media and said he did not want to be linked with the "sign-stealing" scheme, because he had was not involved in it and had no knowledge of it.

172.     Manuel stated that there was no evidence that Partridge was involved with the scheme and falsely stated that the University would not be releasing a statement related to Partridge's termination.

173.     Manuel instructed Partridge not to communicate with any current Michigan employees, football players, or former players.

174.     Manuel told Partridge that he would be receiving a termination letter from Raymond.

175.     Later that day, Partridge received the following letter:



November 17, 2023

Dear Chris,

Pursuant to your Memorandum of Understanding dated February 7, 2023, your employment is subject to your satisfactory performance of your duties as determined by the Head Football Coach and Athletic Director. As we discussed today, the University has received evidence that you have failed to abide by the University directive not to discuss an ongoing NCAA investigation with anyone associated with the Michigan Football Program or others and as a result has determined that you have failed to satisfactorily perform your duties. As a result, your employment as a Football Coach is hereby terminated effective immediately and you will not be eligible for rehire at the University of Michigan.

This will also serve as notice that you are not to: 1) contact or visit any University of Michigan Athletic Department facility; 2) contact any current or former student-athletes or any other members of the Athletic Department.

Please contact the Benefits Office at (734) 615-2000 for questions regarding Benefits of Cobra.

Please work with Tiffany Raymond (ktiffany@umich.edu) to arrange for returning your dealer vehicle and any other University equipment and resources that have been provided in the course of your employment (e.g., MCard; keys and other access devices; ipad; laptop). These items should be returned no later than Tuesday, November 21, 2023. We will box up any personal items in your office and make them available for pick-up no later than November 21, 2023.

Please contact me if you have any questions or need additional information.

Sincerely,

Doug Gnodtke

cc: Personnel file

176.    On December 1, 2023, Partridge contacted Gnodke and notified him that he wished to pursue a grievance under the University's Human Resources Grievance and Dispute Resolution Policy. Partridge wrote:

> Doug,
>
> Pursuant to UM's UHR 201.08 Grievances and Dispute Resolution policy, I am contacting you to discuss a

grievance. I consider this email to be the first step of the grievance process.

The bases of my grievance are as follows: wrongful termination, breach of my employment contract, defamation by UM staff, and failure to engage in a DRC before my termination.

I was wrongfully terminated for allegedly discussing the NCAA investigation with students. I did nothing more than assure students that they should tell the truth in the investigation and let them know they should stay in their lane and not try to speculate or make up information. We tell them constantly- let your pads do the talking, don't get caught up in stuff that doesn't involve you, it's a theme within our teaching of young men, most of who come from environments where there's a lot of illicit stuff going on. Again, we teach them that as a skill-set to grow from. I said nothing to any kid any more significant than that.

Further, my termination letter does not state that I was fired for cause, yet I am no longer being paid by the University in violation of my contract. Only if I am terminated for cause may the University stop paying me my base salary.

Next, UM staff is reporting to the media that I was terminated for allegedly engaging in efforts to destroy evidence relevant to the NCAA investigation amongst other things even more concerning things. These are false and harmful to my reputation.

Finally, pursuant to UM's Standard Practice Guide 201.12, UM may not discharge me without first engaging in a Disciplinary Review Conference (DRC). This did not occur before my termination. SPG 201.12 defines a DRC as follows: "A meeting to provide an opportunity for discussion with an employee whose termination at the initiative of the University is contemplated. The conference will include an oral or written statement of the

35

alleged misconduct or performance concerns and allow an opportunity for the employee to respond. The employee will be informed of the outcome in a timely fashion."  I was never provided with any opportunity to respond after being notified I was being terminated.

Please respond within 3 working days as required by UHR 201.08.

Thanks,
Chris Partridge

177.    On December 4, 2023, Gnodtke responded:

Dear Chris:

I am responding to your email of December 1, 2023, in which you indicated your desire to file a grievance challenging your November 17, 2023, discharge. Initially, I note that you have incorrectly sought to process this grievance at step 1 of the procedure. However, since this is a grievance challenging your discharge, the grievance begins at step 3 of the process with the University Grievance Review Committee SPG 201.08 II (C)(5). All further communications on this matter should be directed to Linda Dabrowski at ldabrow@umich.edu. Pursuant to the grievance process, a meeting with the committee will be scheduled within 30 calendar days.

