# EXHIBIT A

# EXHIBIT A-1

2025 WL 1384809
Only the Westlaw citation is currently available.
Court of Appeals of Michigan.

Nevin COOPER-KEEL, Plaintiff-Appellant,

v.

Robert J. BAKER and RJ Baker &
Associates, PLLC, Defendants-Appellees.

No. 370456
|
May 13, 2025, 2:03 PM

**Synopsis**
**Background:** Paralegal, a law school graduate, brought action against law firm and attorney, paralegal's former employers, asserting claims for intentional infliction of emotional distress and injurious falsehood based on statements made to state bar representative during character and fitness investigation when paralegal sought admission to the state bar. The Circuit Court, Allegan County, Margaret Bakker, C.J., granted summary disposition to law firm and attorney. Paralegal appealed.

**Holdings:** The Court of Appeals, Riordan, J., held that:

attorney and law firm were entitled to absolute immunity from paralegal's claims of intentional infliction of emotional distress and injurious falsehood, and

attorney and law firm were not entitled to sanctions for paralegal filing a vexatious appeal.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Disposition.

Allegan Circuit Court, LC No. 2023-067243-CZ

Before: Borrello, P.J., and Riordan and Patel, JJ.

**Opinion**

Riordan, J.

**\*1** Plaintiff Nevin Cooper-Keel, proceeding *in pro per*, appeals as of right the trial court's order granting summary disposition in favor of defendants Robert J. Baker ("Baker") and RJ Baker & Associates, PLLC ("RJ Baker") pursuant to MCR 2.116(C)(7), (C)(8), and (C)(10). On appeal, plaintiff argues that the trial court erred by dismissing his claims for intentional infliction of emotional distress (IIED) and injurious falsehood. We disagree and affirm.

I. FACTS

Plaintiff is a 2014 law school graduate who, despite his desire for it to happen, has never been granted membership in the State Bar of Michigan. However, between June 2015 and February 2016, he worked as a paralegal for defendant RJ Baker. On or about January 29, 2016, plaintiff was summoned to the RJ Baker office conference room for a meeting with defendant Baker and Steve Vargo, both of whom were attorneys working for defendant RJ Baker at that time.[1] At the meeting, defendant Baker informed plaintiff that he was being fired because Vargo was dissatisfied with his work performance. Plaintiff, however, surmised that he really was being fired because Vargo was "angry" and "jealous" of plaintiff's satisfactory work performance. Plaintiff then, promptly, sought unemployment benefits, which he ultimately received after defendants unsuccessfully pursued an administrative appeal to prevent the payment of those benefits.

Eventually, in December 2020, plaintiff sought admission to the state bar. A representative of the state bar, as part of a corresponding character-and-fitness investigation, contacted defendants to discuss plaintiff. Defendants, specifically defendant Baker, informed the representative that plaintiff's " 'work product was not up to the firm's standards,' " and that that was the reason for [his] discharge." According to plaintiff's complaint, defendants' statements were false, defamatory, and caused him emotional distress. Plaintiff added that he was "still having to answer to the State Bar" for these statements. Thus, plaintiff brought claims for defamation, intentional and negligent infliction of emotional distress, and violation of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*

Defendants moved for summary disposition under MCR 2.116(C)(7), (C)(8), and (C)(10), arguing that plaintiff's claims were barred by the applicable statutes of limitations and, alternatively, that they were barred by Rule 15, Section

Case 4:26-cv-10821-SDK-CI ECF No. 24-2, PageID.313 Filed 08/04/26 Page 4 of 29

10 of the Rules Concerning the State Bar of Michigan ("SBM Rule 15"), which provides that "[a] person is absolutely immune from suit for statements and communications transmitted solely to the State Bar staff" in the course of a character-and-fitness investigation.

Plaintiff then filed his first amended complaint. The amended complaint substantively recited the same allegations as the original complaint but added a fourth claim for injurious falsehood.[2] Defendants moved for summary disposition of the amended complaint as well, again arguing that plaintiff's claims were barred by the applicable statutes of limitations and absolute immunity.

**\*2** In his response brief, plaintiff conceded that he did not "object to the [defamation] and whistleblower claims being dismissed under the statute of limitations." However, plaintiff argued that "both the injurious falsehoods claim and the IIED claims are not time barred, nor could the state give immunity for lying even if it wanted to."[3] With regard to the latter argument, plaintiff asserted that "committing perjury negates any grant of immunity," and in this case, defendants' statements to the state bar were false and therefore comparable to perjury.

After hearing the parties' respective arguments, the trial court granted defendants' motion for summary disposition, reasoning that, first, the parties agreed that the defamation and WPA claims were barred by the applicable statutes of limitations, so defendants were entitled to summary disposition of those two claims under MCR 2.116(C)(7). Second, with regard to the remaining claims, i.e., the IIED and injurious-falsehood claims, defendants were entitled to summary disposition under MCR 2.116(C)(10) because SBM Rule 15 provides "immunity" for statements given in the course of a character-and-fitness investigation. Third, and alternatively, defendants were entitled to summary disposition of the IIED and injurious-falsehood claims under MCR 2.116(C)(8) because plaintiff failed to establish that "he does not have a license to practice law in the State of Michigan because of this single statement by Defendant Baker."

The trial court then entered its order memorializing its opinion from the bench. This appeal followed.

## II. DISCUSSION

### A. STANDARD OF REVIEW

"A trial court's grant of summary disposition is reviewed de novo." *Feyz v Mercy Mem. Hosp*, 475 Mich. 663, 672, 719 N.W.2d 1 (2006). "A motion for summary disposition brought pursuant to MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the allegations of the pleadings alone." *Id.* "When a challenge to a complaint is made, the motion tests whether the complaint states a claim as a matter of law, and the motion should be granted if no factual development could possibly justify recovery." *Id.*

"A motion under MCR 2.116(C)(10), on the other hand, tests the factual sufficiency of a claim." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich. 152, 160, 934 N.W.2d 665 (2019) (emphasis omitted). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id.* "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id.*

Finally, we review de novo the interpretation of administrative or other legal rules. See *Wenkel v Farm Bureau Gen. Ins. Co. of Mich.*, 344 Mich App 376, 383, 1 N.W.3d 353 (2022).

### B. ANALYSIS

Plaintiff argues that the trial court erred by dismissing his claims for IIED and injurious falsehood because SBM Rule 15 does not provide absolute immunity from false statements, and because causation is a question of fact for the jury. We disagree.

With regard to the tort of IIED, "the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh v Taylor*, 263 Mich App 618, 634, 689 N.W.2d 506 (2004).

With regard to the tort of injurious falsehood, "[i]njurious falsehood cases typically concern derogatory or disparaging communications regarding the title to property or its quality." *Kollenberg v Ramirez*, 127 Mich App 345, 350, 339 N.W.2d 176 (1983).[4] "However, the gist of the tort is some interference with an economically advantageous relationship

which results in pecuniary loss rather than an action that directly affects property." *Id.* at 350-351, 339 N.W.2d 176. The elements of that tort are as follows:

**\*3** One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity. [*Id.* at 352, 339 N.W.2d 176 (quotation marks and citation omitted).]

Turning to the question of absolute immunity, MCL 600.904 generally provides that our Supreme Court has the authority to organize the state bar and "to adopt rules and regulations" in that regard. See *In re Mardigian Estate*, 502 Mich. 154, 191 n 11, 917 N.W.2d 325 (2018) (opinion by McCormack, J.) (explaining that under 1935 PA 58, the Court was given "the authority to create and regulate the State Bar of Michigan"). In accordance with that statutory authority, "the Court adopted the Supreme Court Rules Concerning the State Bar of Michigan ...." *Id.* SBM Rule 15 provides, in relevant part, as follows:

*A person is absolutely immune from suit for statements and communications transmitted solely to the State Bar staff, the district committee, the standing committee or the Board of Law Examiners, or given in the course of an investigation or proceeding concerning the character and fitness of an applicant for admission to the bar.* The State Bar staff, the members of the district and standing committees and the members and staff of the Board of Law Examiners are absolutely immune from suit for conduct arising out of the performance of their duties. [Emphasis added.]

This rule closely parallels MCR 9.125, which provides immunity for statements given to the Attorney Grievance Commission and Attorney Discipline Board, as well as MCR 9.263, which provides immunity for statements given to the Judicial Tenure Commission. MCR 9.125 provides, in relevant part:

A person is absolutely immune from suit for statements and communications transmitted solely to the administrator, the commission, or the commission staff, or given in

an investigation or proceeding on alleged misconduct or reinstatement....

MCR 9.263 provides, in relevant part:

A person is absolutely immune from civil suit for statements and communications transmitted solely to the commission, its employees, or its agents, or given in an investigation or proceeding on allegations regarding a respondent, and no civil action predicated upon the statements or communications may be instituted against a grievant, a witness, or his or her counsel....

The few Michigan cases discussing those court rules have concluded that they provide broad immunity, so long as the statements at issue are, essentially, within the scope of the investigation.[5] See, e.g., *Kelley v Peet*, unpublished per curiam opinion of the Court of Appeals, issued February 25, 2016 (Docket No. 326669), p. 6, 2016 WL 757546 ("The purpose of MCR 9.125 is to provide absolute immunity to people for statements they make to the AGC, with the goal of protecting the public and legal profession, and leaving uncloaked unprivileged communications."). Indeed, the general rule is that a party protected by absolute immunity is shielded from all tort liability. See *Petipren v Jaskowski*, 494 Mich. 190, 211, 833 N.W.2d 247 (2013).

**\*4** Here, the parties do not dispute that our Supreme Court has the authority to promulgate SBM Rule 15, thereby providing absolute immunity to those individuals and entities, such as defendants here, who provide information to the state bar in the course of a character-and-fitness investigation. Nor do the parties dispute that, as a general proposition, the statements at issue otherwise are within the scope of SBM Rule 15 as they were provided solely to the state bar and concern plaintiff's character and fitness to be an attorney. Instead, plaintiff argues that defendants' statements to the state bar are not protected by absolute immunity because those statements were false. That is, according to plaintiff, absolute immunity does not protect perjury. In support of this proposition, plaintiff cites *People v McIntire*, 232 Mich App 71, 591 N.W.2d 231 (1998), rev'd 461 Mich. 147, 599 N.W.2d 102 (1999), in which this Court held that a grant of transactional immunity under MCL 767.6 is ineffective when the witness commits perjury. *Id.* at 91-92, 591 N.W.2d 231.[6]

The relationship between absolute immunity and perjury is not relevant here. Rather, the question is whether defendants are protected by absolute immunity from plaintiff's tort claims of IIED and injurious falsehood, notwithstanding plaintiff's

allegation that the statements at issue were false. In other words, the question is whether defendants are protected from tort liability by absolute immunity, regardless of whether their statements arguably could be false. See *Petipren*, 494 Mich. at 211, 833 N.W.2d 247. In this regard, courts generally have held that absolute immunity applies to false or misleading statements, so long as those statements are related to the proceedings in which they were made. See, e.g., *Adams v Hanson*, 656 F.3d 397, 405 (6th Cir. 2011):

> Because Hanson's actions fell within her prosecutorial role, she is entitled to absolute immunity even if her statements were false or misleading. As this court has recently emphasized, prosecutors do not forfeit their absolute immunity when they knowingly make false statements while advocating before the court, so long as the statements were related to the proceedings in which they were made. Therefore, even if Hanson made false representations to the trial judge regarding Adams's availability, she is protected by absolute immunity because she was serving as an advocate in judicial proceedings, when she made statements related to those proceedings. [Cleaned up.]

