**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHRIS PARTRIDGE,

Plaintiff,

v.

UNIVERSITY of MICHIGAN, et al.;

Defendants.

Case No. 4:26-cv-10821
Hon. Shalina D. Kumar

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS UNIVERSITY OF MICHIGAN, UNIVERSITY OF MICHIGAN BOARD OF REGENTS, SANTA ONO, AND WARDE MANUEL'S MOTION TO DISMISS**

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES ..................... ii**

**STATEMENT OF ISSUES PRESENTED ..................... iv**

**CONTROLLING OR MOST APPROPRIATE AUTHORITIES ..................... v**

**INTRODUCTION ..................... 1**

**STATEMENT OF FACTS ..................... 1**

**STANDARD OF REVIEW ..................... 3**

**ARGUMENT ..................... 3**

**I. SOVEREIGN IMMUNITY DOES NOT BAR PARTRIDGE'S INDIVIDUAL-CAPACITY CLAIMS OR CLAIMS FOR PROSPECTIVE RELIEF ..................... 3**

**II. COACH PARTRIDGE HAS PLAUSIBLY ALLEGED FIRST AMENDMENT RETALIATION AGAINST DEFENDANT MANUEL (COUNT III). 4**

A. Coach Partridge Engaged in Protected Speech. ..................... 4

B. Defendants Took Adverse Action Against Partridge Because of His Protected Speech. ..................... 11

C. Defendant Manuel Is Not Entitled to Qualified Immunity. ..................... 12

**III. PARTRIDGE PLAUSIBLY ALLEGED A PROCEDURAL DUE PROCESS VIOLATION (COUNT I) ..................... 13**

A. Partridge Plausibly Alleged a Protected Property Interest. ..................... 13

B. UM Failed to Provide Partridge with Adequate Due Process ..................... 17

C. Manuel Is Not Entitled to Qualified Immunity. ..................... 18

**IV. PARTRIDGE PLAUSIBLY ALLEGES SUPERVISORY LIABILITY AGAINST DEFENDANT ONO (COUNT II) ..................... 19**

A. Partridge Plausibly Alleges Ono's Own Supervisory Conduct Authorized or Encouraged Manuel's Constitutional Violations. ..................... 19

B. Ono Is Not Entitled to Qualified Immunity. ..................... 23

**V. PARTRIDGE PLAUSIBLY ALLEGES A CONSPIRACY TO VIOLATE HIS CONSTITUTIONAL RIGHTS (COUNT IV) ..................... 23**

A. Partridge Plausibly Alleges an Agreement and Shared Objective. ..................... 24

B. Partridge Plausibly Alleges an Act Causing Constitutional Injury ..................... 24

**CONCLUSION ..................... 25**

# TABLE OF AUTHORITIES

**Cases**

*Ashford v. Univ. of Michigan*, 89 F.4th 960 (6th Cir. 2024) .......... 6
*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) .......... 4, 13
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 3
*Bickerstaff v. Lucarelli*, 830 F.3d 388 (6th Cir. 2016) .......... 3
*Boulton v. Swanson*, 795 F.3d 526 (6th Cir. 2015) .......... 5, 6
*Chilingirian v. Boris*, 882 F.2d 200 (6th Cir. 1989) .......... 13, 15
*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) .......... 17, 18, 23
*Connick v. Myers*, 461 U.S. 138 (1983) .......... 4, 7
*DeCrane v. Eckart*, 12 F.4th 586 (6th Cir. 2021) .......... 5
*Diei v. Boyd*, 116 F.4th 637 (6th Cir. 2024) .......... 12, 13
*Ehinger v. Univ. of Mich. Bd. of Regents*, No. 190492, 1997 WL 33343826 …(Mich. Ct. App. Sept. 19, 1997) .......... 16
*Ex parte Young*, 209 U.S. 123 (1908) .......... 3
*Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004) .......... 10
Garcetti v. Ceballos, 547 U.S. 410 (2006) .......... 4, 5
*Garza v. Lansing Sch. Dist.*, 972 F.3d 853 (6th Cir. 2020) .......... 19, 23
*Gillis v. Miller*, 845 F.3d 677 (6th Cir. 2017) .......... 11
*Hafer v. Melo*, 502 U.S. 21 (1991) .......... 3
*Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985) .......... 23, 24
*Josephson v. Ganzel*, 115 F.4th 771 (6th Cir. 2024) .......... 3
*Lane v. Franks*, 573 U.S. 228 (2014) .......... 5, 6
*Liu v. Stone*, Nos. 224784, 224785, 2001 WL 865075 (Mich. Ct. App. July 31, 2001) .......... 16
*Mayhew v. Town of Smyrna*, 856 F.3d 456 (6th Cir. 2017) .......... 5
*Odom v. Univ. of Mich.*, No. 16-12791, 2017 WL 2117978 (E.D. Mich. May 16, 2017) .......... 15
*Pearson v. Callahan*, 555 U.S. 223 (2009) .......... 12
Pickering v. Bd. of Educ., 391 U.S. 563 (1968) .......... 4, 10
*Ramsey v. Bd. of Educ.*, 844 F.2d 1268 (6th Cir. 1988) .......... 18
*Rankin v. McPherson*, 483 U.S. 378 (1987) .......... 10
*Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591 (Mich. 1993). .......... 13
*Sharp v. Lindsey*, 285 F.3d 479 (6th Cir. 2002) .......... 18
*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004) .......... 18, 23
*Solo v. United Parcel Serv. Co.*, 819 F.3d 788 (6th Cir. 2016) .......... 13, 17
*Stern v. Shouldice*, 706 F.2d 742 (6th Cir. 1983) .......... 8, 12, 23
*Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880 (Mich. 1980) .......... 13