Pursuant to your Memorandum of Understanding dated February 7, 2023, your employment was subject to the satisfactory performance of your duties as determined by the Head Football Coach and Athletic Director. As previously discussed and as indicated in your discharge letter it has been determined that you failed to satisfactorily perform your duties. As a result, you are not entitled to continued pay. In addition, since you were subject to removal at the discretion of the Head Football Coach and Athletic Director for unsatisfactory

> performance of your duties you were not entitled to a DRC pursuant to 201.12 III(C).
>
> Finally, the University has not issued any statements alleging that you were discharged for engaging in efforts to destroy evidence.
>
> Go Blue!
>
> --Doug

178. Gnodke's email notified Partridge that his employment was subject to the terms and conditions of the University's Standard Practice Guide (SPG), confirmed Partridge's right to pursue a grievance, and provided him with instructions on how to do so.

179. The following day, on December 5, 2023, Associate Director of Human Resources Linda Dabrowski confirmed that SPG 201.08 applied to Partridge. She wrote the following to Partridge in an email:

> Hi Chris,
>
> I understand you are interested in filing a grievance. I'm asking Julie Doman, cc'd on this email, to forward you the grievance packet.
>
> Please submit your materials by no later than December 19.
>
> If you have any questions, please feel free to reach out to me.
>
> -Linda

180.     Partridge's MOU also confirms this: "You will be subject to the University's standard provisions applicable to employees in your classification regarding termination of your employment."  Def. Mot. to Dismiss, Ex. 1, ECF No. 11-2, PageID.110.

181.     SPG 201.08 states that it applies to "Regular and Temporary Staff Members, except those covered by the Faculty Appeal Procedure for Schools, Colleges, and other academic units, and those covered by the terms of a collective bargaining agreement."

182.     Therefore, because SPG 201.08 applied to Partridge, pursuant to the University's own policy language, he had to be either a Regular or Temporary Staff Member.

183.     SPG 201.57 defines temporary employment.  It reads, in relevant part, "Temporary appointments are not intended to meet ongoing staffing needs, which should be addressed using the Regular appointment process…." Sec. I.

184.     Linebackers Coach was an ongoing staffing need for the University.

185.     Therefore, by a plain reading of the SPG's own language, Partridge was a regular employee at the University and entitled to a DRC.

186.     On December 16, 2023, Partridge filed a grievance with the University's Human Resources office challenging his termination.  Def. Mot. to Dismiss, Ex. 2, ECF No. 11-3, PageID.111-114.

38

187.    On February 27, 2024, Human Resources' University Review Committee held a grievance hearing. Def. Mot. to Dismiss, Ex. 3, ECF No. 11-4, PageID.116.

188.    Unsurprisingly, the University Review Committee upheld the termination decision.  *Id*. at PageID.117.

189.    Upon information and belief, Manuel knew Partridge had not discussed the matters being investigated by the NCAA and had not failed to satisfactorily perform his duties.

190.    Upon information and belief, after Manuel fired Partridge without any investigation or opportunity for Partridge to respond to the grounds for termination, Michigan's Office of General Counsel sent an email to Ono and members of the University's Board of Regents with an explanation of the reasons for Partridge's termination.

191.    Upon information and belief, the explanation given by the Office of General Counsel in that communication was completely different from both the reasons stated by Manuel when meeting with Partridge and the reasons stated in the previously referenced letter from the University Review Committee, paragraph 23, *supra*, in denying Partridge's administrative appeal of his termination.

192.    Although Manuel had assured Partridge that Michigan would not be releasing a statement about his termination, Michigan did issue a public statement

39

about his termination just hours later, along with a statement that Michigan and Harbaugh's lawsuit against the Big Ten and Petitti had been dismissed.

193.    Upon information and belief, later that day, one or more employees of the Michigan Athletics Department and at least one member of the Board of Regents falsely told one or more local and national sportswriters that Partridge had been fired for "destroying evidence" on Stalions' computer.