See also *N. Brevard Co. Hosp. Dist. v Deligdish*, 398 So.3d 1126, 1130-1131 (Fla Dist Ct App, 2024) (explaining that absolute immunity "even applies to statements that are false or malicious, so long as they occurred within the scope of a public employee's duties"); *Deters v Hammer*, 568 F Supp 3d 883, 888-889 (SD Ohio, 2021) (explaining that "a statement made in a judicial proceeding enjoys an absolute privilege against a defamation action as long as the allegedly defamatory statement is reasonably related to the proceeding in which it appears," and this absolute privilege "shelter[s] knowingly false statements"). Moreover, our Supreme Court has held that absolute immunity applies regardless of whether the defendant acted in good faith. *Am. Transmissions, Inc. v Attorney Gen.*, 454 Mich. 135, 143-144, 560 N.W.2d 50 (1997).

Accordingly, given this authority, the trial court correctly determined that defendants' statements, even if false, are

protected by absolute immunity under SBM Rule 15.[7] In a nutshell, because absolute immunity protects against all tort liability, see *Petipren*, 494 Mich. at 211, 833 N.W.2d 247, and because absolute immunity applies even when the underlying statements are false, see *Adams*, 656 F.3d at 405, defendants cannot be liable for plaintiff's claims of IIED and injurious falsehood. As a result, the trial court correctly granted summary disposition in favor of defendants.[8]

**\*5** Finally, having disposed of plaintiff's sole issue on appeal, the only remaining question is whether this Court should grant defendants' request, included in their brief on appeal, to sanction plaintiff for filing a vexatious appeal. See MCR 7.216(C). We decline the invitation to do so at this time because "[a] party's request for damages or other disciplinary action under MCR 7.216(C) must be contained in a motion filed under this rule. A request that is contained in any other pleading, including a brief filed under MCR 7.212, will not constitute a motion under this rule." MCR 7.211(C) (8). See *Barrow v Detroit Election Comm'n*, 305 Mich App 649, 683-684, 854 N.W.2d 489 (2014) ("To the extent that defendants are asking for sanctions against plaintiffs for filing a vexatious appeal, defendants must file a separate motion .... [T]he sanctions request set forth in defendants' appellate brief does not constitute a motion under the court rule."). Such a motion may be filed "at any time within 21 days after the date of the order or opinion that disposes of the matter that is asserted to have been vexatious." MCR 7.211(C)(8).

### III. CONCLUSION

The trial court did not err by granting summary disposition in favor of defendants because they are protected by absolute immunity under SBM Rule 15. Therefore, we affirm.

**All Citations**

--- N.W.3d ----, 2025 WL 1384809

### Footnotes

1     While not stated in the complaint or clearly explained elsewhere in this case, it is implied that defendant Baker is, perhaps, a founding member of defendant RJ Baker.

2     As explained *infra*, the tort of injurious falsehood essentially is defamation as it relates to title to property.

3    Plaintiff did not reference his claim for negligent infliction of emotional distress, and he does not pursue that claim on appeal.

4    "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority[.]" *In re Stillwell Trust*, 299 Mich App 289, 299 n 1, 829 N.W.2d 353 (2012).

5    The term "absolute immunity" generally applies to high-level governmental officials, such as judges and prosecutors. Arguably, SBM Rule 15, as well as MCR 9.125 and MCR 9.263, should instead refer to "absolute privilege," not "absolute immunity." In this regard, there is a longstanding line of caselaw providing that statements made in judicial or quasi-judicial proceedings by witnesses are "absolutely privileged" against defamation claims. See *Oesterle v Wallace*, 272 Mich App 260, 264, 725 N.W.2d 470 (2006).

In *Kalish v Illinois Ed. Ass'n*, 157 Ill App 3d 969, 110 Ill.Dec. 72, 510 N.E.2d 1103 (1987), the Illinois Court of Appeals recognized "absolute privilege to communications with the Character and Fitness Committee." *Id.* at 976, 110 Ill.Dec. 72, 510 N.E.2d 1103. The court reasoned that the Character and Fitness Committee is a "quasi-judicial body," and "statements made during quasi-judicial proceedings are absolutely privileged." *Id.* at 971, 976, 110 Ill.Dec. 72, 510 N.E.2d 1103. The court thus upheld the trial court's dismissal of the plaintiff's defamation claim against his former employer for allegedly defamatory statements made by that former employer to the Character and Fitness Committee because the former employer was protected by absolute privilege. *Id.* at 978-979, 110 Ill.Dec. 72, 510 N.E.2d 1103. With this reasoning, *Kalish* sets forth a proper analytical framework for our consideration of the matter before us. See also *Capeheart v Northeastern Illinois Univ.*, 2010 WL 894052 (ND Ill. 2010) ("[T]he cases Terrell relies upon to support his contention address the doctrine of absolute *privilege*, not absolute *immunity.* The doctrines are distinct from one another. For instance, the doctrine of absolute privilege applies to statements made in judicial or quasi-judicial proceedings by private individuals and public officials alike. In contrast, absolute immunity applies only to public officials and its application is not restricted to statements made in judicial or quasi-judicial proceedings.") (citations omitted).

Our Supreme Court, should it agree with *Kalish*'s analysis, may wish to consider amending SBM Rule 15, as well as MCR 9.125 and MCR 9.263.

6    Our Supreme Court reversed that holding, stating that "immunity [is not] forfeited completely upon the giving of false testimony." *People v McIntire*, 461 Mich. 147, 160, 599 N.W.2d 102 (1999).

7    If this Court applied an alternate "absolute privilege" analysis, defendants' allegedly false statements still would be protected from tort liability. See *Parks v Johnson*, 84 Mich App 162, 165-166, 269 N.W.2d 514 (1978).

8    Arguably, the trial court should have granted summary disposition under MCR 2.116(C)(7) (immunity granted by law), not (C)(8) or (C)(10). Regardless, its ultimate ruling is correct. Having so concluded, it is unnecessary to address plaintiff's argument that the trial court erred by alternatively concluding that he failed to show causation.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT A-2

Kelly v. Daily Beast Company LLC, Not Reported in Fed. Supp. (2022)

Case 4:26-cv-10821-SDK-CL  ECF No. 24-2, PageID.318  Filed 08/04/26  Page 9 of 29

2022 WL 17546616
Only the Westlaw citation is currently available.
United States District Court, W.D.
Michigan, Southern Division.

Kristen Meghan KELLY, Plaintiff,

v.

The DAILY BEAST COMPANY
LLC, et al., Defendants.

Case No. 1:22-cv-482
|
Signed December 9, 2022

**Attorneys and Law Firms**

Jeffrey Albert Buehner, Jeffrey Buehner, PLLC, Farmington Hills, MI, for Plaintiff.

Joseph Abraham Starr, Ryan J. Koss, Starr Butler Alexopoulos & Stoner PLLC, Southfield, MI, for Defendant The American Industrial Hygiene Association.

**OPINION**

HALA Y. JARBOU, CHIEF UNITED STATES DISTRICT JUDGE

**\*1**  In this diversity action, Plaintiff Kristen Meghan Kelly sues an online news website, The Daily Beast Company LLC, and its writer, Larrison Campbell, for alleged harm stemming from an article written by Campbell about Kelly. The other defendant is the American Industrial Hygiene Association ("AIHA"). Before the Court is Defendants Campbell and The Daily Beast's motion to dismiss the complaint against them (ECF No. 7). For the reasons herein, the Court will grant Defendants' motion.[1]

**I. BACKGROUND**

According to Kelly's complaint, she is a "senior industrial hygienist" with over 19 years of experience in "developing, analyzing and implementing workplace health and safety protocols." (Compl. ¶ 18, ECF No. 1-2.) She has "presented testimony before legislative committees, appeared in documentaries, ... and been engaged as a consultant throughout the country regarding workplace health and safety issues." (*Id.*) Among other things, she opposes "mask mandates," i.e., government and private sector requirements to wear masks as a means to mitigate the spread of COVID-19. In April 2021, she appeared at a school board meeting in Hudsonville, Michigan, to express her opposition to its mask mandate. (*Id.* ¶ 21.) She created a video of her attendance at the meeting and then posted the video online.

**A. The Daily Beast's Article**
Kelly's video caught the attention of Campbell, who contacted Kelly and discussed it with her. The Daily Beast later published Campbell's article about Kelly, which is titled, "Meet the Anti-Mask Michigan 'Scientist' Stoking the Fourth Wave."[2] (Article, ECF No. 1-2, PageID.26.)

The Daily Beast's article (the "Article") first describes an interaction depicted in Kelly's video that occurred between Kelly and another parent at the school board meeting. The other parent apparently laughed at Kelly's claim that she is an "exposure scientist." (*Id.*, PageID.27.) Kelly responded, " 'Yes, I'm an industrial hygienist, and I actually travel around the country testifying in front of governors. I've opened up Texas and North Dakota .... Because I know. Masks don't work. Because it's my job. It's my job[.] ... And do you want to know who does want to hear my opinion? Attorneys, who I help with their cases.' " (*Id.*, PageID.27, 32.)

The Article asserts that "Kelly has enjoyed an increasingly robust platform in anti-mask circles" and that public officials fear her activism could cause problems in Michigan. (*Id.*, PageID.28.) The Article quotes a deputy public health officer in Ottawa County as stating that "Mask use continues to be critically important right now. It's proven to be effective and it's proven to be safe." (*Id.*, PageID.29.)

**\*2**  The Article describes Kelly as "unlike most conservative anti-maskers" because she has a "compelling personal story" that includes "nearly two decades of experience as an industrial hygienist, a field that focuses on ways to protect employees from hazardous substances at work." (*Id.*) It then contrasts Kelly's assertion that "science" is "on [her] side" with the opinion of Laurence Svirchev, a certified industrial hygienist with the AIHA, who is quoted as saying that "Face coverings are a proper public health measure that mitigates the transmission of SARS-CoV-2." (*Id.*, PageID.29-30.) The Article also quotes the CEO of the AIHA, Larry Sloan, as telling The Daily Beast that "99 percent of the AIHA's

800 members believe that face coverings are one important strategy for reducing risk" and that Kelly's activism is "very dangerous" and is "undermining the science of industrial hygiene." (Compl. ¶ 31.)[3] The Article reports that Kelly responded to Sloan's statement, calling it "shocking and disturbing" and asserting that "it goes against the whole field of industrial hygiene." (Article, PageID.31.)

The Article contends that Kelly has "capitalized" on her expertise. (*Id.*, PageID.32.) She had been "interviewed dozens of times in conservative media" and she told The Daily Beast that she "either testified or submitted sworn affidavits about the dangers of masking in four states." (*Id.*, PageID.33.) In addition, she has a TikTok account with nearly 30,000 followers, where she boasted about "testify[ing] in front of a state Caucus and meet[ing] with their Governor to relay facts hidden by the MSM." (*Id.*, PageID.34.) In fact, Kelly had recently testified in support of a bill banning mask mandates in North Dakota. "The bill's sponsor told The Daily Beast that Kelly's participation was 'crucial' to the bill's eventual passage." (*Id.*, PageID.36.)