*Venema v. West*, 133 F.4th 625 (6th Cir. 2025) ....................22, 23
*Waters v. Churchill*, 511 U.S. 661 (1994)....................11
*Weisbarth v. Geauga Park Dist.*, 499 F.3d 538 (6th Cir. 2007)....................7
*Weser v. Goodson*, 965 F.3d 507 (6th Cir. 2020)....................24
*Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich. 2003). ....................15
*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ....................3

**Statutes**

42 U.S.C. § 1983 ....................3

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................3

**Constitutional Provisions**

U.S. Const. Amendment XIV....................4, 13

# STATEMENT OF ISSUES PRESENTED

I. Whether sovereign immunity bars Plaintiff's claims against the University Defendants where Plaintiff seeks prospective injunctive relief against the appropriate officials under *Ex parte Young*.

II. Whether Ono and Manuel are entitled to qualified immunity at the pleading stage where the Amended Complaint plausibly alleges violations of clearly established constitutional rights.

III. Whether Plaintiff plausibly alleges a procedural due process claim (Count I) where his MOU incorporated University policies that limited disciplinary discharge and he was terminated without notice or opportunity to respond.

IV. Whether Plaintiff plausibly alleges supervisory liability against Ono (Count II) based on Ono's own supervisory conduct authorizing, encouraging, or acquiescing in Manuel's constitutional violations.

V. Whether Plaintiff plausibly alleges First Amendment retaliation against Manuel (Count III) where he was terminated for advising a student-athlete to obtain counsel and tell the truth during an NCAA investigation.

VI. Whether Plaintiff plausibly alleges a § 1983 conspiracy (Count IV) by alleging an agreement, shared objective, overt acts, and resulting constitutional injury.

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Sovereign Immunity**

*Josephson v. Ganzel*, 115 F.4th 771 (6th Cir. 2024)

**Qualified Immunity**

*Pearson v. Callahan*, 555 U.S. 223 (2009)

*Venema v. West*, 133 F.4th 625 (6th Cir. 2025)

**Count I: Procedural Due Process**

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972)

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)

*Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591 (Mich. 1993)

*Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880 (Mich. 1980)

**Count II: Supervisory Liability**

*Garza v. Lansing Sch. Dist.*, 972 F.3d 853 (6th Cir. 2020)

*Venema v. West*, 133 F.4th 625 (6th Cir. 2025)

**Count III: First Amendment Retaliation**

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)

*Lane v. Franks*, 573 U.S. 228 (2014)

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)

*Stern v. Shouldice*, 706 F.2d 742 (6th Cir. 1983)

**Count IV: Civil Rights Conspiracy**

*Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985)

*Weser v. Goodson*, 965 F.3d 507 (6th Cir. 2020)

## INTRODUCTION

This case arises from the termination of Coach Chris Partridge by the University of Michigan's ("UM" or "the University") during the NCAA sign-stealing investigation within the University's football program. Partridge complied with UM's instruction not to discuss the substance of the investigation but was terminated after advising a nervous student-athlete to speak with his parents about obtaining counsel and to be honest with the NCAA. The University failed to provide Partridge with notice of the accusations against him or an opportunity to respond.

The Amended Complaint (the "Complaint") plausibly states constitutional claims. Partridge alleges that Manuel retaliated against him for protected speech and deprived him of a protected employment interest without required pretermination process, that Ono's own supervisory conduct authorized or encouraged Manuel's constitutional violations, and that Manuel and Petitti agreed to use his termination to resolve UM's dispute with the Big Ten. At the pleading stage, those allegations must be accepted as true and reasonable inferences drawn in Partridge's favor. The Court should deny dismissal of Counts I-IV. Partridge does not oppose dismissal of Count V as a standalone claim, while preserving the request for prospective relief.

## STATEMENT OF FACTS

Partridge joined the UM football program in 2023 under an MOU governing his employment and incorporating UM's termination provisions applicable to employees in his classification. ECF No. 13, PageID.143–45, 164. In Fall of 2023,

outside counsel allegedly presented findings concerning violations within the program to Ono, Manuel, and other senior officials. Ono instructed those present not to take notes or record the presentation or discuss what they learned outside the room. ECF No. 13, PageID.141–42. At a subsequent meeting, UM counsel and athletics officials instructed coaches not to communicate with anyone about the subject of the NCAA investigation. ECF No. 13, PageID.134–37, 152–53. Afterward, a nervous student-athlete asked Partridge for advice before his NCAA interview. Partridge told him to speak with his parents about obtaining counsel and to be honest with the NCAA but did not discuss the matters under investigation. ECF No. 13, PageID.133–34, 153.