194.    That same day, that false information was then reported by several widely followed, reputable news organizations, including Yahoo Sports, which reportedly has more than 35 million subscribers.



yahoo/sports

**Sources: NCAA's evidence vs. Michigan included booster involvement in scouting scheme, attempted destruction of evidence**

'Uncle T' named in report as financial backer of Connor Stalions' alleged sign-stealing plan

Ross Dellenger · Dan Wetzel
Fri, Nov 17, 2023 · 3 min read                                    1.2k

COLLEGE FOOTBALL          PARTRIDGE ALLEGEDLY DESTROYED EVIDENCE ON CONNOR STALIONS' COMPUTER

195.    Through communications with Michigan's Sports Information Director ("SID"), senior Michigan officials were aware of these false, defamatory news reports and knew or should have known that these reports would cause irreparable harm to Partridge's reputation.

196.    There was nothing that would have prevented senior Michigan officials from directing the SID to either issue a corrective public statement or inform individual sportswriters there was no factual basis for reports that Partridge had destroyed, or attempted to destroy, evidence.

197.    However, Michigan's senior officials took no such action.

198.    Partridge never destroyed any evidence, electronically stored or otherwise, and has never been accused of doing so.

199.    Partridge had nothing to do with the "sign-stealing" scheme, and the NCAA has never alleged or even suggested that he was involved in the scheme.

200.    Stalions himself admitted that no member of the remaining Michigan coaching staff, which included Partridge, had any knowledge of the "sign-stealing" scheme.

201.    The University's failure to prevent Michigan employees in the Athletics Department and members of the Board of Regents from providing sportswriters with malicious, unfounded information portraying Partridge as a wrongdoer and to issue a corrective statement after learning of news stories such as

41

the one referenced above has caused permanent, lasting, irreparable damage to Partridge's reputation and employability within college football.

202.    On February 29, 2024, Harbaugh issued the following statement via email:



**Jim Harbaugh**    2/29/24

**CP**

To whom it may concern. I was not consulted by the Michigan Athletics Director or anyone else before Chris Partridge's employment with the University of Michigan was terminated, and I did not agree with that decision. Jim Harbaugh

Sent from my iPhone

203.    Upon information and belief, after learning of Manuel's unilateral termination of Partridge's employment, Harbaugh sent an email to Manuel and Raymond to establish a record that he was not consulted about Manuel's decision and had no part in it.

204.    Upon information and belief, Manuel replied via email to acknowledge the truth of what Harbaugh had said in his email.

205.    Yet, on March 1, 2024, in response to a FOIA request by Partridge's counsel, Shannon Hill, Michigan's FOIA Coordinator, sent the following email:

I am writing in response to your clarified Freedom of Information Act request dated February 15, 2024, which was received on February 16, 2024.

You requested: *I am interested in any and all communications in the past ten years sent from or received by Jim Harbaugh related to Chris Partridge's termination of employment from the University of Michigan.*

Your request is denied because no responsive records were located.

206.    Manuel's unilateral decision to fire Partridge without even hearing his side of the story was squarely at odds with his approach to dealing with other far more serious acts of misconduct by other Michigan coaches and members of their staff, including the following examples:

a. Stalions, whose conduct initiated the NCAA investigation into the University, was suspended with pay following the first reports of sign-stealing and was later allowed to resign;

b. In 2022, former Men's Head Basketball Coach, Juwan Howard, was given no discipline either for punching another team's coach in the face or for engaging in a physical altercation with his own strength coach. Howard was later suspended for five games and fined by the Big Ten—not Michigan—for his misconduct;

c. Also in 2022, former Head Hockey Coach, Mel Pearson, remained as the head hockey coach during a nearly year-long investigation by an

outside law firm, which concluded there were "numerous instances of misconduct by Pearson" and wasn't fired until the law firm's report was reviewed by the University;

d. Upon information and belief, in January 2023, former Co-Offensive Coordinator Matt Weiss was allowed to coach at the Fiesta Bowl despite Manuel knowing that Weiss was being criminally investigated for hacking the email, social media, and cloud storage accounts of thousands of female athletes and downloading intimate photos and videos;

e. In 2024, former Defensive Line Coach, Greg Scruggs, was suspended with pay after he was arrested for drunk driving following a car crash and, upon information and belief, was later allowed to resign.

f. Upon information and belief, Manuel and other Athletics Department leadership were aware of the inappropriate relationship between former Head Football Coach Sherrone Moore and a subordinate employee for years without taking action to protect the employee. Upon information and belief, it was not until an assistant football coach contacted the victim's family in or around December 2025 and convinced them to come forward that Moore was finally fired.