But the Article questions Kelly's expertise, noting that she is not a "certified" industrial hygienist, which she claimed was a "personal choice." (*Id.*, PageID.33.) Instead, she holds bachelor's and master's degrees in occupational safety and refers to herself as a "senior" industrial hygienist, which Sue Marchese, a managing director at AIHA, reportedly told the Daily Beast "is not a real thing." (*Id.*) However, Kelly responded that "senior status means you've got senior status over other industrial hygienists or you've been in the career field a certain amount of time." (*Id.*)

The Article contends that Kelly's expertise "doesn't always hold up." (*Id.*, PageID.34.) For instance, an affidavit that she submitted to Tennessee Stands, a group that "fights against COVID restrictions," "quietly disappeared" from the group's website. (*Id.*) A representative of the group told The Daily Beast that it removed Kelly's affidavit "after inaccuracies came to [its] attention." (*Id.*) But Kelly told The Daily Beast that she asked the group to remove the affidavit because it contained her phone number and she had received harassing calls and texts. (*Id.*)

Examining Kelly's affidavit, the Article notes that she gave the wrong title to a study in a medical journal, claiming that it concluded that coronavirus particles will pass through a N95 mask, when in fact the study does not mention face coverings at all. (*Id.*, PageID.35.) Her affidavit also

cited studies to bolster her argument that "masking doesn't work," but "many of those studies were either inconclusive or outdated or suggested the opposite." (*Id.*) When asked about these discrepancies, Kelly "brushed them off," telling The Daily Beast that she would "go look at it" because she "can't remember." (*Id.*) She contended that "so many studies" supported her view, and later sent The Daily Beast "links to half a dozen other studies that she said support not masking." (*Id.*)

According to the Article, Sloan also told The Daily Beast that Kelly was "taking specific studies and extracting a narrative that is perhaps aligned with her belief set." (*Id.*, PageID.42.) He opined that "her testifying against the use of face covering is contrary to good public health and the science of occupational hygiene[.]" (*Id.*)

**\*3** The Article also discusses Kelly's argument that masking harms people with disabilities "by forcing people like her out of stores, offices and schools[.]" (*Id.*, PageID.39.) Kelly told the Daily Beast that "medically," she "can't wear a mask." (*Id.*) She has a "medical exemption from masking" due to post-traumatic stress disorder; wearing a mask causes her "anxiety and a range of circulatory issues[.]" (*Id.*)

The Article asserts that Kelly is "well-positioned to be a darling of late pandemic anti-mask brigade" because of her work history and because she is a "charismatic speaker who casually ties topics like disability rights and health freedom into a single argument." (*Id.*, PageID.36.) Also, she "stays calm, even in a heated confrontation, but can quickly pivot to tears when the context calls for it, as she did [in her video outside the school board meeting.]" (*Id.*)

Accompanying the Article are two photos of Kelly next to the caption "Black Sheep." (*Id.*, PageID.26.)

### B. Kelly's Claims

Kelly's complaint asserts the following claims: defamation, defamation per se, and intentional infliction of emotional distress. Defendants Campbell and The Daily Beast argue that Kelly's complaint fails to state a claim against them.

### II. DISMISSAL STANDARD

A complaint may be dismissed for failure to state a claim if it fails " 'to give the defendant fair notice of what the ...

Case 4:26-cv-10821-SDK-CI  ECF No. 24-2, PageID.320  Filed 08/04/26  Page 11 of 29

Kelly v. Daily Beast Company LLC, Not Reported in Fed. Supp. (2022)

claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

## III. ANALYSIS

### A. Defamation

**\*4** A defamation claim under Michigan law has the following four elements:

> "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication."

*Smith v. Anonymous Joint Enter.*, 793 N.W.2d 533, 540 (Mich. 2010) (quoting *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005)). "The elements of [a] defamation claim 'must be specifically pleaded, including the allegations with respect to the defamatory words, the connection between the plaintiff and the defamatory words, and the publication of the alleged defamatory words.' " *Ryniewicz v. Clarivate Analytics*, 803 F. App'x 858, 867 (6th Cir. 2020) (quoting *Gonyea v. Motor Parts Fed. Credit Union*, 480 N.W.2d 297, 299 (Mich. Ct. App. 1991)). " '[M]ost importantly, a plaintiff must identify the precise materially false statement published.' " *Id.* (quoting *Rouch v. Enquirer & News of Battle Creek Mich.*, 487 N.W.2d 205, 220 (Mich. 1992) (Riley, J., concurring)).

### 1. Actual Malice

Where the plaintiff is a public official, there is an additional requirement. The plaintiff can prevail only "if he or she establishes that the alleged defamatory statements were made with 'actual malice.' " *Id.* " 'Actual malice' exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth." *Id.* at 540-41. To meet this standard, the plaintiff must demonstrate " 'more than a departure from reasonably prudent conduct.' " *Id.* at 541 (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)). The evidence must "justify a conclusion that the defendant made the allegedly defamatory publication with a 'high degree of awareness' of the publication's probable falsity, or that the defendant 'entertained serious doubts as to the truth' of the publication made." *Id.* at 541-42 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). "[W]hen a defendant has reported a third party's allegations, reckless disregard for the truth of the allegations 'may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' " *Id.* at 542 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

The actual malice requirement also applies to a "limited-purpose public figure," i.e., "a person who has thrust himself or herself to the forefront of a particular public controversy in order to influence the resolution of the issues involved." *Redmond v. Heller*, 957 N.W.2d 357, 372 n.11 (Mich. Ct. App. 2020). Here, Defendants argue that Kelly was a limited-purpose public figure who must show actual malice to succeed on her defamation claim.

There is a " 'two-pronged analysis to determine if a plaintiff is a [limited-purpose] public figure.' " *Thomas M. Cooley Law School v. Kurzon Strauss, LLP*, 759 F.3d 522, 529 (6th Cir.

2014) (quoting *Clark v. ABC, Inc.*, 684 F.2d 1208, 1218 (6th Cir. 1982)). " 'First, a 'public controversy' must exist.' " *Id.* (quoting *Clark*, 684 F.2d at 1218). " 'Second, the nature and extent of the individual's involvement in the controversy must be ascertained[,]' so that the court can determine whether the plaintiff voluntarily injected [her]self into the particular public controversy giving rise to the alleged defamation." *Id.* (quoting *Clark*, 684 F.2d at 1218).

The first prong, the existence of a public controversy, requires " 'a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way.' " *Id.* (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980)). "It is 'a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.' " *Id.* at 529-30 (quoting *Waldbaum*, 627 F.2d at 1296). "[T]he court must isolate the specific public controversy related to the defamatory remarks.' " *Id.* at 530 (quoting *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1137 (10th Cir. 2006)).

**\*5** The first prong is easily met here. The necessity for mask mandates, and the related question of whether masks are effective or appropriate for controlling the spread of COVID-19, were, and continue to be, public controversies. That dispute has received widespread public attention. Indeed, as Kelly's own complaint suggests, those issues were the subject of fierce debate at school board meetings, state legislatures, and many other settings. Also, the ramifications of that dispute have been felt by those who were not direct participants in it. Large segments of the population have been required to wear a mask as a condition for work, public transport, or the use of indoor public spaces.

For the second prong, the nature and extent of Kelly's participation in the controversy, the Court considers three "factors": " 'first, the extent to which participation in the controversy is voluntary; second, the extent to which there is access to channels of effective communication in order to counteract false statements; and third, the prominence of the role played in the public controversy.' " *Id.* (quoting *Clark*, 684 F.2d at 1218).[4]

The second prong is also satisfied here. First, there is no question that Kelly voluntarily injected herself into the public controversy regarding mask mandates. In addition to her appearance at a school board meeting, she alleges that she has testified before state legislatures, she posted a video

of her advocacy on social media, and she has appeared in documentaries, ostensibly for the purpose of promoting her views about mask mandates.[5]

Second, Kelly has had at least some access to channels of communication to counteract false statements. In addition to her public testimony and appearances, her video was distributed widely enough to catch the attention of a news reporter. The Article also notes that Kelly "has been interviewed dozens of times in conservative media" (Article, PageID.33), an assertion that Kelly does not challenge in her complaint or in her briefing. Also, the Article notes that she has thousands of followers on TikTok, a social media platform.[6] And the Article indicates that Campbell gave Kelly an opportunity to respond to some of the statements about her in the Article itself. On other hand, it does not appear that Kelly has had " 'regular and continuing access to the media that is one of the accouterments of having become a public figure.' " *Clark*, 684 F.3d at 1219 (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979)). This does not appear to be a case where "the press has...clamored to interview her." *See id.* (citing *Street v. Nat'l Broadcasting Co.*, 645 F.2d 1227, 1234 (6th Cir. 1981)). Accordingly, this factor only slightly favors a finding that Kelly is a limited-purpose public figure.

Third, by testifying in front of state legislators, one of whom apparently characterized Kelly's support as "crucial" to passage of a bill banning mask-mandates, Kelly assumed a position of some prominence in the controversy.[7] Thus, on the whole, the relevant facts demonstrate that Kelly voluntarily thrust herself into a place of public prominence in the controversy for the purpose of influencing the outcome. By doing so, she "invite[d] attention and comment" and "voluntarily exposed [herself] to increased risk of injury from defamatory falsehood[.]" *Gertz*, 418 U.S. at 345. Consequently, her defamation claim requires that she show actual malice by Defendants.

**\*6** Kelly contends that the real controversy at issue in her defamation claim is the Article's "attack" on her qualifications and its assertions about the affidavit that she posted. She argues that she is not a public figure because *those* particular issues are not public controversies. However, her involvement in the public controversy over mask mandates has invited attention and comment on her credentials, claims, and expertise. Furthermore, she has used her specialized knowledge and qualifications as the basis for her public advocacy. Thus, Defendants' statements on those topics fall within the public figure rule.

Kelly also argues that she has not assumed a position of public prominence. She contends that she is no different from those who use social media or who appear before legislative hearings, school board meetings, and other public forums. But most such individuals are not like Kelly. They do not travel around the country for the purpose of influencing policy makers in multiple states, sit for interviews with the media to advocate for their position, or receive public credit for their advocacy work by state legislators. In other words, they do not put themselves in the position of public prominence and influence that Kelly has assumed here.

As discussed in more detail below, Kelly fails to allege facts from which to infer actual malice. Much of her complaint focuses on the tone of the Article, though as she acknowledges, actual malice is not established "merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Commc'ns*, 491 U.S. at 667. Those factors might be relevant as circumstantial evidence of actual malice, but they are not sufficient to establish it on their own. *Id.* at 667-68.

In an attempt to show actual malice, Kelly refers to an email from Stephen Petty, an industrial hygienist, to Sloan. In the email, Petty claimed the following:

> I spoke with[ ] and sent the author [of the Article] materials I have been using in presentations to groups of 350+ and on national radio shows over the past two month[s] just before the publication of this article. Both my remarks and presentation were ignored by this author. I only contacted this person as Kelly, a disable[d] veteran and long time [industrial hygienist] asked me to do[ ]so given my credentials in major litigation on the topic of exposure and PPE. I figured this was a hit piece, but tried to step in without success. I believe my presentation is an accurate reflection of the science; but I am open to comment and criticism[.]

(4/27/2021 Petty Email to Sloan, ECF No. 1-2, PageID.45.) However, Kelly provides no further details regarding the materials that Petty sent to Sloan. Nor does Kelly explain how those materials are relevant to any of the challenged statements in the Article. Thus, Petty's email does not provide any basis for making a plausible inference that Defendants acted with reckless disregard for the truth.

In another effort to show actual malice, Kelly alleges that, before she filed her lawsuit, she "gave notice to [Defendants] to publish retractions and Defendants were

allowed a reasonable time to do so. No retractions have been published." (Compl. ¶ 50.) Kelly argues that an unwillingness to retract known false statements is indicative of malice, citing *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir. 1983) (" 'Under certain circumstances evidence [of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory] ... might be relevant in showing recklessness at the time the statement was published.' " (quoting Restatement of Torts (Second) § 580A)). But that principle does not aid Kelly here. Kelly does not allege that she demonstrated to Defendants that any statements in the Article were both false and defamatory. Instead, she vaguely alleges that she gave "notice" to Defendants, without describing the contents of her notice. Without sufficient allegations regarding actual malice, Kelly fails to state a defamation claim.