Two days before Partridge's termination, Petitti allegedly threatened to disclose damaging information about Partridge at UM's impending injunction hearing. Manuel allegedly offered to terminate Partridge and dismiss UM's claims in exchange for Petitti withholding the information, issuing a favorable statement, and ending the NCAA investigation. ECF No. 13, PageID.156–57. UM announced the resolution the next day. ECF No. 13, PageID.157. On November 17, Manuel terminated Partridge. He allegedly announced the termination before explaining the accusation against him and refused to let Partridge respond. Manuel acknowledged there was no evidence connecting Partridge to the sign-stealing scheme. ECF No.

13, PageID.158–59. Partridge subsequently pursued UM's grievance process, which upheld his termination. ECF No. 13, PageID.160–65.

Partridge alleges that he is unable to secure employment in college football due to his termination, resulting publicity, and blacklisting, and seeks reinstatement and prospective relief. ECF No. 13, PageID.166–67, 176–77.

## STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead sufficient facts to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept well-pleaded allegations as true and draw reasonable inferences in Plaintiff's favor. *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016).

## ARGUMENT

### I. SOVEREIGN IMMUNITY DOES NOT BAR PARTRIDGE'S INDIVIDUAL-CAPACITY CLAIMS OR CLAIMS FOR PROSPECTIVE RELIEF.

Plaintiff does not dispute that the University is immune from 42 U.S.C. § 1983 damages or that damages are unavailable against Ono and Manuel in their official capacities. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). However, sovereign immunity does not bar individual-capacity claims, *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991), or prospective official-capacity relief under *Ex parte Young*, 209 U.S. 123, 159–60 (1908), including reinstatement. *Josephson v. Ganzel*, 115 F.4th 771, 782 (6th Cir. 2024). *Pennhurst St. Sch. & Hosp. v. Halderman* does not bar the due-process relief sought because the University policies establish the alleged

property interest, 465 U.S. 89, 105 (1984), while the right enforced arises under the Fourteenth Amendment. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Plaintiff therefore does not oppose dismissal of Count V as a standalone claim, while preserving his request for prospective relief under Counts I and III.

## II. COACH PARTRIDGE HAS PLAUSIBLY ALLEGED FIRST AMENDMENT RETALIATION AGAINST DEFENDANT MANUEL (COUNT III).

To state a First Amendment retaliation claim, a plaintiff must allege "(1) [he] engaged in protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (internal citations omitted).

In the public employment context, a court must ask whether (1) the employee spoke as a private citizen (2) on a matter of public concern, and (3) whether his speech interest outweighed the University's operational interests. *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006); *Connick v. Myers*, 461 U.S. 138, 143 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

### A. Coach Partridge Engaged in Protected Speech.

#### *1. Partridge spoke as a private citizen, not pursuant to official duties.*

*Garcetti* held that a public employee does not speak as a citizen when he speaks "pursuant to [his] official duties." 547 U.S. at 421. The Court observed that Ceballos's speech "owe[d] its existence to a public employee's professional

responsibilities" and held that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22. The Court later clarified that an employment connection alone is not sufficient to *per se* classify speech as employee speech. *Lane v. Franks*, 573 U.S. 228, 239–40 (2014). "[T]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 240. The Sixth Circuit accordingly asks whether the speech was made "in furtherance of the ordinary responsibilities of [the employee's] employment," *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015), considering its impetus, setting, audience, and subject matter. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017); *DeCrane v. Eckart*, 12 F.4th 586, 596 (6th Cir. 2021).

Defendants improperly rely on the very *Garcetti* language that *Lane* subsequently clarified. Quoting *Garcetti*, Defendants argue that Partridge's speech "'owes its existence' to his responsibilities as a coach." ECF No. 23, PageID.248–250. However, *Lane* makes clear that the impetus, setting, and audience inform rather than replace the ultimate inquiry: What matters is "whether the speech itself was ordinarily within the employee's duties, not whether it merely concerns those duties. Indeed, speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge

of matters of public concern through their employment." 573 U.S. at 229; *see also Ashford v. Univ. of Mich.*, 89 F.4th 960, 972 (6th Cir. 2024) (applying *Lane*). Thus, while Partridge's employment may explain why he knew and spoke with the student, nothing in the Complaint (or basic common sense) leads to a conclusion that advising a fearful student to speak with his parents or obtain independent legal counsel when faced with an ominous meeting with a powerful oversight body's attorneys was a standard responsibility of college-level football coaching.

Defendants' reliance on Partridge's mentoring responsibilities does not bridge the gap. ECF No. 23, PageID.250. The Complaint recognizes that coaches develop close relationships with student-athletes and provide support through difficult circumstances. ECF No. 13, PageID.136. However, a general responsibility to mentor and support students does not make every subject on which a student seeks advice an official coaching duty. Indeed, UM itself treated this situation as anything but ordinary: amid a nationally publicized NCAA investigation, it convened a special meeting specifically to restrict its coaches' speech. Having created extraordinary restrictions governing an extraordinary situation, the University cannot recast Partridge's response to that situation as ordinary mentoring. The relevant speech must itself have been undertaken in furtherance of Partridge's *ordinary* responsibilities. *Lane*, 573 U.S. at 229; *Boulton*, 795 F.3d at 534. Advising a student facing a consequential quasi-legal process to speak with his parents about

obtaining independent legal counsel is not alleged to have been among those ordinary responsibilities. Defendants then argue that the instruction concerning communications with student-athletes itself confirms that such communications constituted "ad hoc or de facto duties" under *Weisbarth*. ECF No. 23, PageID.250–51; *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007). However, the *ad hoc* duty imposed by the directive was a restriction: do not discuss the investigation's substance. Partridge complied with that restriction. ECF No. 13, PageID.152–54. Nothing in the Complaint establishes that providing advice about independent legal matters became an assigned, implied, or *de facto* coaching responsibility merely because UM restricted communications on a related subject.