44

207. After his termination, Partridge, whose career ambition has always been to coach college football, began searching for jobs.

208. Despite the allegations against him being unfounded and fueled by a media frenzy, the damage to Partridge's reputation made other coaches hesitant to hire him, despite his unparalleled achievements, transformative leadership, and unwavering commitment to and proven track record of excellence.

209. Eventually, Partridge found a school within NCAA Division I Athletics that was willing to consider him, and its head football coach decided he wanted to hire Partridge.

210. Upon information and belief, Manuel told the school's athletics director that he should not hire Partridge.

211. Upon information and belief, because of that conversation, the athletics director vetoed his head football coach's decision, and Partridge was not offered the job.

**The NCAA Investigation and Hearing**

212. On or around November 6, 2023, the NCAA began interviewing Michigan employees and students as part of its investigation.

213. No one at Michigan spoke with Partridge about the initiation of the NCAA investigation.

45

214.    Partridge learned that the investigation had started through media reports.

215.    Partridge fully cooperated in the NCAA's investigation which was conducted over approximately the next eight months.

216.    Partridge spent hours reviewing and producing tens of thousands of text messages and emails and he truthfully answered all questions NCAA enforcement staff asked him during a June 2024 interview.

217.    During the investigation, Partridge learned that Michigan had provided the NCAA with a hard drive containing personal information that had been in Partridge's office when he was fired and escorted from the athletics facilities.

218.    Michigan knew the hard drive belonged to Partridge and allowed the NCAA to image its contents without Partridge's knowledge or consent.

219.    Michigan later claimed it had given the hard drive to the NCAA by mistake.

220.    None of the information contained in the hard drive or on any other electronic equipment given to the NCAA showed, or even suggested, that Partridge had any knowledge of Stalions' "sign-stealing" activities or that Partridge had done anything to interfere with the NCAA's investigation.

221.    In approximately August 2024, the NCAA named numerous involved individuals as respondents in the investigation, including Stalions, Partridge,

46

Harbaugh, former assistant coaches Jesse Minter ("Minter") and Steve Clinkscale ("Clinkscale"), former assistant director of player personnel Denard Robinson ("Robinson"), and former assistant coach then former head coach Sherrone Moore ("Moore").

222.     The NCAA conducted a hearing on the matter on June 6 and 7, 2025.

223.     Harbaugh did not attend or participate in the hearing.

224.     Partridge attended and testified at the hearing, as did Manuel and Michigan's Chief Compliance Officer, Elizabeth Heinrich.

225.     When questioned as to whether he had fired Partridge just for telling a student to talk to an attorney, Manuel testified that he "loved" Partridge and thought he did a great job in his role at Michigan.

226.     Manuel testified that he was under immense pressure at the time he fired Partridge.

227.     Manuel testified that the NCAA and the Big Ten Conference were leading Michigan administrators to believe that there were multiple people involved in the "sign stealing" operation.

228.     Manuel testified that, because of this pressure, he made hasty decisions.

229.     After the hearing, Manuel approached Partridge, shook his hand, and told him he was sorry Partridge had to go through this.

230.    Heinrich gave extensive testimony demonstrating that Michigan's Athletics Department was fully aware of its obligations to Partridge, other coaches, and its student athletes, but chose to ignore them.

231.    Heinrich's testimony also illuminated a culture of legal noncompliance Manuel created within the Athletics Department.