**2. Matter of Public Concern / Media Defendant**

 **\*7**  Where "a media defendant is involved," "a statement on matters of public concern must be provable as false before there can be liability under state defamation law." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990). "[T]he First Amendment [protects] 'statements that cannot be reasonably interpreted as stating actual facts about an individual,' " including "statements employing 'loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining' an assertion of fact." *Seaton v. Trip Advisor LLC*, 728 F.3d 592, 597 (6th Cir. 2013) (quoting *Milkovich*, 497 U.S. at 20-21).

Defendants The Daily Beast and Campbell are media defendants, and the Article discusses matters of public concern. Accordingly, the statements challenged by Kelly must be provable as false.

**3. Challenged Statements / Claims**

Kelly's complaint does not clearly set forth each of the allegedly false statements that she is challenging. But in her response brief, she identifies the following false "claims" in the Article that are the basis for her defamation suit: (1) Kelly is "anti-mask"; (2) Kelly is "stoking the fourth wave of COVID"; (3) Kelly is not a scientist; (4) Kelly is "leading the charge in her own state and nationwide against wearing masks"; (5) "experts in her field are losing it" in response

Case 4:26-cv-10821-SDK-CI ECF No. 24-2, PageID.323 Filed 08/04/26 Page 14 of 29

Kelly v. Daily Beast Company LLC, Not Reported in Fed. Supp. (2022)

to Kelly's advocacy; (6) "leading scientists" in Kelly's field are "not on her side"; (7) "99% of AIHA's members believe that face coverings are one important strategy for reducing [COVID] risk"; (8) Kelly's activism is "very dangerous" and is "undermining the science of industrial hygiene"; (9) Kelly is not a "senior industrial hygienist"; (10) Kelly's affidavit was removed from the Tennessee Stands website "after inaccuracies came to their attention"; (11) Kelly submitted false information in her affidavit. (Pl.'s Resp. Br. 13-14, ECF No. 12.) For reasons discussed below, none of these statements/claims give rise to a defamation claim against Defendants.

*(1) Kelly is anti-mask.* The Article's headline refers to Kelly as an "anti-mask" Michigan scientist. In context, this is not a false statement of fact. "Anti-mask" is simply a shorthand reference to Kelly's opposition to mask mandates. Indeed, Kelly makes a similar assertion about The Daily Beast, saying that it has a "pro-mask, pro-vaccine agenda." (Compl. ¶ 14.)

*(2) Kelly is stoking the fourth wave of COVID.* This assertion is not provable as false. It is rhetorical hyperbole that cannot serve as the basis for a defamation claim against Defendants.

*(3) Kelly is not a scientist.* The Article does not make or imply this assertion.

*(4) Kelly is leading the charge in her own state and nationwide against wearing masks.* Kelly does not allege or indicate what is false about this assertion, which simply refers to her prominence in advocating against mask mandates.

*(5) Experts in Kelly's field are losing it.* It is not clear why Kelly believes this statement is false. It is another example of rhetorical hyperbole, referring to the fact that other industrial hygienists disagree with her advocacy. It is not an actionable statement.

*(6) Leading scientists are not on Kelly's side.* Kelly does not indicate why she thinks this statement is false.

*(7) 99% of AIHA's members believe that face coverings are one important strategy for reducing [COVID] risk.* This statement says very little about Kelly. At most, it implies that she disagrees with most AIHA members on whether mask-wearing is an "important" strategy, which is an inherently subjective issue that is open to debate.

**\*8** Furthermore, the statement is not actionable because the "99%" language is Sloan's estimate about the high degree of support among AIHA members for the proposition asserted. There are no facts from which to infer that Defendants recklessly disregarded the truth when reporting this statement. Kelly does not allege facts suggesting that Defendants had serious reason to doubt the veracity of the statement. Indeed, Kelly herself does not identify why the statement is false.

Kelly notes that, in an email attached to the complaint, Sloan told another person, "When I read the article I winced when I saw that quote. That is not what [sic] said, and we have notified the editor accordingly." (Sloan Email, ECF No. 1-2, PageID.47.) The Daily Beast subsequently changed the Article to say that the "vast majority" of AIHA's members "believe that face coverings are one important strategy for reducing risk." (*See* Article, ECF No. 1-2, PageID.31.) However, Kelly attributes any falsehood in the statement to *Sloan*; she alleges that "Sloan [k]new his statements were false when he made them to Campbell." (Compl. ¶ 37.) Yet there are no facts from which to infer that Campbell or The Daily Beast had reason to know of any falsehood in what Sloan told them. Thus, Kelly has not alleged actual malice by Defendants in connection with that statement.

*(8) Kelly's activism is very dangerous and is undermining the science of industrial hygiene.* Here, Defendants were reporting the opinion of Sloan about his perception of the impact of Kelly's activism. They were not making provably false statements of fact about that activism.

*(9) Kelly is not a senior industrial hygienist.* The Article did not make this assertion. Instead, it reported the opinion of one person who purportedly said that a senior industrial hygienist is "not a real thing." It also reported Kelly's reasons why she believes that the term has meaning in her profession. In doing so, Defendants did not make a false statement of fact. Indeed, the assertion that Kelly's job title "is not a real thing" is clearly a subjective opinion expressed in loose, rhetorical terms. It is not an assertion that is provable as false.

*(10) Kelly's affidavit was removed from the Tennessee Stands website after inaccuracies came to its attention.* Kelly objects to this statement because she asked Tennessee Stands to remove the affidavit due to concerns that it contained her personal information. However, Defendants reported her account in the Article. Notably, Kelly does not challenge the substance of Defendants' statement, which is that Tennessee Stands *told* The Daily Beast that it learned of inaccuracies in

her affidavit before it removed the affidavit from its website. Indeed, it is possible to reconcile that statement with Kelly's account. In other words, both can be true at the same time: Kelly asked Tennessee Stands to remove the affidavit and Tennessee Stands learned about inaccuracies in that affidavit before it did so. Thus, Kelly has not adequately alleged a false statement.

Moreover, Kelly does not allege facts sufficient to establish actual malice by Defendants. To the contrary, the Article purports to identify several inaccuracies in the affidavit, undermining any contention that Defendants recklessly disregarded the truth.

Kelly compares this situation to other circumstances where a court could find there was a reckless disregard for the truth, including: reliance on an "unverified anonymous telephone call"; publishing statements that are "inherently improbable"; or publishing statements by an informant where there were "obvious reasons to doubt the veracity of the informant." *See St. Amant*, 390 U.S. at 732. None of those circumstances are present here. The Article cited an unnamed source, not an anonymous one, and it verified the information provided by identifying several inaccuracies in the affidavit and then giving Kelly an opportunity to respond. Apparently, she did not refute those inaccuracies when responding to Defendants and she does not do so here. Also, the inaccuracies in the affidavit and the discovery of them by Tennessee Stands were not "inherently improbable." Finally, Kelly provides no facts that would suggest there were obvious reasons for Defendants to doubt the truth of the information received from Tennessee Stands. As indicated, the statement from Tennessee Stands did not directly contradict with Kelly's account.

**\*9** *(11) Kelly submitted false information in the affidavit.* The Article did not make this statement, but it did purport to identify inaccuracies in the affidavit. However, Kelly does not explain how any statements in the Article about the contents of the affidavit are false. Instead, she simply makes a conclusory assertion in the complaint that "[t]here were no inaccuracies in the affidavit." (Compl. ¶ 46.) The Court need not accept this conclusory assertion as true. *See Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 846 (6th Cir. 2012) (The Court "must accept non-conclusory allegations of fact in the complaint as true and determine if the plaintiff has stated a plausible claim for relief."); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (noting that " 'naked assertion[s]' devoid of 'further factual enhancement' " are not sufficient to state a claim (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 557 (2007))). Thus, for all the foregoing reasons, Kelly has not alleged an actionable false statement of fact by Defendants, or one that is accompanied by actual malice.

### B. Defamation Per Se

The second count of Kelly's complaint asserts a claim of defamation per se. Some defamatory statements do not require proof of injury. For instance, "words charging the commission of a crime are defamatory per se, and hence, injury to the reputation of the person defamed is presumed to the extent that the failure to prove damages is not a ground for dismissal." *Burden v. Elias Bros. Big Boy Rests.*, 613 N.W.2d 378, 381 (Mich. Ct. App. 2000). Here, Kelly argues that Defendants effectively accused her of the crime of perjury when stating that she submitted an affidavit that contained inaccuracies.

Kelly acknowledges that the Article does not expressly accuse her of perjury, i.e., willfully making false statements in her affidavit. Nevertheless, she contends that a reader could interpret the Article as making such an assertion. According to Kelly, Michigan courts look to the effect of statements on a reader, i.e., the "sting" of a statement, to determine whether a statement is defamatory. She contends that the "sting" of the Article is that she committed perjury. But this claim fails for the same reason as her defamation claim regarding inaccuracies in the affidavit. She does not plead facts indicating that Defendants made false statements or acted with actual malice when discussing the contents of her affidavit.

Moreover, Kelly misapplies the law. To the extent Kelly relies on a theory of defamation by implication, she does not state a claim against Defendants. A claim for defamation by implication relies on "defamatory *implications* [that] are materially false"; "such a cause of action might succeed even without a direct showing of any actual literally false *statements*." *Hawkins*, 583 N.W.2d at 732 (emphasis in original). However, "Michigan prohibits libel liability for true speech on matters of public concern. Liability may not be imposed on a media defendant for facts about public affairs it publishes accurately and without material omissions." *Nichols*, 477 F.3d at 402 (quoting *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392, 394 (Mich. Ct. App. 1992)). Thus, Defendants are " 'not responsible for every defamatory implication a reader might draw from [their] report of true facts, absent evidence [they] intended the defamatory implication.' " *Id.* (quoting *Royal Palace Homes*, 495 N.W.2d at 396). Put another way,

a [media] defamation defendant cannot be held liable for the reader's possible inferences, speculations, or conclusions, where the defendant has not made or directly implied any provably false factual assertion, and has not, by selective omission of crucial relevant facts, misleadingly conveyed any false factual implication.

*Id.* (quoting *Locricchio v. Evening News Ass'n*, 476 N.W.2d 112, 139 (Mich. 1991)).

**\*10** Here, Kelly alleges no facts indicating that Defendants made any provably false assertions of fact or selectively omitted any crucial relevant facts. And as to the affidavit, there are no facts indicating that Defendants intended to imply that Kelly committed perjury. Thus, for all the foregoing reasons, Kelly fails to state a defamation claim against Defendants.

### C. Intentional Infliction of Emotional Distress

Kelly's last claim against Defendants is one for intentional infliction of emotional distress ("IIED"). Where a plaintiff's claim of IIED is premised on the same statements as a defamation claim, the IIED claim is subject to the same First Amendment limitations as the defamation claim. *See Ireland v. Edwards*, 584 N.W.2d 632, 641 (Mich. Ct. App. 1998)

(citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)). In other words, the "statements must be provable as false, [the] statements must be understandable as stating actual facts about the plaintiff, and, in the case of public-official or public-figure plaintiffs, the plaintiffs must prove actual malice by clear and convincing evidence[.]" *Id.* Here, Kelly's allegations in support of her defamation claim cannot survive the First Amendment limitations on them. For similar reasons, her allegations are not adequate to state an IIED claim against Defendants.

## IV. CONCLUSION

For the reasons stated, Kelly does not state a claim against Defendants Campbell and The Daily Beast. Consequently, the Court will grant their motion and dismiss the claims against them.

The Court will enter an order that is consistent with this Opinion.

### All Citations

Not Reported in Fed. Supp., 2022 WL 17546616

### Footnotes

1   Defendant AIHA filed a "concurrence" in the motion by the other defendants (ECF No. 11); apparently, AIHA also seeks dismissal of the claims against it. That concurrence is not sufficient to put Kelly on notice of AIHA's grounds for dismissal. It is not a motion. And it is not obvious that the same reasons for dismissal would apply to AIHA.