Partridge plausibly alleges that the advice he gave the student was not an "ad hoc or de facto" duty, and it was not part of his ordinary duties of coaching, mentoring, supervising athletic performance, and enforcing team discipline. ECF No. 13, PageID.146. The allegations plausibly establish that Partridge spoke as a private citizen.

***2. Partridge spoke on a matter of public concern.***

Whether speech addresses a matter of public concern turns on its "content, form, and context." *Connick v. Myers*, 461 U.S. 138, 147 (1983). The Sixth Circuit has already protected remarkably similar speech. In *Stern v. Shouldice*, where a suspended public-college student approached his faculty advisor, who advised him

to seek legal assistance, the Sixth Circuit held that "counseling the student to seek legal advice about the suspension was protected under the first amendment." 706 F.2d 742, 744–45, 748 (6th Cir. 1983) (internal citations omitted). The parallel is substantial: Partridge served in a mentoring relationship with a student facing consequential proceedings and advised him to seek assistance. Further:

> The record is devoid of evidence that Stern's counseling adversely affected his teaching, caused problems among other faculty members or undermined the authority of Linderoth as the head of the Arts and Letters Division. Nor was Stern a confidential employee of Shouldice or Linderoth as that term is used in *Pickering*. Finally, Stern's advice did not disrupt College operations in general. Precisely the opposite appears to have been true; for after the student sought legal counsel, the matter was smoothly resolved by readmitting the student subject to certain restrictions on participation in extra-curricular activities.

*Id*. As in *Stern*, Partridge's advice helped the investigation proceed smoothly.

The extraordinary public attention surrounding the sign-stealing investigation further confirms that Partridge's speech concerned a matter of public concern. Between October 19 and November 13, 2023—before Partridge's speech in question occurred—the investigation generated extensive national and international headlines. The Washington Post described the controversy as "the talk of this college football season."[1] The Guardian described the allegations as having "rocked" one of

---

[1] Matt Bonesteel, *The Michigan Sign-Stealing Scandal: What You Need to Know*, WASH. POST (Oct. 31, 2023), https://www.washingtonpost.com/sports/2023/10/26/michigan-sign-stealing-scandal/.

college sports' largest programs.[2] The Associated Press reported that NCAA investigators were interviewing members of UM's coaching staff.[3] ESPN called this "the biggest story in college football" and described information about the investigation as "flowing fast and furiously."[4] By the time Partridge spoke with the student, the investigation was not merely an internal University matter; it was the subject of sustained national and international scrutiny and public debate about the integrity of UM's football program.

As the investigation rapidly unfolded under intense public scrutiny, the rights of the students being questioned took on particular significance. Partridge alleges that University officials did not inform the students that NCAA Bylaws permitted interviewees to be represented by counsel. ECF No. 13, PageID.137. Partridge further alleges that UM and the NCAA preferred that students attend their interviews without counsel present because attorneys could guard against coercive questioning and seek limited immunity, thereby protecting students' scholarships and eligibility. *Id*. Against that backdrop, Partridge advised a student to speak with his parents about obtaining counsel and to tell the truth. ECF No. 13, PageID.153–54. As in *Stern*, that

---

[2] Oliver Connolly, *Disguises, Subterfuge and Conspiracy: College Football's Sign-Stealing Scandal Explained*, THE GUARDIAN (Nov. 10, 2023, at 4:35 PM ET), https://www.theguardian.com/sport/2023/nov/10/michigan-wolverines-college-football-big-ten-sign-stealing-jim-harbaugh-suspension.

[3] Larry Lage, *NCAA Investigators Interview Jim Harbaugh's Staff About Sign-Stealing Scheme, AP Source Says*, ASSOC. PRESS (Oct. 26, 2023, at 6:30 PM ET), https://apnews.com/article/michigan-sign-stealing-ncaa-jim-harbaugh-84777a6c138c87c8ea0f3d729d60db71.

[4] Heather Dinich, Adam Rittenberg & Mark Schlabach, *Michigan Sign-Stealing Allegations: Next Steps for NCAA, Big Ten and More*, ESPN (Oct. 26, 2023, at 12:30 PM ET), https://www.espn.com/college-football/story/_/id/38749342/michigan-sign-stealing-allegations-ncaa-big-ten-investigation.

advice implicated the protections available to students facing consequential institutional questioning, not merely an internal workplace grievance.