232.    The NCAA's Public Infractions Decision summarizes their testimony as follows:

> The relationship between Michigan's football staff members and the compliance office was challenging at best. According to Michigan's director of athletics, he observed a "tension" between the football and compliance staffs and alluded to a lack of respect towards compliance staff members. Michigan's well-resourced and veteran chief compliance officer noted that the football staff regularly questioned the compliance staff's authority. In her interview, the chief compliance officer also stated that she was "perceived as a thorn in [Harbaugh's] side."
>
> According to Partridge, football staff members viewed the compliance staff as a "roadblock." Putting it much more bluntly, one recruiting staff member said in a text exchange that Michigan's compliance staff are "shitty at their jobs and actively working against us from the inside. True scum of the earth."
>
> …
>
> With regard to educational efforts, the chief compliance officer noted that the interns had varying start and end dates and would "come and go" quite a bit, which made them difficult to track. She also explained that the institution was targeting compliance efforts towards on-field staff members given the violations in Michigan's

48

> previous case. The chief compliance officer also clarified that any education was initiated by the compliance staff, stating that "I can't think of [a] time when we scheduled a meeting at football's request. I feel like it was pretty much always at our -- like we were saying, hey, we've got to get in there, we've got to do some education."

233.    This was the first time Partridge learned that Manuel knew of the "tension" between compliance and football staff, and that compliance perceived they were unable to do their jobs within football but did nothing about it.

234.    As Director of Athletics, it was Manuel's job to ensure that all Michigan athletics employees were properly trained and fulfilling compliance requirements.

235.    On August 15, 2025, the NCAA issued a Public Infractions Decision in the matter.

236.    The decision issued findings and penalties against Stalions, Coach Harbaugh, Robinson, and Moore.[5]

237.    Only Partridge was issued no punishment, and, according to the investigation report, the only thing he had done wrong was send text messages to a recruit before it was permissible to do so.

238.    With respect to Failure to Monitor, NCAA Division I Manual Constitution 2.8.1 (2021-22) and Bylaw 8.01.3 (2022-24), the NCAA found:

> Pursuant to Bylaw 19.1.3-(b), failure to monitor violations are presumed to be Level II unless the conduct is substantial or egregious. While aspects of this case are

---

[5] Minter and Clinkscale had negotiated resolutions with the NCAA prior to the hearing.

49

particularly troubling and could support a Level I violation, the panel strongly considered the appropriate balance of responsibility and with whom it most appropriately rests. Although Michigan acknowledged compliance shortcomings, the failures do not and should not rest with Michigan's chief compliance officer or her staff. She faced an insurmountable challenge with Harbaugh and his football program, one in which she was never going to prevail. While not an excuse for the failure to monitor violation or the responsibility the institution shares in the violation, the Level I designation is more appropriate for the head coach responsibility violation. To be clear, more should have been done from an institutional leadership standpoint to provide Michigan's chief compliance officer and her staff more support with the football program. However, based on the unique facts of this case, the panel concludes that Michigan's failure to monitor violation is Level II.

### *Ongoing Harm and Damages to Partridge Due to Defendants' Actions and Failures*

239.    To date, Partridge has been unable to secure employment in college football.

240.    Working in college football—and doing so at Michigan—has been Partridge's sole goal and ambition since he started his first position as Director of Player Personnel at Michigan in 2015.

241.    Defendants' actions and inactions have completely foreclosed this career path to Partridge.

242.    Partridge has never been able to rectify the harm that Michigan's wrongful termination, the media firestorm against him, and Manuel's subsequent

50

blacklisting have caused to his career and employment prospects within college athletics.

243. Despite being part of an NFL team that won the Super Bowl, Partridge does not believe he will ever be able to obtain another job in college football.

244. Throughout the entire two-and-a-half-year ordeal, Partridge has acted with dignity and restraint, complying with all requests made to him by the University and the NCAA, and never commenting publicly despite being publicly disparaged, humiliated, and defamed.

245. Partridge has consistently focused on the players that he is coaching and on his important role as a mentor to many young men, and he only files this Complaint now as he sees no other way to clear his name.

## CAUSES OF ACTION

### COUNT I
**Denial of Due Process**
**42 U.S.C. § 1983 and the Fourteenth Amendment**
**(The Michigan Defendants, Defendant Ono,**
**and Defendant Manuel)**

246. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

247. Defendants were state actors and at all relevant times were acting under color of law.

248.     The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

249.     A plaintiff's due process claim against a public employer depends on him having a property right in continued employment. *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 538; 105 S. Ct. 1487; 84 L. Ed. 2d 494 (1985).

250.     In *Loudermill*, the Supreme Court held that public employees with a protected property interest in continued employment could not be dismissed without due process. *Id*. at 545-46.