2   The subtitle of the article is:

> An industrial hygienist and self-styled exposure scientist is leading the charge in her own state and nationwide against wearing masks. Experts in her field are losing it.

(ECF No. 1-2, PageID.26.)

3   The Daily Beast later modified Sloan's statement to say that "the vast majority" of AIHA's members believe that face coverings are important, rather than "99 percent."

4   These factors were first laid out in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343-45 (1974).

5   The complaint does not identify the documentaries, but a Google search reveals that Kelly has appeared in a documentary series by InfoWars called "Covidland," which purports to "expose[ ] the official COVID-19 narrative." *See* Kristen Meghan Kelly – IMDB, https://m.imdb.com/title/tt15426894/fullcredits/cast?ref_=m_ttfc_3.

6   In addition, she has a YouTube channel that states it has over 8,000 subscribers. *See* https://www.youtube.com/@RealDealMediaTV/.

Case 4:26-cv-10821-SDK-CI ECF No. 24-2, PageID.326 Filed 08/04/26 Page 17 of 29

Kelly v. Daily Beast Company LLC, Not Reported in Fed. Supp. (2022)

7    Similarly, Kelly asserted in a media interview that she has "travel[ed] around the country ... testifying in front of legislative bodies, helping to open up states like North Dakota, Texas, New Hampshire, and Florida[.]" Russia Today (RT) Interview, https://www.youtube.com/watch?v=9Cd4xHTPMnE&t=194s.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT A-3

2021 WL 4290181
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

Amy SOLEK, Personal Representative of the
Estate of Emily Victoria Solek, Deceased, Amy
Solek and Brent Solek, Individually, Plaintiffs,

v.

K & B TRANSPORTATION, INC., an
Iowa corporation, Brock Ackerman, Kory
Ackerman, and Johnny Stewart, Defendants.

Case No. 21-cv-10442
|
Signed 09/21/2021

**Attorneys and Law Firms**

Marc E. Lipton, Steffani E. Chocron, Lipton Law Center,
Southfield, MI, for Plaintiffs.

David J. Yates, Geoffrey Andrew Leskie, Stephanie Brooke
Burnstein, Segal McCambridge Singer and Mahoney,
Southfield, MI, for Defendants K&B Transportation, Inc., an
Iowa Corporation, Johnny Stewart.

**OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTION TO
DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) (ECF
NO. 30)**

Paul D. Borman, United States District Judge

 **\*1** This case arises from a tragic automobile accident that
occurred at approximately 9:30 a.m. on Friday, June 19,
2020, which resulted in the death of 21-year-old University
of Michigan student Emily Solek when the vehicle she was
driving was struck from behind by a semi-truck, crushing her
vehicle between the semi-truck and a cargo van in front of
her and causing her vehicle to catch fire. Ms. Solek's parents,
individually and as the personal representative of the Estate
of Emily Solek, have filed this wrongful death suit against
the driver of the semi-truck that struck Ms. Solek's vehicle,
as well as his employer/owner of the semi-truck, and two
individual officers/owners of the company. Now before the

Court is Defendants' Motion to Dismiss Pursuant to Fed. R.
Civ. P. 12(b)(6) (ECF No. 30). The motion has been fully
briefed, and the Court held a hearing on this motion on Friday,
September 10, 2021. For the reasons that follow, the Court
GRANTS IN PART and DENIES IN PART Defendants'
motion.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

 **A. Statement of Facts**[1]
According to Plaintiffs' First Amended Complaint, on June
19, 2020, Emily Solek, a 21-year-old student at the University
of Michigan, was driving from Ann Arbor to her home in
Rochester, Michigan. (ECF No. 21, Plaintiffs' First Amended
Complaint (FAC), ¶¶ 8, 74, PageID.353, 362.) While Emily
was driving east on Michigan highway M-14, traffic slowed
due to an exit closure, and she slowed her vehicle along
with other traffic. (*Id.* ¶ 72, PageID.361.) Around that same
time, Defendant Johnny Stewart, a truck driver employed
by Defendant K&B Transportation, Inc. (K&B), was also
driving eastbound on M-14, in a 2013 Freightliner semi-truck
owned by K&B. (*Id.* ¶¶ 70-71, PageID.361.) Stewart failed to
keep his semi-truck under control in the slowing traffic and
drove at or near full speed into the rear of Emily's vehicle,
a 2017 Jeep Grand Cherokee, resulting in Emily's death. (*Id.*
¶ 73, PageID.361.) Emily's vehicle was crushed between the
Freightliner and a cargo van ahead of her, and as a result of the
collision, both the K&B truck and the Solek vehicle caught
fire. (*Id.* ¶ 75, PageID.362.) Plaintiffs allege that the impact
"fractured [Emily's] skull, cervical spine, and ribs, amputated
her right leg above the knee, and caused severe, permanent,
and fatal internal injuries" and that "Emily was consumed by
the fire, as she was unable to escape or be retrieved from her
burning vehicle." (*Id.* ¶ 76, PageID.362.)

 **B. Procedural History**
On February 26, 2021, Emily Solek's parents, Amy Solek
and Brent Solek, individually and as personal representative
of Emily Solek's Estate, brought this action against four
Defendants: (1) Johnny Stewart, the truck driver; (2) K&B
Transportation, Inc., the owner of the semi-truck and
Stewart's employer; (3) Brock Ackerman, the registered agent
of K&B and also its Secretary, Treasurer and Director; and,
(4) Kory Ackerman, President and Director of K&B. (ECF
No. 1.)

**\*2** In lieu of an answer, on April 23, 2021, Defendants filed a motion to dismiss Plaintiffs' Complaint, and a motion to strike Plaintiffs' complaint. (ECF Nos. 16, 18.) On May 7, 2021, Plaintiffs responded to the motion to dismiss by filing a First Amended Complaint (ECF No. 21), and they also filed a response to the motion to strike (ECF No. 22). Defendants subsequently withdrew their motion to dismiss and motion to strike. (ECF No. 24.)

Plaintiffs' First Amended Complaint, brought by the same Plaintiffs and against the same Defendants as the original Complaint, contains three counts:

> (1) Count I – Liability of K&B Transportation, Brock Ackerman, Kory Ackerman and Stewart to Plaintiff, the Estate of Emily Victoria Solek, deceased (a negligence claim);
>
> (2) Count II – Liability of K&B Transportation, Brock Ackerman, Kory Ackerman and Stewart to Plaintiffs, Amy and Brent Solek, for Negligent Infliction of Emotional Distress (Bystander Liability); and
>
> (3) Count III – Liability of Brock and Kory Ackerman to Amy and Brent Solek for Intentional Infliction of Emotional Distress.

(FAC.)

On May 21, 2021, Defendants filed the instant Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 30, Defs.' Mot.) Defendants argue that Plaintiffs fail to state a negligence claim against Defendants Brock and Kory Ackerman personally, and have failed to plead facts sufficient to pierce the corporate veil to reach the Ackerman Defendants. Defendants contend that the FAC attributes allegedly tortious conduct against K&B only, not Brock and Kory Ackerman as individuals. Defendants further argue that Plaintiffs' FAC fails to state a claim for negligent or intentional infliction of emotional distress. Defendants contend that the FAC as a whole should be dismissed with prejudice, or, at a minimum, that the FAC should be narrowed to Count I against only Defendants Stewart and K&B.

Plaintiffs filed a Response in opposition to Defendants' motion to dismiss. (ECF No. 35, Pls.' Resp.) Plaintiffs argue that they have sufficiently alleged that the Ackerman Defendants personally participated in the alleged tortious acts, and that it is premature to address arguments regarding piercing the corporate veil at this stage of the litigation, before any discovery has been conducted. Plaintiffs continue

that, in any event, they have sufficiently pleaded allegations that support piercing the corporate veil with respect to the Ackerman Defendants. Plaintiffs further argue that they have sufficiently pleaded claims of negligent and intentional infliction of emotional distress.

Defendants filed a Reply brief in support of their motion to dismiss. (ECF No. 37, Defs.' Reply.) Defendants assert that their motion to dismiss is not "premature," as Plaintiffs allege. Defendants contend that the Ackerman Defendants, as officers and agents of K&B, cannot be held personally liable to Plaintiffs for K&B's business decisions, as a corporation can only act through its agents. Defendants argue that Plaintiffs' negligence claims fails because they have failed to plead any actionable duty owed by the Ackerman Defendants to Plaintiffs, and that Plaintiffs' negligent and intentional infliction of emotional distress claims fail as a matter of law.[2]

## II. LEGAL STANDARD

 **\*3** Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. To state a claim, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.' " *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Id.* at 539 (internal citations and quotation marks omitted); *see also Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). In other words, a plaintiff must provide more than a "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The Sixth Circuit has explained that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make

it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). It is the defendant who "has the burden of showing that the plaintiff has failed to state a claim for relief." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015).

In ruling on a motion to dismiss, the Court may consider the complaint as well as: (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims; (2) matters of which a court may take judicial notice; (3) documents that are a matter of public record; and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings.... [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings).

## III. ANALYSIS

### A. Whether the FAC States a Negligence Claim Against Defendants Brock and Kory Ackerman

**\*4** Count I of the FAC alleges a negligence claim on behalf Plaintiff, the Estate of Emily Solek only, and against all Defendants. Defendants seek dismissal of Count I against Brock and Kory Ackerman, arguing that Plaintiffs attempt to circumvent the high hurdle to pierce the corporate veil by pleading that Brock and Kory Ackerman, individually, are directly liable to the Estate as negligent actors. (Defs.' Mot. at p. 9, PageID.901-04.)[3] Defendants contend that Plaintiffs fail to properly plead a negligence claim against Defendants Brock and Kory Ackerman because Plaintiffs fail to allege a duty owed to the Estate by the Ackerman Defendants,

individually, and fail to allege that the Ackerman Defendants breached such a duty, and instead only allege breaches of duty by Defendants Stewart and K&B. (*Id.*)

Plaintiffs respond that Michigan has long held that corporate employees are personally liable for their own torts. (Pls.' Resp. at p. 12, PageID.1199.) Plaintiffs contend that Defendants Brock and Kory Ackerman are personally liable for the tortious acts in which they have actively participated, whether on their own behalf or as agents of K&B. (*Id.*)

Michigan law presumes that the corporate form will be respected. *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798 (6th Cir. 2007) (citing *Seasword v. Hilti*, 449 Mich. 542, 537 N.W.2d 221, 224 (1995)). "It is well-settled that Michigan courts will respect the separate existence of business entities from their owners. This is true even when a single shareholder or member owns the entity." *Alpha Inv., L.L.C. v. Alpha Real Estate, L.L.C.*, No. 291939, 2010 WL 4977902, at \*3 (Mich. Ct. App. Dec. 7, 2010) (citations omitted) (holding that "in the absence of evidence that would warrant disregarding the separate existence of the entities involved, [an incorporator who signed the purchase agreement at issue which stated that he 'was acting on behalf of two entities that had not yet been formed'] could not be individually liable for breaches of those contracts"); *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 797 (E.D. Mich. 2014) (" 'Michigan courts typically consider corporations legally distinct from their shareholders, even if a single shareholder owns all the stock.' ") (quoting *Department of Consumer Indus. Servs. v. Shah*, 236 Mich. App. 381, 393 (1999)).