### *3. Partridge's Speech Outweighed UM's Operational Interests.*

Finally, *Pickering* balances a public employee's First Amendment interest against the employer's interest in efficient operations, considering workplace discipline, relationships, and disruption. 391 U.S. at 568; *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Partridge agrees that UM had legitimate operational interests in protecting the sanctity of the investigation and enforcing its lawful directives. However, Defendants' argument assumes that Partridge violated directives and threatened the investigation. ECF No. 23, PageID.251–52. In fact, the Complaint alleges the opposite: Partridge did not discuss the investigation's substance. ECF No. 13, PageID.133–34, 153. It alleges no concealment, refusal to cooperate, coordination of testimony, dishonesty, or other interference. Defendants cannot manufacture necessary disruption by assuming that Partridge violated the directive and then use that disputed premise to tip the *Pickering* balance in their favor.

Defendants' reliance on *Farhat* is misplaced. ECF No. 23, PageID.252. There, on summary judgment, the Sixth Circuit upheld a 15-day restriction on speech during an investigation of an employee's abusive conduct. The record was "replete with Appellant's history of this very type of behavior." *Farhat v. Jopke*, 370 F.3d 580, 598 (6th Cir. 2004). Here, the University's restriction had no alleged end date,

and there is no comparable history or alleged disruption—only one communication advising a student to obtain counsel and tell the truth. ECF No. 13, PageID.153–54. Nor have Defendants identified a reasonable basis to predict that Partridge's speech would disrupt the investigation. Although an employer need not await actual disruption, *Gillis v. Miller*, 845 F.3d 677, 687 (6th Cir. 2017), its prediction of disruption must be reasonable. *Waters v. Churchill*, 511 U.S. 661, 677–78 (1994). Defendants point to UM's interest in preventing interference with the investigation, ECF No. 23, PageID.251–52, but do not explain how Partridge's speech threatened that interest. Advising a student to talk with his parents about obtaining counsel as expressly permitted by NCAA rules and to tell the truth does not obstruct an investigation, it facilitates informed and truthful participation in it.

Because Partridge spoke as a private citizen on a matter of public concern and the *Pickering* balancing test tilts in his favor, Partridge plausibly alleges that his speech was protected under the First Amendment.

**B. Defendants Took Adverse Action Against Partridge Because of His Protected Speech.**

Defendants do not dispute that termination constitutes adverse action. As to causation, Partridge need only allege that his protected conduct was "at least in part" a motivating factor for the adverse action. *Thaddeus-X*, 175 F.3d at 394. The Complaint does just that. The speech Partridge argues is protected was the same speech that Defendants invoked in terminating him. Manuel terminated Partridge

because he "failed to comply with the directive." ECF No. 23, PageID.232. Characterizing the speech as a violation of a directive does not break the causal link—it confirms it.

**C. Defendant Manuel Is Not Entitled to Qualified Immunity.**

Qualified immunity turns on whether (1) the allegations establish a constitutional violation and (2) whether the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). At the pleading stage, those questions are evaluated on Partridge's allegations, not Defendants' competing characterization of the facts. *Diei v. Boyd*, 116 F.4th 637, 651 (6th Cir. 2024).

Manuel had fair notice that Partridge's speech was protected. In *Stern v. Shouldice*, the Sixth Circuit held that a public-university employee's counseling of a student to obtain legal assistance was protected by the First Amendment and denied qualified immunity because "a reasonable person should have known" that the counseling was protected. 706 F.2d at 749. Thus, *Stern* did more than clearly establish the right decades before the conduct alleged here; it held that reasonable university officials should have recognized the constitutional protection even then, in 1983. Manuel had fair notice. Defendants' reliance on the University directive does not alter that conclusion. They characterize Partridge's speech as violating the directive and rely on that asserted violation in arguing his speech was unprotected. ECF No. 23, PageID.250–51. That argument assumes the disputed premise that

Partridge violated the University's directive. However, the Complaint alleges that Partridge complied with the directive and was terminated for advising a student to obtain counsel. ECF No. 13, PageID.152–54. At the pleading stage, that factual dispute cannot be resolved in Manuel's favor. *See Diei*, 116 F.4th at 651. Further, because resolution of this issue turns on a factual dispute, the claim cannot be dismissed at the pleading stage. *See Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016).

## III. PARTRIDGE PLAUSIBLY ALLEGED A PROCEDURAL DUE PROCESS VIOLATION (COUNT I).

### A. Partridge Plausibly Alleged a Protected Property Interest.

The Fourteenth Amendment protects a public employee from deprivation of a property interest in continued employment without due process of law. U.S. Const. Amendment XIV. A public employee has a protected property interest in continued employment when state law, contract, or governing employment rules create a "legitimate claim of entitlement" by substantively limiting the employer's discretion to discharge. *Roth*, 408 U.S. at 577. That limitation may arise from contractual provisions or sufficiently definite employment policies restricting discharge to just cause. *Toussaint v. Blue Cross & Blue Shield of Mich.*, 292 N.W.2d 880, 892 (Mich. 1980); *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 597–98 (Mich. 1993).

Defendants treat the MOU's statement that Partridge's employment was "at will and may be terminated with or without cause" as dispositive. ECF No. 11-2,

PageID.110. But the MOU also subjected Partridge to "the University's standard provisions applicable to employees in your classification regarding termination of your employment." ECF No. 13, PageID.164. As shown below, those incorporated provisions plausibly limited Defendants' authority to discharge Partridge for misconduct.