251.     The Supreme Court held that before a public employer may fire such an employee, the employer must provide notice and "some kind of hearing." *Id*. at 542.

252.     The hearing need not be "elaborate," but it must provide the employee with "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. at 545-46.

253.     At all material times, Plaintiff had a protected property interest in his employment.

254.     Defendants failed to offer Plaintiff any of the mandatory pre-termination process required by *Loudermill*.

255.    Plaintiff was given no oral or written notice of the charges against him.

256.    Plaintiff was given no explanation of Defendants' evidence.

257.    Plaintiff was given no opportunity to present his side of the story.

258.    In an apparent attempt to rectify their error, Defendants offered Plaintiff a grievance hearing after he had been terminated.

259.    Plaintiff's right to due process under the law is one of which reasonable officials in Defendants' positions would have known.

260.    Defendants deprived Plaintiff of his property interest in his employment without due process of law, in violation of the Fourteenth Amendment to the U.S. Constitution.

261.    Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

262.    As a direct and proximate result of the Defendants' wrongful acts and omissions, Plaintiff has sustained and continues to sustain injuries and damages, outlined in the Damages section of this Complaint.

## COUNT II
### Failure to Train and Supervise
### 42 U.S.C. § 1983 and the Fourteenth Amendment
### (Defendant Ono)

263.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

264.     Defendant Ono failed to properly train, supervise, and monitor Defendant Manuel.

265.     At the meeting during which the law firm presented the findings of the Weiss investigation to Defendant Ono, Defendant Manuel, and other University administrators, Defendant Ono 's instruction not to report the "sign-stealing" scheme to University compliance, the NCAA, and any other relevant entities, nor to discuss it outside the room, was an infringement upon the First Amendment rights of those in attendance, because presented by the law firm constituted a matter of public concern, given the extreme national popularity of college football, Michigan's high profile as a team, and the widespread nature of the "sign-stealing" scheme.

266.     Defendant Ono's actions therefore demonstrated to Defendant Manuel that it was acceptable to infringe upon employees' Constitutional rights to protect the reputation of oneself and the University, and that the University and Defendant Ono had adopted a policy of such a practice.

267.     Had Defendant Ono properly trained, supervised, and monitored Defendant Manuel, and not prevented him from reporting the "sign-stealing" scheme

as appropriate, Defendant Manuel would never have entered a deal with Defendant Petitti which resulted in Partridge's wrongful termination.

268.    Defendant Ono, acting as Defendant Manuel's supervisor, knew or should have known that, because of Defendant Ono's own actions and inactions, Defendant Manuel would and did engage in conduct that posed a pervasive and unreasonable risk of Constitutional injury to Plaintiff and citizens like Plaintiff.

269.    Defendant Ono either acquiesced in or was deliberately indifferent to Defendant Manuel's unconstitutional conduct.

270.    Defendant Ono's action or inaction was affirmatively linked to the deprivation of Plaintiff's Constitutional rights.

271.    A reasonable person in Defendant Ono's position would have known that his failure to train and supervise reflected deliberate indifference.

272.    As a direct and proximate result of Defendant Ono's wrongful acts and omissions, Plaintiff has sustained and continues to sustain injuries and damages, outlined in the Damages section of this Complaint.

**<u>COUNT III</u>**
**Retaliation**
**42 U.S.C. § 1983 and the First Amendment**
**(Defendant Manuel)**

273.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

55

274. Plaintiff made comments to a Michigan football player as a private individual on a matter of public interest, the sign-stealing scandal that had made national news.

275. Whether speech by a public employee is protected depends on whether the speech was ordinarily within the course of his duties as a public employee, not whether it merely concerns those duties. *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345 (6th Cir. 2010).

276. Plaintiff's speech was protected by the First Amendment to the U.S. Constitution as he had been explicitly directed that talking with players about the sign-stealing investigation was not within his official duties, and because talking with players about how to respond to an interview request an NCAA investigation was not ordinarily within the course of his duties as a football coach.

277. After Plaintiff spoke to the player, Defendant Manuel abused his authority as Athletic Director and engaged in retaliation by firing Partridge and disparaging him to potential employers.

278. Defendant Manuel's retaliation was designed to silence Plaintiff and prevent him from speaking further about the sign-stealing investigation, which would likely prevent an ordinary person from continuing to engage in the exercise of free speech, and did prevent Plaintiff from continuing to engage in the exercise of free speech.