**\*5** However, Michigan courts will disregard the corporate form and hold an officer of a corporation *personally* liable for *his own tortious or criminal acts*, even when that officer was acting for the benefit of the corporation, and for the actions of the corporation where that officer *caused* the corporation to act criminally or tortiously. *See Livonia Bldg. Materials Co. v. Harrison Constr. Co.*, 276 Mich. App. 514, 519 (2007). Under Michigan law, "[i]t is well established that a corporate officer or agent is personally liable for torts committed by him even though he was acting for the benefit of the corporation." *In re Interstate Agency, Inc.*, 760 F.2d 121, 125 (6th Cir. 1985) (emphasis in original); *see also Department of Agric. v. Appletree Mktg., LLC*, 485 Mich. 1, 17 (2010) ("Michigan law has long provided that corporate officials may be held personally liable for their individual tortious acts done in the course

of business, regardless of whether they were acting for their personal benefit or the corporation's benefit"). For example, corporate officials have been held individually liable in such instances for their personal actions in committing intentional torts such as conversion of funds or property, making fraudulent representations, sexually harassing an employee, or misappropriation of trade secrets, copyright infringement, and trademark and Lanham Act violations. *See, e.g., Appletree Mktg.*, 485 Mich. at 17 (conversion of funds); *Innovation Ventures, L.L.C. v. Aspen Fitness Products, Inc.*, No. 11-cv-13537, 2015 WL 11071470, at *15 (E.D. Mich. Mar. 31, 2015) (misappropriation, copyright, trademark); *Kheder Homes at Charleston Park, Inc. v. Charleston Park Singh, LLC*, No. 307207, 2014 WL 60326, at *6-7 (Mich. Ct. App. Jan. 2, 2014) (fraud); *Elezovic v. Ford Motor Co.*, 274 Mich. App 1, 13–14 (2007) (sexual harassment). The Michigan Supreme Court has explained that imposition of personal liability in such instances does not require piercing of the corporate veil, but rather derives from the concept that a corporate officers may not escape liability for "their own tortious misconduct" by "hid[ing] behind the corporate form." *Appletree Mktg.*, 485 Mich. at 18-19 (emphasis in original).

In order to state claim for negligence against an individual under Michigan law, Plaintiffs must plausibly allege "(1) duty; (2) breach of that duty; (3) causation, both cause in fact and proximate causation; and (4) damages." *Grifo & Co., PLLC v. Cloud X Partners Holdings, LLC*, 485 F. Supp. 3d 885, 894 (E.D. Mich. 2020) (citing *Romain v. Frankenmuth Mut. Ins. Co.*, 483 Mich. 18, 21 (2009)). Defendants argue that Plaintiffs fail to allege a duty owed to the Estate by Defendants Brock and Kory Ackerman, individually, or that either of the Ackerman Defendants breached such a duty.

**1. Whether Plaintiffs sufficiently allege that Brock and/or Kory Ackerman, individually, owed a duty to the Estate**

Plaintiffs broadly plead that *all* Defendants "owed duties of reasonable care to all Plaintiffs, including the duty to comply with all applicable Federal, State and local statutes, regulations and ordinances, as well as industry practices," and that Defendants K&B, Brock Ackerman and Kory Ackerman specifically "owed Plaintiffs a duty to use reasonable care as an interstate transporter, with such duties established by common law, as well as applicable Federal, State and Local statutes, regulations, and ordinances." (FAC ¶¶ 79, 82, PageID.362-63.) Defendants argue that Plaintiffs have failed

to properly plead an actionable duty that Defendants Brock and Kory Ackerman, as individuals, owed to the Estate.

"[T]he existence of a duty is a question of law." *Grifo & Co.*, 485 F. Supp. 3d at 894 (citing *Hill v. Sears, Roebuck and Co.*, 492 Mich. 651, 659 (2012)). In making this determination, courts consider "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Id.* at 895. Most importantly, "there must be a relationship between the parties and the harm must have been foreseeable." *Id.* (citation omitted); *see also Massey v. Grant*, 679 F. Supp. 711, 713 (W.D. Mich. 1988) ("The law will hold defendant liable for his negligent conduct only if, because of his relationship with plaintiffs, he is deemed to owe them, in particular, a duty of due care."), *aff'd*, 875 F.2d 865 (6th Cir. 1989). And, "[a] foundational rule in negligence law is that parties are not held liable for 'passive inaction or the failure to actively protect others.'" *Grifo & Co.*, 485 F. Supp. 3d at 895 (citations omitted).

**\*6** Defendants argue that Plaintiffs have not sufficiently alleged a breach of any duty by Brock and/or Kory Ackerman owed to the Estate, and instead allege only breaches of duty by K&B and Stewart. Defendants state that Brock and Kory Ackerman are not "interstate transporters," as alleged in paragraph 82 of the FAC. (Defs.' Mot. at p. 10, PageID.902.)[4] Plaintiffs do not address or explain this allegation in their Response brief. As Defendants explain, Plaintiffs allege in their FAC that Brock and Kory Ackerman are employees and officers of K&B. (Defs.' Mot. at p. 10, PageID.902.) (FAC ¶¶ 13-14, 20-21, PageID.353-54.) Plaintiffs further allege that the death of Emily Solek was caused by Defendant Stewart "fail[ing] to stop in the assured clear distance...." (FAC ¶ 1, PageID.351.) (Pls.' Resp. at p. 3, PageID.1190 ("Ms. Solek died from a rear-end accident caused by K&B driver Stewart.").) Defendants argue that Plaintiffs have failed to allege that the Ackerman Defendants, as employees and officers of K&B, individually owed a duty to protect Emily Solek from the allegedly tortious conduct of Stewart or from harm in general. *See Grifo & Co.*, 485 F. Supp. 3d at 895 ("A foundational rule in negligence law is that parties are not held liable for 'passive inaction or the failure to actively protect others from harm.'").

Plaintiffs respond that they do not allege that Brock and Kory Ackerman failed to protect Ms. Solek from Defendant Stewart, and thus they do not need to establish the existence of a "special relationship" with the Ackerman Defendants

to establish a duty of care. (Pls.' Resp. at pp. 18-19, PageID.1205-06.) Plaintiffs contend instead that they plead that the Ackerman Defendants owed the Estate a general duty of due care.

However, Plaintiffs fail to allege that the Ackerman Defendants, as individuals, had any relationship with Ms. Solek, and fail to allege any specific conduct by the Ackerman Defendants, individually, directed to Ms. Solek. *See Massey,* 679 F. Supp. at 713 ("The law will hold defendant liable for his negligent conduct only if, because of his relationship with plaintiffs, he is deemed to owe them, *in particular*, a duty of due care.") (emphasis added); *see also Hill,* 492 Mich. at 671 (stating that "duty is circumscribed by the bounds of the parties' relationship"). Plaintiffs do not allege that the Ackerman Defendants knew Ms. Solek or that they personally were involved in the June 19, 2020 accident that resulted in her death. Rather, Plaintiffs plead that "[t]he Ackerman Defendants, at all relevant times, were acting during the course of, and within the scope of their employment with KB." (FAC, ¶ 50, PageID.358.) Similarly, in their Response brief, Plaintiffs argue that the Ackerman Defendants' duty "arises from the undertaking of running a trucking company that operates on the highway." (Pls.' Resp. at p. 18, PageID.1205.)

Plaintiffs' attempt to impose liability for a negligence claim against the Ackerman Defendants individually, as employees and officers of K&B, not for their alleged involvement in the accident, but rather for their general alleged business decisions involved with "running" the Company in this case, would eliminate the benefit of the corporate form. As Defendants correctly explain, it is well-established that "a corporation acts through its agents." *Edmonds v. Fehler & Feinauer Constr. Co.,* 252 F.2d 639, 642 (6th Cir. 1958); *see also Altobelli v. Hartmann,* 499 Mich. 284, 297 (2016) (same). "The mere fact that a corporation ... commits a tort, does not mean that the individual shareholders of the corporation should personally be liable. To the contrary, the corporate form of doing business is typically selected precisely so that the individual shareholders will not be liable." *Stramaglia v. United States,* No. 06-13764, 2007 WL 4404185, *3 (E.D. Mich. Dec. 13, 2007). Plaintiffs have failed to allege that the Ackerman Defendants had any relationship with Ms. Solek that would support the existence of a duty owed to her in this case.

Plaintiffs also seek to base the existence of a duty on Michigan's adoption of the Federal Motor Carrier Safety

Regulations (FMCSR), as part of the Michigan Motor Carrier Safety Act (MCSA), Mich. Comp. Laws § 400.11, *et seq.* (Pls.' Resp. at pp. 14-16, PageID.1201-03.) However, Plaintiffs fail to establish that this statute creates a duty owed by the Ackerman Defendants, as individuals, to Ms. Solek.[5] Plaintiffs rely on *Tingle v. Cornelison,* No. 3:15-cv-00319-RGJ, 2018 WL 6594544 (W.D. Ky. Dec. 14, 2018) in support of their argument. (Pls.' Resp. at p. 15, PageID.1202.) However, that case does not support Plaintiffs' argument that the Ackerman Defendants owed a duty to Plaintiffs. In fact, in *Tingle*, the parties did not dispute that defendant Ernest Cornelison, the defendant truck driver in that case, owed a duty of care to the plaintiff while driving his truck. *Tingle,* 2018 WL 6594544, at *2. They instead disagreed about the appropriate standard of care by which to measure Cornelison's actions. *Id.* at *2-3. Plaintiffs here have failed to establish that the FMCSR established a duty between the Ackerman Defendants, individually as owners and officers of K&B, and Ms. Solek.

**\*7** Because Plaintiffs fail to plead any legally recognized duty owed by the Ackerman Defendants, personally and individually, to the Estate, Count I of the FAC is dismissed without prejudice against Defendants Brock and Kory Ackerman.

### 2. Whether Plaintiffs sufficiently allege that the Ackerman Defendants breached a duty to the Estate

Defendants further argue that Plaintiffs fail to allege any conduct by the Ackerman Defendants, in their individual and personal capacities, that breached any duty owed to the Estate. In support of their negligence claim, Plaintiffs allege breaches in every instance by "K & B Transportation and the Ackerman Defendants" collectively, directed to the company's business practices and decisions. (See FAC ¶ 83, PageID.364-65 (alleging, *e.g.*, negligent hiring and entrustment, failure to screen, monitor, and test drivers, failure to implement safety policies and procedures, failure to provide safety and defensive driving training, failure to equip vehicles with appropriate safety devices, etc.).) These are all allegations related to K&B and the operation of the Company, and Plaintiffs do not plead in Count I any alleged individual breaches by the Ackerman Defendants that were not attributable to the operation of the Company. Indeed, in their Response brief, Plaintiffs again state that they are seeking to hold the Ackerman Defendants personally liable for acts committed "as the decision-makers for K&B"

Case 4:26-cv-10821-SDK-CI   ECF No. 24-2, PageID.333   Filed 08/04/26   Page 24 of 29

Solek v. K & B Transportation, Inc., Not Reported in Fed. Supp. (2021)

and "while working for K&B." (Pls.' Resp. at p. 19, PageID.1206.)

The Court finds that Plaintiffs fail to plead that the Ackerman Defendants, as individual defendants, breached any duty owed to the Estate. Accordingly, for this additional reason, Count I is dismissed, without prejudice, against Defendants Brock and Kory Ackerman only. Count I may proceed against Defendants Stewart and K&B.

### B. Count II – Negligent Infliction of Emotional Distress

Defendants argue that Plaintiffs' claim for negligent infliction of emotional distress, also referred to as bystander liability, alleged against all Defendants, fails to state a claim upon which relief can be granted. (Defs.' Mot. at pp. 12-19, PageID.905-11.)[6] Under Michigan law, the elements of a negligent infliction of emotional distress claim are:

> (1) serious injury threatened or inflicted on a person, not the plaintiff, of a nature to cause severe mental disturbance to the plaintiff, (2) shock by the plaintiff from witnessing the event that results in the plaintiff's actual physical harm, (3) close relationship between the plaintiff and the injured person (parent, child, husband, or wife), and (4) presence of the plaintiff at the location of the accident at the time the accident occurred or, if not presence, at least shock "fairly contemporaneous" with the accident.