UM's Standard Practice Guide ("SPG")[5] 201.57 provides that temporary appointments address "short-term or sporadic staffing needs," while "ongoing staffing needs" use the regular appointment process. ECF No. 13, PageID.164. Partridge alleges that his full-time Linebackers Coach position was regular and permanent, ECF No. 13, PageID.146, thereby plausibly alleging that it met an ongoing staffing need and that he was "regular" staff.

SPG 201.10 defines "discipline" as action taken "as a result of misconduct," expressly includes "discharge" as discipline, and provides that misconduct constitutes "just cause for taking disciplinary action." SPG 201.10, Ex. 1 at 3–4. Together, those provisions plausibly condition disciplinary discharge on misconduct constituting just-cause. The apparently competing provisions can be harmonized: the MOU permitted termination without cause, while the incorporated provisions restricted disciplinary discharge for misconduct. Defendants themselves

[5] "University policies (SPGs) set expectations for individual and organizational behavior for employees and departments, and apply to the entire institution." *U-M Standard Practice Guide*, UNIVERSITY OF MICHIGAN, https://spg.umich.edu/ (last visited Aug. 24, 2026).

characterize Partridge's termination as disciplinary—they argue that Manuel discharged Partridge because he "violated the directive." ECF No. 23, PageID.252. The just-cause limitation plausibly applies to Partridge's employment. *See Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (Mich. 2003).

Defendants' reliance on *Odom* and *Chilingirian* does not alter that conclusion. Those cases recognize that a public employee lacks a property interest when (1) he has not been promised termination only for good cause, and (2) his position is held "at the will and pleasure of his superiors." *Odom v. Univ. of Mich.*, No. 16-12791, 2017 WL 2117978, at *5 (E.D. Mich. May 16, 2017) (quoting *Chilingirian v. Boris*, 882 F.2d 200, 203 (6th Cir. 1989)). The first predicate is addressed above: Partridge plausibly alleges that his MOU incorporated provisions conditioning disciplinary discharge on just cause. As to the second, Defendants contend that Partridge fell outside SPG protections because he served "at the pleasure" of his superiors. ECF No. 23, PageID.240. It is true that SPG 201.12 expressly excludes employees "whose employment agreement states that they serve at the pleasure of a particular University official." ECF No. 11-5, PageID.121. However, Partridge's MOU says no such thing. It instead conditions his employment on "satisfactory performance as determined by the Head Football Coach and Athletic Director." ECF No. 13, PageID.144. If a condition of "satisfactory performance" were enough to place an employee within the "serve at the pleasure" exclusion in SPG 201.12, the exception

would swallow the rule. All employment relationships condition continued employment on satisfactory performance as determined by a superior. Defendants' conflation of these two different contractual standards should not be merited. *Odom* and *Chilingirian* do not help Defendants.

Defendants' reliance on *Liu* and *Ehinger* is likewise misplaced. In those cases, the employees relied on University policies as independent sources of a just-cause limitation. *Liu v. Stone*, Nos. 224784, 224785, 2001 WL 865075, at *3 (Mich. Ct. App. July 31, 2001); *Ehinger v. Univ. of Mich. Bd. of Regents*, No. 190492, 1997 WL 33343826, at *2 (Mich. Ct. App. Sept. 19, 1997). That is not Partridge's theory. Partridge's MOU itself expressly incorporates the University provisions applicable to employees in his classification. His claimed limitation therefore arises from the written terms governing his employment—including the provisions incorporated by reference—not from the SPGs standing alone.

Taken together, the allegations establish a plausible chain of entitlement: Partridge was Regular Staff; his MOU incorporated the policies applicable to that classification, including provisions conditioning disciplinary discharge on misconduct constituting just cause; and the "serve at the pleasure" exclusion does not apply.

Finally, any dispute over whether Partridge was Regular Staff or instead fell within an excluded employment classification presents a factual issue that cannot be

resolved against him on the pleadings and warrants development through discovery. *See Solo*, 819 F.3d at 796. At this stage, Partridge has plausibly alleged a protected property interest.

**B. UM Failed to Provide Partridge with Adequate Due Process.**

An employee with a protected property interest generally must receive notice of the charges, an explanation of the employer's evidence, and an opportunity to respond *before* termination. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–46 (1985). Partridge plausibly alleges that he was not given sufficient due process prior to his dismissal. The grievance proceeding the University provided Partridge after it terminated him does not cure that deprivation. *Loudermill* itself involved post-termination review but required an opportunity to respond before termination. *Id.* at 535–36, 545–48.

Partridge plausibly alleges specific facts supporting the lack of due process. Manuel "immediately" announced Partridge's termination, identified the accusation only afterward, and "refused to let him speak" when he attempted to respond. ECF No. 13, PageID.158. The Complaint alleges that Manuel had offered to terminate Partridge two days earlier in connection with UM's litigation against the Big Ten. ECF No. 13, PageID.157–58. Taken as true, Partridge was terminated without prior notice or a meaningful opportunity to respond.