279. Defendant Manuel's retaliation has had a chilling effect that acts as a deterrent to free speech.

280. Plaintiff's protected speech was a motivating factor in Defendant Manuel's retaliatory actions.

281. Plaintiff's right to free speech and expression under the law is one of which reasonable officials in Defendant Manuel's position would have known.

282. As a direct and proximate result of Defendant Manuel's wrongful acts and omissions, Plaintiff has sustained and continues to sustain injuries and damages, outlined in the Damages section of this Complaint.

<u>COUNT IV</u>
**Conspiracy to Violate Plaintiff's Rights to
Free Speech and Expression and Due Process
42 U.S.C. § 1983 and the First and
Fourteenth Amendments
(Defendants Manuel and Petitti)**

283. Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

284. Defendants Manuel and Petitti developed a single plan to retaliate against Plaintiff for exercising his right to free speech and expression and deny him due process with respect to this property.

285. The plan was to wrongfully terminate Plaintiff based on knowingly false information and use him as a scapegoat for the "sign-stealing" scheme.

286.    Defendants Manuel and Petitti shared this conspiratorial objective and reached an agreement to violate Plaintiff's Constitutional rights.

287.    Manuel did terminate Plaintiff in furtherance of the conspiracy.

288.    As a direct and proximate result of Defendants Manuel and Petitti's wrongful acts and omissions, Plaintiff has sustained and continues to sustain injuries and damages, outlined in the Damages section of this Complaint.

## COUNT V
**Injunctive Relief**
**42 U.S.C. § 1983 and the Fourteenth Amendment**
**Under *Ex Parte Young***

289.    Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

290.    The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

291.    Plaintiff possessed a property right to continued employment at the University.

292.    Defendant Manuel's unlawful termination of Partridge without due process destroyed that right without adequate justification, notice, or compensation.

293. Plaintiff's rights to due process and to free speech and expression under the law are ones of which reasonable persons in Defendant Manuel's position would have known.

294. Plaintiff is seeking restoration to his position of Linebackers Coach at the University.

295. Plaintiff is also seeking an order enjoining any further disparagement or retaliation for his protected speech by any employee, agent, representative, or Regent of the University.

296. In the absence of such orders, Plaintiff will continue to suffer irreparable injury.

297. Further, irreparable harm is presumed where 42 U.S.C. § 1983 and 28 U.S.C. § 2201 authorize such relief to remedy the violations of Plaintiff's Constitutional rights.

298. Plaintiff has no other adequate remedy at law to address the continued damage to reputation and career.

299. Plaintiff is entitled to declaratory and injunctive relief, as well as such other relief as the Court deems just and proper.

## COUNT VI
### Civil Conspiracy
### (Defendant Petitti)

300.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

301.     Defendants Manuel and Petitti engaged in concerted action to protect their jobs and the reputations of the institutions that employed them by unlawfully retaliating against Plaintiff for exercising his Constitutional rights to free speech and expression, violating his Constitutional right to due process, and violating his employment contract.

302.     As a direct and proximate result of Defendants Manuel and Petitti's wrongful acts and omissions, Plaintiff has sustained and continues to sustain injuries and damages, outlined in the Damages section of this Complaint.

## COUNT VII
### Negligence
### (Defendant Petitti)

303.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

304.     Defendant Petitti owed a duty of reasonable care to Plaintiff.

305.     Defendant Petitti breached that duty sharing uncorroborated, second-hand, inflammatory, and false information about him to Defendant Manuel and using

the information to pressure Defendant Manuel into causing the University's lawsuit against the Big Ten to be dismissed.

306.     Defendant Petitti's breach resulted from his own negligent conduct.

307.     As a direct and proximate result of Defendant Petitti's wrongful acts and omissions, Plaintiff has sustained and continues to sustain injuries and damages, outlined in the Damages section of this Complaint.

<u>COUNT VIII</u>
**Intentional Infliction of Emotional Distress**
**(Defendant Petitti)**

308.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

309.     Defendant Petitti engaged in extreme and outrageous conduct by sharing uncorroborated, second-hand, inflammatory, and false information about him to Defendant Manuel and using the information to pressure Defendant Manuel into causing the University's lawsuit against the Big Ten to be dismissed.