*Hesse v. Ashland Oil, Inc.*, 466 Mich. 21, 34 (2002) (citing *Wargelin v. Sisters of Mercy Health Corp.*, 149 Mich. App. 75, 81 (1986)); *see also House of Providence v. Meyers*, 458 F. Supp. 3d 621, 641 (E.D. Mich. 2020) (citing *Taylor v. Kurapati*, 236 Mich. App. 315 (1999)). Defendants argue that Plaintiffs fail to sufficiently plead elements two and four of their negligent infliction of emotional distress claim.

### 1. Whether the Soleks suffered shock "fairly contemporaneous" with the accident

**\*8** Defendants first argue that Plaintiffs have failed to sufficiently plead the fourth prong of their negligent infliction of emotional distress claim – that the Soleks were present at the time of the accident or that they suffered shock "fairly contemporaneous" with the accident. (Defs.' Mot. at pp. 13-17, PageID.905-09.) As explained above, under Michigan law, a plaintiff may recover for negligent infliction of emotional distress only if the plaintiff is "present at the time of the accident or suffers shock 'fairly contemporaneous'

with the accident." *House of Providence*, 458 F. Supp. 3d at 641; *Gustafson v. Faris*, 67 Mich. App. 363, 368-69 (1976). Michigan has refused "to apply the tort of negligent infliction of emotional distress beyond the situation where a plaintiff witnesses negligent injury to a third person and suffers mental disturbance as a result." *Duran v. The Detroit News*, 200 Mich. App. 622, 629 (1993) (emphasis added).

In this case, Plaintiffs' FAC alleges:

> 89. Amy and Brent Solek first suspected that their daughter was injured in a collision when they were alerted by the tracking features on their cell phones that she was no longer driving towards home on M-14.
>
> 90. Amy and Brent Solek began driving towards the crash scene from their home in Rochester Hills.
>
> 91. Shortly thereafter, they were confronted by a large back-up in traffic that had occurred on SB I-275 as a consequence of the crash.
>
> 92. On the way to the scene, Amy frantically called area hospitals, seeking information on the admission of her daughter to a local facility.
>
> 93. Amy and Brent Solek also reached out to members of the State Police, to determine if their daughter had been involved in the crash. They were told that a crash had occurred.
>
> 94. When they arrived at the scene, Amy and Brent saw the burning vehicles and identified the charred and crushed remains of the Grand Cherokee Jeep they recognized as the one Emily was driving. They also saw the overturned other vehicles and the smashed KB Freightliner.
>
> 95. When the investigating officers recognized Amy and Brent for who they were – the parents of the driver of the Jeep – they directed Amy and Brent first to the side of the road, and then instructed them to return home to wait for more information.
>
> 96. Amy and Brent Solek, in shock, waited first at the scene and then drove to their home in Rochester Hills, Michigan. Before returning home, they stopped at their church, seeking solace and comfort.
>
> 97. Later that evening, Amy and Brent were visited by the assigned and investigating officers who advised them that their daughter had not survived.

(FAC ¶¶ 89-97, PageID.366.)

Case 4:26-cv-10821-SDK-CI ECF No. 24-2, PageID.334 Filed 08/04/26 Page 25 of 29

Solek v. K & B Transportation, Inc., Not Reported in Fed. Supp. (2021)

Plaintiffs do not plead that they were present at the instant of the accident. Thus, the issue is whether they have sufficiently pleaded that they suffered shock "fairly contemporaneous" with the accident. With respect to the standard to be used in determining whether emotional shock is "fairly contemporaneous" with the injury or accident, the Michigan Court of Appeals has approved the following rule:

> In determining what the term 'fairly contemporaneous' means, guidance is found in the decisions of a sister state wherein the standard has been previously applied. In *Powers v. Sissoev,* 39 Cal App 3d 865; 114 Cal Rptr 868 (1974), the Court of Appeals for California held that a mother could not recover for emotional distress which resulted in seeing her daughter some 30 to 60 minutes after the occurrence of an accident. The Court reasoned that the circumstances under which the mother saw her child were not materially different from the circumstances undergone by virtually all parents whose children have been injured in accidents which the parents did not witness. In the earlier case of *Archibald v. Braverman,* 275 Cal App 2d 253; 79 Cal Rptr 723 (1964), the California Court of Appeals held that a mother who viewed her son's injuries from an explosion within moments after the allegedly negligent accident occurred had a cause of action for emotional distress and resulting physical injury in spite of the fact that she did not witness the actual incident."

 **\*9** *Gustafson,* 67 Mich. App. at 368, 369-70. *See also Deisler v. Lutz*, No. 252051, 2005 WL 736517, at \*4 (Mich. Ct. App. Mar. 31, 2005) (plaintiff's hearing about accident ten minutes after the accident, and seeing daughter about an hour after the accident, not "fairly contemporaneous"); *DAIIE v. McMillan,* 159 Mich. App. 48, 55 (1987) (finding that defendant's injury was not fairly contemporaneous as she arrived on the accident scene one hour later and "did not see her daughter until sometime thereafter"); *Henley v. Dep't of State Highways & Transp.*, 128 Mich. App. 214, 219 (1983) (parents' learning of accident five hours later not "fairly contemporaneous"); *Bernier v. Board of Cnty. Rd. Comm'n for Ionia Cnty.*, 581 F. Supp. 71, 79 (W.D. Mich. 1983) (parent's learning of accident and her son's death two hours after accident not "fairly contemporaneous").

According to the FAC, the accident happened around 9:30 a.m. (FAC ¶ 1, PageID.351.) Plaintiffs subsequently learned, at some unidentified time after that, that Ms. Solek was no longer traveling on M-14 when they were "alerted by the tracking features on their cell phones," and they immediately then traveled from Rochester Hills to the accident location at the M-14/I-275 interchange, encountered a "large" traffic back-up, and engaged in several telephone conversations before arriving at the accident location. It was not until later that evening that the Soleks were informed that Emily Solek had not survived the collision. This length of time between the accident at 9:30 a.m. and the Solek's observance of the accident scene, is not pleaded. The FAC does allege, however, that the accident events were still ongoing when the Soleks arrived, and that they saw "the burning vehicles" and "the charred and crushed remains of the Grand Cherokee Jeep," which they identified as their daughter's vehicle. (FAC ¶ 94, PageID.366.)

The Court cannot say at this time, based solely on the pleadings and "constru[ing] the complaint in the light most favorable to the plaintiff[s], accept[ing] its allegations as true, and draw[ing] all reasonable inferences in favor of the plaintiff[s]," that the Soleks' observance of this terrible accident scene is outside the window of time such that the Soleks did not experience shock "fairly contemporaneous" with the accident. This accident was indeed tragic. The Court can appreciate that taking in the ongoing and active accident scene, with the still "burning vehicles," "smashed KB Freightliner," and "the charred and crushed remains of the Grand Cherokee Jeep they recognized as the one Emily was driving," when the Soleks arrived upon the scene was a horrible shock. The parties are entitled to determine, through discovery, whether Plaintiffs can establish that the Soleks were "present at the time of the accident *or* suffer[ed] shock 'fairly contemporaneous' with the accident." *Wargelin,* 149 Mich. App. at 81 (emphasis added).

**2. Whether the Soleks suffered actual physical harm**

Defendants also argue that Plaintiffs also fail to sufficiently plead the second prong of their negligent infliction of emotional distress claim – that the Soleks suffered shock from witnessing the event that resulted in actual physical harm. (Defs.' Mot. at pp. 17-19, PageID.909-11.) Plaintiffs plead that they "both suffered actual physical harm as a consequence of the shock they experienced at the accident scene. Both have suffered and are suffering from severe traumatic depressive reaction and mental anguish, have withdrawn from normal forms of socialization, have altered sleep patterns, headaches, and other manifestations of shock and mental anguish from witnessing the immediate aftermath of their child's death." (FAC ¶ 99, PageID.367.)

Case 4:26-cv-10821-SDK-CI ECF No. 24-2, PageID.335 Filed 08/04/26 Page 26 of 29

Solek v. K & B Transportation, Inc., Not Reported in Fed. Supp. (2021)

**\*10** Defendants rely on *York v. Big Ten Ribs, Inc.*, No. 270592, 2006 WL 3040646 (Mich. Ct. App. Oct. 26, 2006) in support of their argument. In *York*, parents and grandparents of a minor child observed the child traumatically fall into an open commercial septic tank and become completely submerged in sewage. *Id.* at *1. The child's mother alleged that she suffered from "nervousness, sleep deprivation (due to bad dreams), fatigue (from sleep deprivation), nightmares, and an inability to perform household chores (due to sleep deprivation) after witnessing the accident," and the boy's father suffered from "sleep deprivation and fatigue ... [and] feeling stress when he thought about his son's accident[.]" *Id.* The boy's grandmother stated that "she had problems sleeping and other undefined problems ... but did not seek psychiatric or psychological help or request medication." *Id.* at *2. The Michigan Court of Appeals held, on a motion for summary disposition, that neither the boy's parents nor his grandparents could establish a claim for negligent infliction of emotional distress, even if they experienced "shock from witnessing their son's accident," because they could not establish the actual physical harm element necessary to establish a claim for negligent infliction of emotional distress. *Id.*

However, in *Nawrocki v. City of Dearborn Heights*, No. 04-CV-74869-DT, 2005 WL 3556203 (E.D. Mich. Dec. 29, 2005), the court found that the plaintiff proffered sufficient evidence of "actual physical harm" to satisfy the second prong of her negligent infliction of emotional distress claim when she presented evidence that she "suffered a bout of depression as a result of the death of her son, developed ulcers, and experienced a heart condition." *Id.* at *9. And in *Fisher v. Lindauer*, 904 F. Supp. 2d 750 (W.D. Mich. 2012), the court found that evidence that the plaintiff suffered from "anxiety, hyperventilation, using oxygen, losing sleep, agitation and panic," and had "sudden mood changes," "expressed homicidal ideation against staff," and showed "Anxiety, Depressed mood, Hopelessness, Impaired concentration, Manic symptoms, Sleep disturbance (decrease), [and] Thought disturbance," was sufficient to establish the second prong of the plaintiffs' negligent infliction of emotional distress claim. *Id.* at 754.

In light of *Narwocki* and *Fisher*, the Court finds, at this stage of the litigation, construing the allegations in the light most favorable to Plaintiffs, that Plaintiffs' allegations that they "have suffered and are suffering from severe traumatic depressive reaction and mental anguish, have withdrawn from normal forms of socialization, have altered sleep patterns, headaches, and other manifestations of shock and mental anguish from witnessing the immediate aftermath of their child's death," (FAC ¶ 99, PageID.367) are sufficient to allege "actual physical harm."

Accordingly, Defendants' motion to dismiss Plaintiffs' negligent infliction of emotional distress claim in Count II of their FAC, against Defendants K&B and Stewart only, is DENIED.

### C. Count III – Intentional Infliction of Emotional Distress

Plaintiffs assert a claim for intentional infliction of emotional distress against Defendants Brock and Kory Ackerman only. (FAC, Count III, PageID.367-68.) To establish a claim for intentional infliction of emotional distress under Michigan law, a plaintiff must establish "(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Houston of Providence*, 458 F. Supp. 3d at 641 (citing *Lucas v. Awaad*, 299 Mich. App. 345 (2013)). "The threshold for showing extreme and outrageous conduct is high." *In re Estate of Bandemer*, No. 293033, 2010 WL 3984653, at *3 (Mich. Ct. App. Oct. 12, 2010). A plaintiff must allege conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Doe v. Mills*, 212 Mich. App. 73, 91 (1995); *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 603 (1985) (the test for common law intentional infliction of emotional distress is "one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' "); *see also Graham v. Ford*, 237 Mich. App. 670, 674 (1999) ("It is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort."). "It is for the trial court to initially determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Haley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577 (2004).