Defendants rely on *Ramsey* and *Sharp* for the rule that an adequate state-law

remedy may satisfy due process where the alleged deprivation amounts only to an ordinary breach of an employment contract. ECF No. 23, PageID.243; *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1273 (6th Cir. 1988); *Sharp v. Lindsey*, 285 F.3d 479, 489 (6th Cir. 2002). But that argument depends on the premise rejected above—that Partridge alleges merely a contractual deprivation. He does not. He alleges deprivation of the protected employment interest itself. *Ramsey* distinguished a dispute over an employment benefit from the deprivation of continued employment, 844 F.2d at 1274, recognizing that, because public employment implicates an employee's livelihood, due process ordinarily requires some predeprivation procedure before termination. *Id.* at 1273. Because Partridge plausibly alleges a protected property interest arising from substantive restrictions on disciplinary discharge, *Loudermill* required constitutionally adequate pretermination process.

**C. Manuel Is Not Entitled to Qualified Immunity.**

To overcome qualified immunity, Partridge must plausibly allege (1) a constitutional violation and (2) that the right violated was clearly established. *Loudermill* established that an employee with a protected property interest is entitled to notice and an opportunity to respond before termination. 470 U.S. at 545–46; *see Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 567 (6th Cir. 2004). Because Partridge plausibly alleges that Manuel terminated him without affording him that process, Manuel is not entitled to qualified immunity at the pleading stage.

## IV. PARTRIDGE PLAUSIBLY ALLEGES SUPERVISORY LIABILITY AGAINST DEFENDANT ONO (COUNT II).

### A. Partridge Plausibly Alleges Ono's Own Supervisory Conduct Authorized or Encouraged Manuel's Constitutional Violations.

Section 1983 does not impose supervisory liability based on *respondeat superior*. A supervisor may nevertheless be individually liable where he "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865 (6th Cir. 2020), citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Although supervisory liability requires some "active unconstitutional behavior," the supervisor need not physically participate in, or be present during, the ultimate constitutional violation. *Id.* at 867-68. The question is whether the supervisor's own conduct sufficiently authorized, encouraged, approved, or knowingly acquiesced in the subordinate's violation and was causally connected to the resulting injury.

The allegations concerning Ono's supervisory role began when UM first discovered violations within the football program. ECF No. 13, PageID.141. The circumstances of the ensuing investigation were extraordinary. Ono allegedly retained outside counsel to investigate, who presented their findings orally to Ono, Manuel, and a small group of senior officials. ECF No. 13, PageID.141–42. Ono prohibited those present from taking notes or recording the presentation and instructed them not to discuss what they learned outside the room. ECF No. 13, PageID.142. Neither Ono nor Manuel reported the information to the Regents,

Compliance Services, or the NCAA. ECF No. 13, PageID.142. These allegations permit the inference that confidentiality was not incidental to the investigation; it was a priority personally enforced by the University's highest-ranking official.

Manuel was not merely somewhere within the institutional hierarchy when Ono imposed those restrictions. He was in the room and personally subject to them. ECF No. 13, PageID.142. Ono's example communicated the relevant message to Manuel: when information about potential program violations threatened UM's interests, restricting employee speech was an acceptable response. That message did not depend on an employee first violating the directive or being disciplined for doing so; it arose from Ono's own exercise of supervisory authority.

Months later, when the NCAA's investigation brought the same controversy into the football program, a strikingly similar restriction appeared within Manuel's chain of command. At the November 13 meeting, University counsel and athletics administrators instructed coaches not to communicate with anyone about the investigation. ECF No. 13, PageID.152–53. Partridge does not allege that Manuel attended that meeting, but the officials implementing the restriction included athletics administrators operating under Manuel's authority, and the directive mirrored the approach Ono had previously imposed on Manuel: information concerning program violations was not to leave the prescribed circle.

Those circumstances permit an inference of continuity rather than coincidence. The Complaint need not allege that Ono attended the November 13 meeting or dictated its precise instructions to plausibly allege that Manuel was operating within a supervisory framework Ono himself had established. Ono had already demonstrated to Manuel how University leadership responded when disclosure threatened institutional interests. The same approach later appeared within Manuel's operation. And when Partridge engaged in speech that Manuel allegedly regarded as violating that restriction, Manuel terminated him.

The same supervisory theory extends to procedural due process. The Complaint alleges that Ono failed to train, supervise, or monitor Manuel to ensure that he exercised his disciplinary and termination authority consistently with employees' constitutional rights. The alleged deficiency therefore was not an abstract failure to provide constitutional training. Ono allegedly modeled the institutional response to perceived violations of confidentiality restrictions, placed Manuel under that directive, and then failed to ensure that Manuel understood the constitutional limits governing discipline or termination for violating it. Manuel allegedly carried that approach forward by deciding to terminate Partridge before providing notice of the accusation or a meaningful opportunity to respond.

The allegations also permit an inference of subsequent acquiescence. After Manuel terminated Partridge, UM's General Counsel allegedly sent Ono an

explanation for the termination that was "completely different" from both Manuel's stated reason and the reason given by the University Review Committee. ECF No. 13, PageID.165. Ono allegedly received materially inconsistent justifications for the termination, yet took no alleged action to investigate, correct, or remedy the alleged constitutional violations.