310.     Defendant Petitti's conduct was for an ulterior motive or purpose.

311.     Defendant Petitti intended to cause emotional distress to Plaintiff and/or was reckless regarding whether emotional distress would result.

312.     Defendant Petitti's conduct did cause severe emotional distress to Plaintiff.

313.     As a direct and proximate result of Defendant Petitti's wrongful acts and omissions, Plaintiff has sustained and continues to sustain injuries and damages, outlined in the Damages section of this Complaint.

## COUNT IX
### Defamation
### (Defendant Petitti)

314.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

315.     Defendant Petitti made false statements concerning Plaintiff to Defendant Manuel.

316.     Defendant Petitti knew of the statements' falsity and/or recklessly disregarded whether the statements were false and/or was negligent in determining the truth of the statements before sharing them with Defendant Manuel.

317.     As a direct and proximate result of Defendant Petitti's wrongful acts and omissions, Plaintiff has sustained and continues to sustain injuries and damages, outlined in the Damages section of this Complaint.

## COUNT X
### Tortious Interference with a Business Relationship
### (Defendant Petitti)

318.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

319.     A business relationship existed between Plaintiff and the University of Michigan.

320.     Defendant Petitti knew of the business relationship.

321.     Defendant Petitti intentionally and improperly interfered with the business relationship by sharing uncorroborated, second-hand, inflammatory, and false information about him to Defendant Manuel and using the information to pressure Defendant Manuel into causing the University's lawsuit against the Big Ten to be dismissed.

322.     Defendant Petitti's interference caused Defendant Manuel to terminate Plaintiff's employment.

323.     As a direct and proximate result of Defendant Petitti's wrongful acts and omissions, Plaintiff has sustained and continues to sustain injuries and damages, outlined in the Damages section of this Complaint.

## DAMAGES

324.     Plaintiff realleges and incorporates by reference the allegations contained in the previous paragraphs.

325.     As a direct and proximate result of the above-described conduct, Plaintiff suffered general, special, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this

Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

a. Physical injury and suffering;

b. Pain, suffering, mental, and emotional distress;

c. Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, and humiliations;

d. Loss of Constitutional rights;

e. Loss of employment opportunities;

f. Damage to his professional reputation;

g. Anxiety;

h. Depression;

i. Hypervigilance;

j. Economic loss;

k. Loss of the ordinary pleasures of everyday life;

l. Loss of relationships;

m. Travel and travel-related expenses;

n. All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

64

## **RELIEF REQUESTED FOR ALL CAUSES OF ACTION**

For all the foregoing reasons, Plaintiff prays for judgment against Defendants as follows:

A. For past, present, and future non-economic damages in an amount to be determined at trial;

B. Declare that Plaintiff's termination constituted a Constitutional violation;

C. Enjoin Defendants from continuing any actions in violation of the U.S. Constitution or applicable law;

D. Restore Plaintiff to his position of Linebackers Coach at the University of Michigan;

E. For past, present, and future general, special, incidental, punitive, and consequential damages in an amount to be determined at trial;

F. For any appropriate statutory damages;

G. For costs of this suit;

H. For punitive damages, according to proof, as appropriate to the individual cause of action;

I. For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

J.  For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

K.  All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## JURY DEMAND

Now comes Plaintiff, by and through his attorneys, and demands a trial by jury.

Dated: June 1, 2026

Respectfully submitted,
ABDNOUR WEIKER LLP

*s/Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)
Mitchell D. Sickon (P82407)
325 E. Grand River Ave., Ste. 250
East Lansing, MI 48823
(517) 994-1776
liz@education-rights.com
mitch@education-rights.com

Mark A. Weiker (P85381)
Jessica N. Moore (OH: 0101098)
262 S. Third St.
Columbus, OH 43215
(614) 745-2001
mark@education-rights.com
jessica@education-rights.com

*Attorneys for Plaintiff*

66

## CERTIFICATE OF SERVICE

I certify that on June 1, 2026, I filed this document by use of this Court's ECF system, which will serve copies to the Clerk of Courts and all counsel of record.


By: *s/Elizabeth K. Abdnour*