**\*11** Defendants argue that Plaintiffs fail to state a claim for intentional infliction of emotional distress because they have not pleaded that Defendants Brock and Kory Ackerman's conduct was outrageous, or that the Ackerman Defendants had the requisite intent. (Defs.' Mot. at pp.

19-24, PageID.911-16.) Plaintiffs respond that consideration of this claim is "premature" as no discovery has been conducted, but that they have nevertheless sufficiently pleaded a claim of intentional infliction of emotional distress against the Ackerman Defendants. (Pls.' Resp. at pp. 24-25, PageID.1211-12.)

Plaintiffs allege in their FAC that:

> 103. At all relevant times, Defendants Brock Ackerman and Kory Ackerman intentionally or recklessly failed to avoid extreme and outrageous conduct by: choosing to put vehicles on the road without FCAM even after making the choice to begin equipping some of their trucks with that life-saving technology; allowing their newer, less experienced drivers to operate their older, more dangerous vehicles rather than placing those vehicles under the control of more experienced and trusted operators; routinely disregarding their driver's federally mandated off-duty time; creating a system of sanctions and penalties that had the direct effect of encouraging their drivers to extend their hours beyond what was reasonable or permissible; ... failing to protect the public from the foreseeable and catastrophic collisions that would occur by intentionally underinsuring the corporate entity; and other violations of common law, and Federal, State and local statutes, regulations and ordinances.

(FAC ¶ 103, PageID.367-68.)

First, this alleged conduct – whether and when to equip vehicles with safety equipment, hiring, assigning, and scheduling drivers, etc. – is the conduct of Defendant K&B, as a company, and not Brock and Kory Ackerman, individually. Second, while Plaintiffs raise issues regarding Defendant K&B's business practices and decisions, construing all allegations in Plaintiffs' favor, the alleged conduct complained of fails as a matter of law to constitute extreme and outrageous conduct or a specific intent on Brock and Kory Ackerman's part to inflict the alleged injury of emotional distress on Plaintiffs. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 799 (6th Cir. 2005) (holding that the plaintiff's allegations that police officers denied her insulin which resulted in her being hospitalized and treated for diabetic ketoacidosis the next day were insufficient to sustain a claim of intentional infliction of emotional distress, noting "Garretson has not offered proof that the officers *intended* to subject her to emotional distress by specifically denying her medical treatment") (emphasis in original); *Taylor v. Blue Cross and Blue Shield of Michigan,* 205 Mich. App. 644, 646-48, 657 (1994) (refusing to conclude that the defendant's

conduct was outrageous even though the defendant's conduct of erroneously refusing to pay for the plaintiff's chemotherapy treatments resulted in delayed treatments which caused the plaintiff's cancer to spread throughout her body); *Meek v. Michigan Bell Tel. Co.,* 193 Mich. App. 340, 346-47 (1992) (holding that severe verbal abuse, including ethnic slurs, at work does not constitute outrageous conduct.); *Duran,* 200 Mich. App. at 630 (holding that the conduct of the Detroit News in publicizing the plaintiffs' location after death threats were made against the plaintiffs was not sufficiently outrageous or extreme, and the trial court did not err in granting summary disposition); *compare Miller v. Currie,* 50 F.3d 373, 378 (6th Cir. 1995) (reversing dismissal of plaintiff's intentional infliction of emotional distress claim against nursing home that "intentionally and maliciously hid" her mother from her on visits, and on one occasion caused her to be arrested when she came to visit her mother); *Mroz v. Lee,* 5 F.3d 1016, 1019-20 (6th Cir. 1993) (intentional infliction of emotional distress claim lies where "defendant deliberately misinformed plaintiff's business associates that plaintiff engaged in criminal behavior, deliberately used this misinformation to manipulate the legal and financial system to plaintiff's great detriment, and personally threatened the safety of plaintiff and plaintiff's family").

**\*12** Further, while it is undeniable that the accident in this case was horrific, as Defendants explain, "it is the [defendants'] conduct, rather than the consequences of the conduct, that must be 'extreme and outrageous,'" for a plaintiff's action to succeed." *Hesse v. Chippewa Valley Sch.*, No. 244153, 2004 WL 1161416, at \*2 (Mich. Ct. App. May 25, 2004). In *Hesse*, the plaintiffs' 16-year-old son was killed in an explosion at the defendant's auto repair shop. *Id.* at \*1. The court, affirming the rejection of the plaintiffs' intentional infliction of emotional distress claim, determined that the defendant's alleged failure to send the plaintiffs' son home on time, failure to adequately train employees regarding workplace safety, and failure to adhere to requirements of the son's school-sponsored work study program, could not "reasonably be regarded as so reckless that any reasonable person would know emotional distress would result." *Id.* at \*8.

Similarly, in this case, Brock and Kory Ackerman's, as owners of K&B Transportation, "failure to avoid extreme and outrageous conduct" by allegedly deciding, for example, whether and when to equip vehicles with safety equipment, scheduling drivers, and assigning vehicles to drivers, cannot be regarded as extreme and outrageous individual conduct.

Case 4:26-cv-10821-SDK-CI ECF No. 24-2, PageID.337 Filed 08/04/26 Page 28 of 29

Solek v. K & B Transportation, Inc., Not Reported in Fed. Supp. (2021)

Defendants also argue that Plaintiffs fail to allege the requisite intent for their intentional infliction of emotional distress claim because they allege that the Ackerman Defendants "intentionally or recklessly *failed to avoid* extreme and outrageous conduct...." (Defs.' Mot. at pp. 23-24, PageID.915-16.) Defendants contend that Plaintiffs fail to allege that the Ackerman Defendants *intended* to "inflict the injury of emotional distress on Plaintiffs" as required by Michigan law. (*Id.*, citing *Graham*, 237 Mich. App. 670). In *Graham*, the court found that plaintiffs failed to satisfy the "intent" requirement because they did not demonstrate "a specific intent on Ford's part to inflict the alleged injury of emotional distress on plaintiffs." *Graham*, 237 Mich. App. at 675. Defendants point out that the Ackerman Defendants did not know the Solek Plaintiffs prior to the accident, and thus could not have any intent toward them. Plaintiffs respond that the Ackerman Defendants at least "recklessly inflicted emotional distress with their profit-driven scheme, meeting this element." (Pls.' Resp. at p. 25, PageID.1212.) The Court agrees with Defendants and finds that, in addition to Plaintiffs' failure to sufficiently plead extreme and outrageous conduct, that they fail to sufficiently plead that Brock and Kory Ackerman individually intentionally or recklessly caused severe emotional distress to the Plaintiffs.

The Court therefore dismisses Plaintiffs' intentional infliction of emotional distress claim with prejudice.

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 30).

Specifically, Defendants' motion is **GRANTED** as to Plaintiffs' negligence claim against Defendants Brock and Kory Ackerman, individually, in Count I, and that claim against the Ackerman Defendants is **DISMISSED WITHOUT PREJUDICE**. However, Plaintiffs' negligence claim in Count I shall proceed against Defendants K&B Transportation, Inc. and Johnny Stewart.

Defendants' motion is **GRANTED** with respect to Plaintiffs' negligent infliction of emotional distress claim in Count II against Defendants Brock and Kory Ackerman <u>only</u>, but is otherwise **DENIED** with respect to the negligent infliction of emotional distress claim in Count II against Defendants K&B Transportation, Inc. and Johnny Stewart.

Finally, Defendants' motion is **GRANTED** with respect to Plaintiffs' intentional infliction of emotional distress claim in Count III, and that claim is **DISMISSED WITH PREJUDICE**.

 **\*13** To sum, Plaintiffs may proceed with their negligence and negligent infliction of emotional distress claims in Counts I and II of their FAC against Defendants K&B Transportation, Inc. and Johnny Stewart.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4290181

---

Footnotes

1    This statement of facts is taken directly from the allegations in Plaintiffs' First Amended Complaint, and these allegations, and all reasonable inferences from them, are presumed true for purposes of deciding this motion to dismiss.

2    Defendants also filed a Motion to Strike Pursuant to Fed. R. Civ. P. 12(f), seeking to strike certain portions of Plaintiffs' First Amended Complaint. (ECF No. 27.) On September 10, 2021, the Court granted in part and denied in part that motion to strike. (ECF No. 39, Order.)

3    Plaintiffs assert claims for negligence and negligent infliction of emotional distress against Defendants Brock and Kory Ackerman in their individual capacities (the Ackerman Defendants), as well as against Defendants K&B and Stewart, and a claim for intentional infliction of emotional distress against the Ackerman Defendants only. Defendants initially argue in their motion to dismiss that "in order to assert all three claims against Brock and Kory [Ackerman] in their individual capacities, [Plaintiffs] improperly seek to pierce the corporate veil." (Defs.' Mot. at p. 3, PageID.895.) Defendants contend that Plaintiffs fail to meet their heavy burden of establishing that the corporate veil should be pierced." (*Id.*) However, Plaintiffs state in their Response brief that they want to make it "clear from the outset" that they "do not claim that

**WESTLAW**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    10

Brock and Kory Ackerman are mere instrumentalities of K&B (or vice versa)" and that they "are not currently attempting to pierce the corporate veil in the traditional sense to hold the Ackermans personally liable at all." (Pls.' Resp. at pp. 1-2, PageID.1188-89 ("Indeed, Plaintiffs are not currently trying to pierce the corporate veil at all[.]").) Plaintiffs' counsel similarly stated during the hearing on this motion that the Plaintiffs were not currently seeking to pierce the corporate veil, but instead contend that Brock and Kory Ackerman are liable for their own negligent conduct. Accordingly, the Court will not address the piercing-the-corporate-veil issue at this time.

The Court further notes that Plaintiffs argue first in their Response that Defendants' motion to dismiss is premature because discovery has not been conducted, citing Fed. R. Civ. P. 56(b), which governs motions for summary judgment. (Pls.' Resp. at pp. 5-6, PageID.1192-93.) This argument is rejected. Defendants' motion is brought pursuant to Fed. R. Civ. P. 12(b)(6), not Rule 56(b), and was required to be filed "before pleading if a responsive pleading is allowed," and thus necessarily before any discovery could be conducted, and thus is clearly not "premature."

4      The term "interstate transporter" is not defined in the FAC, and does not appear to be a statutory term, but presumably this term is more properly referring to K&B, an interstate trucking transportation company.

5      Although a duty of care can be established through a statute, "the fact that defendant's conduct may have been in violation of a statute does not in and of itself shed light on whether defendant owed plaintiff a duty of care." *Cipri v. Bellingham Frozen Foods, Inc.*, 235 Mich. App. 1, 16 (1999). Plaintiffs here have presented no caselaw establishing a duty of care under the facts of this case, and "[i]t is Plaintiff's responsibility to establish the existence of a duty by which Defendant may be held liable for negligence." *Grifo & Co.*, 485 F. Supp. 3d at 900 (collecting cases).

6      Plaintiffs assert their negligent infliction of emotional distress claim against all Defendants, including Brock and Kory Ackerman, individually. (FAC, Count II, PageID.365.) Plaintiffs allege that "K & B Transportation, Brock Ackerman, Kory Ackerman, and Stewart owed to the general public, including Plaintiffs Amy and Brent Solek, the duty to exercise reasonable care in their conduct, so as to prevent emotional injury to innocent bystanders who are immediate family relatives of the deceased." (*Id.* ¶ 86, PageID.365.) For the reasons discussed *supra* as to why Plaintiffs' general negligence claim against Brock and Kory Ackerman, individually fails – namely, failure to allege a duty owed by these individual defendants to Plaintiffs – their negligent infliction of emotional distress claim against these two defendants, individually, fails, and this claim is dismissed as to Brock and Kory Ackerman only.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.