Defendants argue that supervisory liability requires a pattern of prior constitutional violations. ECF No. 23, PageID.245–46. The Sixth Circuit Court of Appeals has rejected that categorical rule. *See Venema v. West*, 133 F.4th 625 (6th Cir. 2025). *Venema* explains that an identified pattern of prior violations is not the exclusive means of establishing the authorization, approval, or acquiescence necessary for supervisory liability. *Id.* at 634–35. What matters is whether the pleaded facts plausibly establish the supervisor's own actionable involvement and a causal connection to the constitutional injury.

Defendants argue that the causal connection Partridge asserts is too attenuated. Defendants construct a five-step causal chain through former Coach Jim Harbaugh and then attack that chain as too remote. ECF No. 23, PageID.245. That, however, is not the causal theory Partridge alleges. Partridge alleges a single supervisory theory: Ono established and modeled an unusually restrictive response to disclosures about violations in the football program; Manuel observed and was subject to that response; a materially similar restriction later governed the football

program; Manuel enforced it against Partridge through a termination that violated both his speech and procedural-due-process rights; and Ono acquiesced despite learning of materially inconsistent explanations for the termination. If Defendants dispute the strength of that inference, *Garza* cautions that "causal weaknesses will more often be fodder for a summary-judgment motion under Rule 56 than a motion to dismiss under Rule 12(b)(6)." 972 F.3d at 868 (citations omitted).

### B. Ono Is Not Entitled to Qualified Immunity.

As explained above, Partridge plausibly alleges that Ono's own supervisory conduct was causally connected to Partridge's injury. Next, *Venema* holds that a plaintiff "needs only to show that the right violated by the subordinate officers . . . was clearly established at the time of the violation." 133 F.4th at 636. Both rights were clearly established. As explained in Section II, *supra*, *Stern* clearly establishes First Amendment protection for materially analogous speech. And as explained in Section III, *supra*, *Loudermill* and *Singfield* clearly establishes Partridge's right to notice and a meaningful opportunity to respond before termination. Ono is not entitled to qualified immunity at this stage.

## V. Partridge Plausibly Alleges a Conspiracy to Violate His Constitutional Rights (Count IV).

A private party may be liable under § 1983 when he is jointly engaged with a state official in the deprivation of constitutional rights. *Hooks v. Hooks*, 771 F.2d 935, 943 (6th Cir. 1985). A conspiracy requires "a single plan," a shared

conspiratorial objective, and an overt act in furtherance of the conspiracy causing injury. *Id*. at 943–44. An express agreement is unnecessary. *Id*. at 944. Although a private party's provision of information to a state actor, standing alone, does not establish a § 1983 conspiracy, *see Weser v. Goodson*, 965 F.3d 507, 516–17 (6th Cir. 2020), Partridge alleges more: a specific bargain between Manuel and Petitti.

**A. Partridge Plausibly Alleges an Agreement and Shared Objective.**

After Petitti allegedly threatened to reveal allegedly damaging information about Partridge at UM's impending injunction hearing, Manuel offered to terminate Partridge and dismiss UM's claims against Petitti and the Big Ten, and Petitti agreed and promised to withhold the alleged information about Partridge, issue a positive public statement, and end the Big Ten investigation. ECF No. 13, PageID.156–58. Those allegations identify the parties to the agreement, what each side promised, and what the bargain was intended to accomplish. Count IV further alleges that Manuel and Petitti shared the objective of terminating Partridge based on knowingly false information and using him as a scapegoat, thereby retaliating against him for protected speech and depriving him of due process. ECF No. 13, PageID.156–59.

**B. Partridge Plausibly Alleges an Act Causing Constitutional Injury.**

The alleged agreement was followed by performance. On November 16—the day after the alleged bargain was struck—UM announced that its litigation with the Big Ten had been resolved and that the Conference had agreed to close its investigation. ECF No. 13, PageID.157–58. The following day, Manuel terminated

Partridge. ECF No. 13, PageID.158–59. These were not merely acts occurring alongside the alleged agreement; they were the acts the parties promised to perform.

Partridge's termination inflicted the constitutional injuries underlying Count IV as it constituted retaliation against Partridge for engaging in protected speech and occurred without constitutionally adequate pretermination process. Count IV expressly alleges that Manuel terminated Partridge in furtherance of a conspiracy. ECF No. 13, PageID.184. Defendants therefore cannot reduce Count IV to speculation based on parallel conduct. The Complaint alleges a particular agreement, its terms and objective, performance by both sides, and the resulting constitutional injury. Taken as true, the allegations plausibly state a § 1983 conspiracy claim.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the University Defendants' Motion to Dismiss, except that Plaintiff does not oppose dismissal of Count V as an independent cause of action, while preserving his right to seek prospective injunctive relief under Counts I and III.

Dated: August 24, 2026

Respectfully submitted,
ABDNOUR WEIKER LLP

*s/Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)
Mitchell D. Sickon (P82407)
Mark A. Weiker (P85381)
Jessica N. Moore (OH: 0101098)

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on August 24, 2026, I filed this document by use of this Court's ECF system, which will serve copies to the Clerk of Courts and all counsel of record.

By: *s/Elizabeth K. Abdnour*