**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CHRIS PARTRIDGE,**<br><br>Plaintiff,<br><br>v.<br><br>**UNIVERSITY OF MICHIGAN; UNIVERSITY OF MICHIGAN BOARD OF REGENTS; SANTA ONO, in his official and individual capacities; WARDE MANUEL, in his official and individual capacities; and TONY PETITTI;**<br><br>Defendants. | Case No.: 4:26-CV-10821<br><br>Hon. Shalina D. Kumar<br>Mag. Judge Curtis Ivy, Jr. |

**PLAINTIFF'S OPPOSITION TO DEFENDANT TONY PETITTI'S MOTION TO DISMISS**

# TABLE OF CONTENTS


**STATEMENT OF ISSUES PRESENTED** ........ iii

**CONTROLLING OR MOST APPROPRIATE AUTHORITIES** ........ v

**INTRODUCTION** ........ 1

**STATEMENT OF FACTS** ........ 2

**STANDARD OF REVIEW** ........ 3

**ARGUMENT** ........ 4

- **I. COACH PARTRIDGE PLAUSIBLY ALLEGES TORTIOUS INTERFERENCE.** ........ 4
  - **A. Petitti's Separate Litigation Motive Does Not Negate His Interference with Partridge's Employment.** ........ 4
  - **B. Petitti's Asserted Business Objective Does Not Justify the Interference.** ........ 5
  - **C. Manuel's Authority to Fire Partridge Does Not Break Causation.** ........ 6
- **II. COACH PARTRIDGE PLAUSIBLY ALLEGES NEGLIGENCE.** ........ 7
  - **A. Petitti Owed Partridge a Duty of Reasonable Care.** ........ 7
  - **B. Petitti Breached His Duty of Reasonable Care.** ........ 9
  - **C. Manuel's Termination of Partridge Does Not Sever Causation.** ........ 11
- **III. COACH PARTRIDGE PLAUSIBLY ALLEGES IIED.** ........ 13
  - **A. Partridge Plausibly Alleges Extreme and Outrageous Conduct.** ........ 13
  - **B. Partridge Plausibly Alleges Recklessness.** ........ 14
  - **C. Partridge Plausibly Alleges Causation.** ........ 16
  - **D. Partridge Plausibly Alleges Severe Emotional Distress.** ........ 16
- **IV. COACH PARTRIDGE PLAUSIBLY ALLEGES CONSPIRACY.** ........ 17
  - **A. Independent of Any Conspiracy, Partridge's Injury is Fairly Traceable to Petitti's Own Conduct.** ........ 17
  - **B. The Complaint is Sufficiently Specific.** ........ 18
  - **C. Partridge Plausibly Alleges § 1983 Conspiracy.** ........ 19
  - **D. Partridge Plausibly Alleges Civil Conspiracy.** ........ 23

**CONCLUSION AND REQUEST FOR RELIEF** ........ 24

## STATEMENT OF ISSUES PRESENTED

I. Whether Plaintiff plausibly alleges tortious interference where Defendant Petitti allegedly participated in an exchange that resulted in Plaintiff's termination, even if Defendant Petitti's ultimate objective was dismissal of Plaintiff's Employer's lawsuit.

II. Whether Plaintiff plausibly alleges negligence where the Plaintiff's foreseeable reliance on Defendant Petitti, the nature and foreseeability of the risk, and public-policy considerations support a duty of reasonable care, and Plaintiff alleges facts permitting reasonable inferences of breach and causation.

III. Whether Plaintiff plausibly alleges intentional infliction of emotional distress where Defendant Petitti's alleged conduct, considered in its full context, permits reasonable inferences that the conduct was extreme and outrageous, that Defendant Petitti acted intentionally or recklessly, and that the conduct caused Plaintiff severe emotional distress.

IV. Whether Plaintiff's injuries are fairly traceable to Defendant Petitti for the purpose of Article III standing where Plaintiff alleges that Defendant Petitti's conduct contributed to the events resulting in Plaintiff's injuries, notwithstanding Plaintiff's Employer's involvement as an intermediary.

V. Whether Plaintiff plausibly alleges 42 U.S.C. § 1983 and Michigan conspiracy claims by alleging facts supporting a reasonable inference that Defendant Petitti and Plaintiff's Employer reached an agreement and acted in concert pursuant to that agreement, which caused Plaintiff's injuries, and whether the Complaint is sufficiently specific.

# CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Standing**

*Hammoud v. Equifax Information Services, LLC*, 52 F.4th 669 (6th Cir. 2022)

*Turaani v. Wray*, 988 F.3d 313 (6th Cir. 2021)

**Count IV: 42 U.S.C. § 1983 Conspiracy**

*Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985)

*Marvaso v. Sanchez*, 971 F.3d 599 (6th Cir. 2020)

*Memphis American Postal, Afl-Cio v. Memphis*, 361 F.3d 898 (6th Cir. 2004)

*Rudd v. City of Norton Shores*, 977 F.3d 503 (6th Cir. 2020)

*Hooks v. Hooks*, 771 F.2d 935 (6th Cir. 1985)

**Count VI: Civil Conspiracy**

*Admiral Insurance Co. v. Columbia Casualty Insurance Co.*, 486 N.W.2d 351 (Mich. Ct. App. 1992)

*El Camino Residential, Ltd. v. Huntington National Bank*, 722 F. Supp. 2d 875 (W.D. Mich. 2010)

**Count VII: Negligence**

*Case v. Consumers Power Co.*, 615 N.W.2d 17 (Mich. 2000)

*Craig ex rel Craig v. Oakwood Hospital*, 684 N.W.2d 296 (Mich. 2004)

*Haliw v. City of Sterling Heights*, 627 N.W.2d 581 (Mich. 2001)

*Hickey v. Zezulka*, 487 N.W.2d 106, 119 (Mich. 1992)

*In re Flint Water Cases*, 752 F. Supp. 3d 832 (E.D. Mich. 2024)

*McMillian v. Vliet*, 374 N.W.2d 679 (Mich. 1985)

*Meyers v. Rieck*, 983 N.W.2d 747 (Mich. 2022)

*Ross v. Glaser*, 559 N.W.2d 331 (Mich. Ct. App. 1996)

**Count VIII: Intentional Infliction of Emotional Distress**

*Armstrong v. Shirvell*, 596 F. App'x 433 (6th Cir. 2015)

*Ellis v. Dykema Gossett PLLC*, No. 301131, 2013 WL 3717799 (Mich. Ct. App. July 16, 2013)

*Haverbush v. Powelson*, 551 N.W.2d 206 (Mich. Ct. App. 1996)

*Hayley v. Allstate Insurance Co.*, 686 N.W.2d 273 (Mich. Ct. App. 2004)

*Mroz v. Lee*, 5 F.3d 1016 (6th Cir. 1993)

*Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905 (Mich. 1985)

*Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436–37 (6th Cir. 1988)

*Wilson v. Kiss*, 751 F. Supp. 1249 (E.D. Mich. 1990)

**Count X: Tortious Interference with a Business Relationship**

*Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710 (6th Cir. 2018)

*Badiee v. Brighton Area Schools*, 695 N.W.2d 521 (Mich. Ct. App. 2005)

*Haygood v. General Motors, LLC*, No. 346470, 2020 WL 1043613 (Mich. Ct. App. Mar. 3, 2020)

*Tata Consultancy Services v. Systems International*, *Inc.*, 31 F.3d 416 (6th Cir. 1994)

## INTRODUCTION

Defendant Tony Petitti's Motion to Dismiss depends on separating the Amended Complaint's (Complaint) allegations into a series of independent events. The Complaint, however, alleges a connected course of events. Two days before a preliminary injunction hearing in the University of Michigan's ("UM" or the "University") lawsuit against the Big Ten Conference and Petitti, its commissioner, Petitti presented Athletic Director Warde Manuel with uncorroborated, second-hand, inflammatory, and false information accusing Plaintiff Chris Partridge of interfering with an NCAA investigation. Petitti threatened to disclose that information at the hearing and said doing so could jeopardize UM's request for relief. Manuel then offered to terminate Partridge and dismiss the lawsuit. Petitti accepted those terms in exchange for withholding the information, issuing a positive statement, and taking no further action concerning the investigation. UM dismissed its lawsuit the following day and terminated Partridge the next.

Taken as true and considered together, those allegations plausibly connect Petitti's conduct to Partridge's termination. They also identify the participants in the alleged arrangement, its terms, and the acts undertaken to carry it out. The Complaint does not compel a different conclusion. It alleges that Manuel made the "unilateral decision to fire Partridge without even hearing his side of the story," describing

Manuel's failure to obtain Partridge's account rather than characterizing the decision as independent of Petitti's alleged pressure. ECF No. 13, PageID.169.

The events of November 15–17, 2023, as alleged in the Complaint, support Partridge's claims. They supply Petitti's (1) knowledge and inducement of Partridge's termination, supporting the tortious interference claim; (2) duty to Partridge, forming the negligence claim; (3) reckless use of Partridge's livelihood as leverage, establishing the intentional infliction of emotional distress (IIED) claim; and (4) agreement and concerted action with Manuel to injure Partridge, underlying the conspiracy claims.

## **STATEMENT OF FACTS**

In October 2023, the NCAA began investigating alleged sign-stealing within UM's football program. ECF No. 13, PageID.150. When a student-athlete summoned as a witness came to Partridge for advice, Partridge advised him to speak with his parents about getting a lawyer and "just be honest." *Id.* at PageID.153–54. Partridge did not discuss the substance of the investigation with the student. *Id.*

On November 10, 2023, UM and its head football coach, Jim Harbaugh, sued the Big Ten and Petitti, its Commissioner, seeking emergency injunctive relief from a pending three-game suspension. ECF No. 13, PageID.156. The court scheduled a preliminary-injunction hearing for November 17, 2023. *Id.*

On November 15, 2023, Petitti presented Manuel with "uncorroborated, second-hand, inflammatory, and false information" concerning Partridge. ECF No. 13, PageID.156. Petitti accused Partridge of "'interfer[ing] with' the NCAA's ongoing investigation." *Id.* at PageID.139. Petitti threatened to present the information in open court and stated that its disclosure could jeopardize UM's request for an injunction. *Id.* at PageID.138, 156.

That same day, Manuel offered to terminate Partridge and dismiss the lawsuit. *Id.* at PageID.157. In return, Petitti agreed to withhold the information concerning Partridge, issue a positive statement, and take no further action regarding the investigation. *Id*. UM dismissed the lawsuit on November 16, 2023 and terminated Partridge the next day. *Id.* at PageID.157–58. The Complaint alleges that Manuel made the "unilateral decision to fire Partridge without even hearing his side of the story." *Id.* at PageID.169. (Collectively, the "November 15–17 Events").

At a June 2025 NCAA hearing, Manuel testified that he "loved" Partridge and believed that Partridge had done a good job in his role and that he had been under "immense pressure" when he terminated Partridge, which had caused him to make "hasty decisions." *Id.* at PageID.169, 173. After the hearing, Manuel approached Partridge, shook his hand, and apologized for what he had endured. *Id*.

## STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint

must plead sufficient facts to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept well-pleaded allegations as true and draw reasonable inferences in Plaintiff's favor. *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016).

## ARGUMENT

### I. COACH PARTRIDGE PLAUSIBLY ALLEGES TORTIOUS INTERFERENCE.

A tortious interference claim requires (1) a valid business relationship or expectancy, (2) the defendant's knowledge of it, (3) intentional interference—either improper or without justification—inducing or causing its breach or termination, and (4) resulting damages. *Badiee v. Brighton Area Schs.*, 695 N.W.2d 521, 538 (Mich. Ct. App. 2005). Petitti challenges the third element, specifically the improper interference requirement, arguing that his separate objective negates intent and justifies his conduct, and that Manuel's professional authority to terminate Partridge defeats causation. ECF No. 24, PageID.299. Each argument fails.

#### A. Petitti's Separate Litigation Motive Does Not Negate His Interference with Partridge's Employment.

Intentional interference does not require that interference be the defendant's sole or ultimate objective. Rather, if a defendant "'knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.'" *Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 718 (6th Cir. 2018) (quoting Restatement (Second) of Torts § 8A cmt. b (1979)).

Petitti argues that his objective was dismissal of UM's lawsuit, not Partridge's termination. ECF No. 24, PageID.300. However, once Manuel offered Partridge's termination as part of the bargain and Petitti accepted, termination was no longer merely a possible consequence—it was an express term of the exchange. ECF No. 13, PageID.157. Under *Auburn Sales*, that alleged knowledge supports an inference of intent to interfere, notwithstanding Petitti's separate objective, because it shows his "knowledge (and decision to ignore) that his conduct would inevitably interfere with [Partridge's] contract or business relationship." 898 F.3d at 718.

**B. Petitti's Asserted Business Objective Does Not Justify the Interference.**

Petitti relies on *Bonds v. Philips Electronics North America*, which involved Philips's response to learning that one of its employees was simultaneously working for a competitor. 613 F. App'x 469, 471 (6th Cir. 2015). Philips sought to protect its confidential information by expressing concern about possible disclosure and requesting assurances that its information had not been shared. *Id.* at 472. The court found no improper interference because Philips acted to protect a legitimate business interest without threatening the competitor or seeking the employee's termination. *Id.* at 475. Here, the November 15–17 Events include both features absent from *Bonds*: Petitti's threat against Partridge's employer and his acceptance of Partridge's termination as part of the exchange. Unlike *Bonds*, Petitti's interference was not merely incidental to the pursuit of his asserted legitimate interest.

*Tata Consultancy Services v. Systems International, Inc.* provides the closer analogy. 31 F.3d 416 (6th Cir. 1994). There, the defendant actively recruited Tata employees whom it knew could not accept its employment without breaching their existing contracts. *Id.* at 425. Although the defendant acted to advance its own economic interests, the Sixth Circuit held that those interests did not justify its affirmative inducement of the breaches. *Id.* Here, too, Petitti could have pursued his asserted interest without involving Partridge's employment but instead accepted Partridge's termination as part of the exchange. ECF No. 13, PageID.157. As in *Tata*, the mere fact that Petitti sought to advance his own interests is not sufficient to justify his participation in Partridge's termination.

**C. Manuel's Authority to Fire Partridge Does Not Break Causation.**

Tortious interference encompasses conduct "inducing or causing" a breach or the termination of a business relationship. *Badiee*, 695 N.W.2d at 538. An employer's authority to terminate an employee does not defeat causation when the defendant allegedly induced the employer to exercise that authority. In *Haygood v. General Motors, LLC*, for example, the court held that whether the defendant's conduct "required" the employer to discharge the plaintiff was "irrelevant" because the record supported a finding that the conduct caused his termination. No. 346470, 2020 WL 1043613, at *14. Nor must a defendant's conduct be the sole cause of the termination. When multiple factors contribute to an injury, Michigan law permits

liability if the defendant's conduct was a substantial factor in causing that injury. *McElwee v. Wharton*, 7 F. App'x 437, 438 (6th Cir. 2001).

Although the trial record in *McElwee* established independent reasons for the third party's decision to terminate the plaintiff, no comparable factual findings have been made here. *Id.* at 438. Moreover, the Complaint's description of the termination as "unilateral" refers to Manuel's failure to provide Partridge with due process, not to whether Petitti's conduct contributed to the decision. ECF No. 13, PageID.168. The causation inquiry turns on whether Petitti *induced* Manuel to terminate Partridge—not whether Manuel retained the ultimate authority to do so. The Complaint plausibly alleges such inducement.

## II. COACH PARTRIDGE PLAUSIBLY ALLEGES NEGLIGENCE.

### A. Petitti Owed Partridge a Duty of Reasonable Care.

To state a negligence claim, a plaintiff must allege (1) duty, (2) breach, (3) causation, and (4) damages. *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000). Petitti argues that no duty exists because Michigan has never recognized one running from a conference commissioner to an employee of a member institution. ECF No. 24, PageID.302. However, Michigan negligence law does not limit duty to specific occupational relationships. The relevant inquiry is whether a plaintiff would have foreseeably relied on a defendant for a duty of care.

In *In re Flint Water Cases*, the U.S. District Court for the Eastern District of Michigan found that a consulting firm retained by the City of Flint owed a duty to

nonclient residents because it had voluntarily undertaken an assignment to assess the City's water system and therefore had a "limited professional relationship" with all who relied upon that system. 752 F. Supp. 3d 832, 848 (E.D. Mich. 2024). The court rejected "rigid restrictions" on relationships involving a duty of care and found that a voluntary undertaking may create a sufficient relationship with third parties connected to the work. *Id.* at 847 n.10. As Petitti explained in his November 10, 2023 letter to UM, under the Big Ten's Sportsmanship Policy, he had "'discretion to pursue, or choose not to pursue, an investigation . . .'" Petitti Letter, Ex. 1 at 8.[1]

Any reasonable person in Partridge's situation would rely on the Big Ten Commissioner to investigate wrongdoing with fairness. Thus, Partridge's reliance on Petitti created a duty. As Petitti explained in his November 10, 2023 letter to UM, he possessed "wide discretion" to investigate potential offensive conduct within the conference, and he exercised that authority to investigate alleged misconduct by members of UM's football staff. Ex. 1 at 8. Petitti accordingly owed a duty to exercise reasonable care in performing the investigation before using the results in a manner that could harm any of the third parties involved, including Partridge. The harm that Partridge suffered was the precise harm against which Petitti's use of reasonable care in conducting the investigation would have guarded.

---

[1] "[A] document that is not formally incorporated by reference or attached to a complaint may still be considered part of the pleadings. See 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.30 (3d ed.1998). This occurs when 'a document is referred to in the complaint and is central to the plaintiff's claim....' Id." *Greenberg v. Life Ins. Co. of Va*., 177 F.3d 507, 514 (6th Cir. 1999); *see* ECF No. 13, PageID.155.

Petitti's cited authorities are both distinguishable and support a finding that the Complaint properly stated his duty. In *Riggs v. NCAA*, the Indiana Court of Appeals acknowledged a third-party reliance standard as creating the basis for a duty. 279 N.E.3d 924, 933 (Ind. Ct. App. 2026) (citing *Webb v. Jarvis*, 575 N.E.2d 992, 996 (Ind. 1991)). *Hall v. United Laboratories, Inc.* involved the routine laboratory analysis of a drug-test sample, not an investigation specifically directed at the plaintiff's alleged professional misconduct. 31 F. Supp. 2d 1039, 1043 (N.D. Ohio 1998). And in *Friedman v. Dozorc*, the Michigan Supreme Court rejected a plaintiff's argument that "an attorney who initiates a civil action owes a duty to his client's adversary and all other foreseeable third parties who may be affected by such an action," 312 N.W.2d 585, 590–91 (Mich. 1981), but held that a duty attached where a third party would have foreseeably relied on a defendant. *Id*. at 593 n. 14. This is exactly what Partridge alleges.

**B. Petitti Breached His Duty of Reasonable Care.**

A defendant breaches a duty by failing to exercise reasonable care under the circumstances. *Case*, 615 N.W.2d at 20. The Complaint alleges that Petitti failed to exercise reasonable care towards Partridge by relying solely on "uncorroborated, second-hand" information and accusing Partridge of "interfer[ing] with" the NCAA's ongoing investigation, ECF No. 13, PageID.156, 139. Petitti presented that information to Manuel while representing that its disclosure could jeopardize UM's pending legal action. *Id*. at 156. Thus, Partridge alleges not merely an incorrect

investigative conclusion, but a careless investigative process in which Petitti acted on uncorroborated, second-hand accusations.

Petitti's own prior conduct supports a conclusion that a duty of reasonable care required him to substantiate serious allegations and interview the accused. Just five days before he made uncorroborated accusations against Partridge to Manuel, Petitti had exercised reasonable care towards UM and Harbaugh. In a thirteen-page letter explaining his decision to suspend Harbaugh for only three games, Petitti emphasized that he had allowed UM and Harbaugh to respond to allegations against them, distinguished his "careful review and consideration" of the evidence from "rumor or mere summaries and descriptions," and made concerted efforts to corroborate evidence he had collected against them. Ex. 1 at 7–8. Yet five days later, Petitti shared "uncorroborated, second-hand" information concerning Partridge without giving him notice of the accusation or an opportunity to respond. ECF No. 13, PageID.156.

Petitti argues that the Complaint does not identify the source of the information, provide every detail of the accusation, or allege that he vouched for its truth. ECF No. 24, PageID.303. However, the Complaint identifies the accusation—that Partridge had "interfered with" the NCAA investigation—and alleges that Petitti acted on "uncorroborated, second-hand" information without interviewing Partridge or otherwise obtaining his account. *Id.* at PageID.139, 156. Neither the source's

identity nor whether Petitti vouched for the accusation is relevant to whether he exercised reasonable care before acting in a way that could foreseeably harm Partridge. Petitti's reliance on *Howe v. Detroit Free Press, Inc.* is misplaced. 555 N.W.2d 738 (Mich Ct. App. 1996). At summary judgment, *Howe* held that a newspaper had no duty to independently verify a release received from a reputable wire service where it had no reason to believe the release was inaccurate. *Id*. at 740–41. Here, the Complaint alleges that Petitti relied on uncorroborated, second-hand information, clearly breaching his duty of care.

**C. Manuel's Termination of Partridge Does Not Sever Causation.**

Pleading negligence requires both cause in fact[2] and legal, or proximate, cause. *Haliw v. City of Sterling Heights*, 627 N.W.2d 581, 588 (Mich. 2001) (citation omitted). Proximate cause asks whether the resulting harm was a foreseeable consequence of that conduct. *Id*. A defendant's conduct need not be the sole catalyst of the injury. *Craig ex rel. Craig v. Oakwood Hosp.*, 684 N.W.2d 296, 309 (Mich. 2004). An intervening act constitutes a superseding cause only when it was not reasonably foreseeable. *McMillian v. Vliet*, 374 N.W.2d 679, 682 (Mich. 1985). Where a defendant's negligence increases the likelihood that the intervening act will occur, the act is reasonably foreseeable. *Ross v. Glaser*, 559 N.W.2d 331, 337 (Mich. Ct. App. 1996), citing *Hickey v. Zezulka*, 487 N.W.2d 106, 119 (Mich. 1992). The

[2] Petitti does not argue that the Complaint fails to allege cause in fact.

Complaint plausibly alleges proximate cause. Petitti accused Partridge of professional misconduct to Manuel and threatened to disclose the information as leverage in a legal dispute. ECF No. 13, PageID.156. Manuel was UM's Athletic Director, and adverse employment action against Partridge was reasonably foreseeable. Indeed, Manuel offered to fire Partridge during that very exchange. *Id.* at 157. Petitti's conduct therefore increased the likelihood of Partridge's termination rather than merely preceding it. *See Ross*, 559 N.W.2d at 335–37.

Petitti argues that causation fails because Manuel retained authority over Partridge's employment and made the ultimate termination decision. ECF No. 24, PageID.303. That argument confuses the identity of the decisionmaker with the cause of the decision. Manuel's authority to terminate Partridge does not establish that his exercise of that authority occurred independently of Petitti's inducement. Under *McMillian*, the relevant question is whether Manuel's intervening decision was reasonably foreseeable. 374 N.W.2d at 682. Given that Petitti communicated damaging accusations foreshadowing dire litigation consequences and agreed to an exchange in which Partridge's termination became an express term, Manuel's decision to fire Partridge was plausibly foreseeable.

The Complaint alleges a "unilateral decision to fire [Plaintiff] without even hearing his side of the story;" it does not allege a decision independent of Petitti's pressure. ECF No. 13, PageID.169. Indeed, it alleges that Manuel later

acknowledged being under "immense pressure" when terminating Partridge and making "hasty decisions." *Id.* at PageID.173.

## III. Coach Partridge Plausibly Alleges IIED.

### A. Partridge Plausibly Alleges Extreme and Outrageous Conduct.

IIED has four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Hayley v. Allstate Ins. Co.*, 686 N.W.2d 273, 276 (Mich. App. 2004). Outrageousness is evaluated under the totality of the circumstances, including "whether there is an 'abuse of a relationship which…gives a defendant power to affect a plaintiff's interest.'" *Mroz v. Lee*, 5 F.3d 1016, 1019 (6th Cir. 1993) (citations omitted).

Petitti was willing to ruin Partridge to win a lawsuit. He traded on the livelihood and reputation of an uninvolved person—with neither notice nor an opportunity to respond—in a bargain intended to burnish his own reputation. A reasonable factfinder could conclude that Petitti's actions were "so outrageous in character, and so extreme in degree," that an average member of the community would resent Petitti and exclaim, "Outrageous!" *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908–09 (Mich. 1985). Because reasonable minds could differ on whether Petitti's abuse of power crossed the boundary of tolerable conduct, dismissal at this stage is premature. *See Mroz*, 5 F.3d at 1020.

Petitti's reliance on *Webster v. UAW Local 51* is misplaced. 394 F.3d 436 (6th Cir. 2005). At summary judgment, the *Webster* court considered whether the

defendants had met their burden under Fed. R. Civ. P. 56(c). *Id*. at 440. The instant matter is only at the pleadings stage. *Webster* cites to *Margita v. Diamond Mortgage Corporation*, which involved harassment of plaintiffs by a mortgage company. 406 N.W.2d 268, 269–70 (Mich. App. 1987). In denying summary disposition on the IIED claim, the court found:

> The extreme and outrageous character of the conduct may arise from the position of the actor or a relationship to the distressed party. For example, it may occur through an abuse of a relationship which puts the defendant in a position of actual or apparent authority over a plaintiff or gives a defendant power to affect a plaintiff's interest. Whether a defendant's acts were sufficiently outrageous depends upon the context in which the defendant committed them.

*Id*. at 272 (citations omitted).

**B. Partridge Plausibly Alleges Recklessness.**

The second element of IIED requires either an intent to cause emotional distress or conduct so reckless that "any reasonable person would know emotional distress would result." *Haverbush v. Powelson*, 551 N.W.2d 206, 210 (Mich. App. Ct. 1996). Here, Petitti raises mental state requirements that IIED does not impose, arguing that Partridge fails to allege that Petitti intended to cause his termination or reputational harm and that the Complaint likewise does not allege that Petitti knew that the information was false or probably false. ECF No. 24, PageID.307. Neither is required. The relevant question is whether Petitti acted with such recklessness that a reasonable person would know emotional distress would result. In *Ellis v. Dykema*

*Gossett PLLC*, the Michigan Court of Appeals found that conduct threatening the plaintiff's livelihood and professional reputation "could viewed as beyond all bounds of decency and could be regarded as atrocious and utterly intolerable in a civilized community" and supported a finding of "deliberate disregard of a high degree of probability that emotional distress would follow." No. 301131, 2013 WL 3717799, at *7, *12 (Mich. Ct. App. July 16, 2013). The same inference is plausible here. Petitti had recognized the importance of investigative safeguards, then disregarded those safeguards only five days later, acting on uncorroborated, second-hand information carrying obvious negative professional and reputational consequences for Partridge. ECF 13, PageID.155-56. Those circumstances plausibly support an inference that he deliberately disregarded the substantial risk that his conduct would cause Partridge emotional distress.

Petitti's authorities do not compel a different result: *Solek* involved ordinary operational decisions affecting plaintiffs who the defendants did not know, while *Graham* resolved the issue on a developed summary-disposition record including around thirty deposition transcripts. *Solek v. K&B Transp., Inc.*, No. 21-cv-10442, 2021 WL 4290181, at *12 (E.D. Mich. Sept. 21, 2021); *Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999). Neither case resembles the deliberate, plaintiff-directed conduct alleged here.

**C. Partridge Plausibly Alleges Causation.**

A defendant's conduct need not be the sole catalyst of injury. *Craig*, 684 N.W.2d at 309. The Complaint alleges that Petitti used information about Partridge as leverage in an exchange culminating in Partridge's termination, making resulting emotional distress reasonably foreseeable. ECF No. 13, PageID.156, 187. Manuel's role as decisionmaker does not sever causation for the reasons discussed *infra*. Neither Petitti's lack of direct communication with Partridge nor his ultimate nondisclosure defeats causation because the alleged injury flows from his conduct.

**D. Partridge Plausibly Alleges Severe Emotional Distress.**

Petitti wrongly asserts that the Complaint fails to sufficiently plead emotional distress. "'Emotional distress passes under various names, such as mental suffering, *mental anguish,* mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, *humiliation, embarrassment,* anger, chagrin, disappointment, worry, and nausea....'" *Wilson v. Kiss*, 751 F. Supp. 1249, 1252 (E.D. Mich. 1990) (citing Restatement (Second) of Torts) (emphasis in original). Partridge alleges harm to his personal well-being, prolonged public humiliation, embarrassment, loss of self-esteem, anxiety, depression, and hypervigilance. ECF No. 13, PageID.130, 170, 190.

## IV. COACH PARTRIDGE PLAUSIBLY ALLEGES CONSPIRACY.

### A. Independent of Any Conspiracy, Partridge's Injury is Fairly Traceable to Petitti's Own Conduct.

Petitti argues that Manuel alone terminated Partridge and therefore Partridge can establish Article III traceability only by imputing Manuel's conduct to Petitti through the alleged conspiracy. ECF No. 24, PageID.292. That argument conflates standing with conspiracy liability. To establish standing, Partridge must allege "(1) that he 'suffered an injury in fact that is concrete, particularized, and actual or imminent'; (2) 'the injury was likely caused by [Petitti]'; and (3) the injury 'would likely be redressed by judicial relief.'" *Hammoud v. Equifax Info. Servs., LLC*, 52 F.4th 669, 673 (6th Cir. 2022).[3]

Partridge need not first establish that Manuel's conduct can be imputed to Petitti because the Complaint attributes the pressure that induced Partridge's termination directly to Petitti. ECF No. 13, PageID.138–39, 156–57, 173. *Turaani v. Wray* illustrates the distinction. 988 F.3d 313 (6th Cir. 2021). There, the FBI passed information to a firearms dealer about Turaani, a potential customer whose background check was flagged for a delayed sale. *Id.* at 315. The dealer chose to cancel the transaction, and Turaani sued the FBI. *Id.* The court found that the FBI did not "cajole, coerce, or command" the dealer or otherwise exert a "determinative or coercive effect" on the dealer's independent decision not to complete a sale. *Id.*

[3] Petitti only challenges the second element of the *Hammoud* test. ECF No. 24, PageID.292.

at 316. Here, the Complaint alleges far more than the passive transmission of information. As Petitti frames it, he and Manuel were both, at the least, parties in a lawsuit seeking to avoid "damage to their respective institutions from a contentious court hearing amid a media firestorm." ECF No. 24, PageID.298. Of course Petitti's actions were meant to have a "determinative" effect—on both the lawsuit and Partridge's employment. Taken as true, those allegations plausibly establish that Petitti's conduct exerted the coercive influence absent from *Turaani*. Partridge's termination is therefore fairly traceable to Petitti's alleged conduct.

The Complaint alleges that Manuel made the "unilateral decision to fire Partridge without even hearing his side of the story." ECF No. 13, PageID.169. In context, "unilateral" describes Manuel's failure to obtain Partridge's account before terminating him. It does not characterize Manuel's decision as independent from Petitti's pressure. Nor do later grievance proceedings establish that Petitti had no role in inducing the firing. Those allegations merely identify the UM actors who implemented and reviewed the termination, not what induced Manuel to initiate it. Whether the same allegations establish an agreement and shared unlawful objective sufficient to impose conspiracy liability is a separate question addressed *supra*.

**B. The Complaint is Sufficiently Specific.**

In asserting that the conspiracy claims lack specificity, Petitti argues, without authority, that they must be dismissed because Partridge fails to allege that Manuel and Petitti "agreed" to fire him. ECF No. 24, PageID.295. Petitti misstates *Blick v.*

*Ann Arbor Public School District*, which requires not a "'subjective[]' desire" to engage in an illegal objective, ECF No. 24, PageID.296, but simply to "subjectively 'share[]'" it. 105 F.4th 868, 887 (6th Cir. 2024). *Gamrat v. Allard* involved a "group pleading" that failed to identify who agreed to or directed the unlawful acts. 320 F. Supp. 3d 927, 942 (W.D. Mich. 2018). By contrast, Partridge alleges that Manuel offered his termination as part of a defined exchange and Petitti accepted that proposal. ECF No. 13, PageID.157. *Libertarian Party of Ohio v. Husted* analyzed, at summary judgment, whether there was sufficient evidence to establish a conspiratorial objective, not whether the claim was properly plead. 831 F.3d 382, 399 (6th Cir. 2016). Petitti wrongly claims the Complaint "does not allege the content of the information" Petitti threatened to reveal about Partridge. ECF No. 24, PageID.306. In fact, it does: Petitti said Partridge had "interfered with" the NCAA investigation. ECF No. 13, PageID.139. Regardless, "'a plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim.'" *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436–37 (6th Cir. 1988) (citations omitted).

**C. Partridge Plausibly Alleges § 1983 Conspiracy.**

To state a conspiracy claim under § 1983, a plaintiff must plausibly allege "an agreement between two or more persons to injure another by unlawful action." *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) (citation omitted). A plaintiff must allege (1) a single plan, (2) the conspirators shared a conspiratorial objective

to deprive the plaintiff of his constitutional rights, and (3) an overt act was committed in furtherance of the conspiracy that caused the injury.[4] *Id*. The agreement need not be express, and "[e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). Where, as here, the alleged coconspirator is a private actor, § 1983 reaches a private party who is "jointly engaged with state officials in a deprivation of civil rights . . ." *Hooks*, 771 F.2d at 943. Although the allegations must be pleaded with "some degree of specificity," the agreement may be established through circumstantial evidence. *Marvaso*, 971 F.3d at 606.

***i. Partridge plausibly alleges an agreement to injure him by unlawful action via a single plan.***

At the pleadings stage, "a plaintiff's specific allegations of a conspiracy will suffice as long as they are plausible . . . That is so even if a defendant's briefing identifies a 'more likely alternative explanation[ ]' for what occurred." *Rudd v. City of Norton Shores*, 977 F.3d 503, 518 (6th Cir. 2020) (citations omitted). The Complaint alleges that Manuel offered to fire Partridge and, in exchange, Petitti agreed not to share the sensationalized (and false) information about Partridge, issue a positive public statement about UM, and cease his efforts to investigate the sign-stealing scheme. ECF No. 13, PageID.157. Partridge alleges that the plan violated his constitutional right to due process. *Id*. at PageID.177. "Express agreement . . . is

[4] Petitti makes no argument that Partridge failed to plead the "overt act" element of the claim.

not necessary to find . . . conspiracy. Each conspirator need not have known all of the details of the illegal plan . . ." *Memphis American Postal, Afl-Cio v. Memphis*, 361 F.3d 898, 905 (6th Cir. 2004).

Petitti's authorities do not support a finding that the Complaint fails. In *Heyne v. Metropolitan Nashville Public Schools*, the complaint alleged only that the defendants had conferred at various points during a disciplinary process, without identifying a plan or agreement to violate the plaintiff's constitutional rights. 655 F.3d 556, 563–64 (6th Cir. 2011). In *Bickerstaff*, an alleged coconspirator was not alleged to know of the conduct she supposedly agreed to conceal, so she "could not have plausibly shared in the 'general conspiratorial objective' to conceal conduct of which she had no knowledge." 830 F.3d at 401.

The Complaint supplies the connection missing from those cases. It does not merely allege that Petitti and Manuel communicated about Partridge. It alleges that Manuel offered to terminate Partridge and dismiss the lawsuit and that Petitti accepted that proposal in exchange for withholding information concerning Partridge. ECF No. 13, PageID.157–59. It also alleges that Petitti accused Partridge of "'interfer[ing] with' the NCAA's ongoing investigation." *Id.* at PageID.139. The Complaint identifies all necessary details of the arrangement: its participants, its object, its terms, the steps taken to carry it out, and its unlawfulness. Taken as true, the allegations plausibly assert a single plan rather than parallel or independently

motivated conduct. That Manuel proposed Partridge's termination does not matter. ECF No. 24, PageID.295–96. The question is whether Petitti joined the plan. Manuel placed Partridge's termination on the table, and Petitti accepted an arrangement that included that termination and accepted corresponding obligations in return. ECF No. 13, PageID.157. The Complaint plausibly alleges Petitti's participation in the plan.

***ii. Partridge plausibly alleges that Petitti shared the general conspiratorial objective to deprive Partridge of his constitutional rights.***

Allegations of a common plan do not, standing alone, complete the § 1983 inquiry. A plaintiff must also plausibly allege that a defendant shared the plan's "general conspiratorial objective" to deprive a plaintiff of a federally protected right. *Hooks*, 771 F.2d at 944. *Marvaso v. Sanchez* illustrates what is required at the pleading stage. 971 F.3d at 606. There, municipal fire officials allegedly agreed to falsify a fire-investigation report implicating the plaintiffs and submit it to the Michigan State Police to deflect responsibility from the fire department and trigger an unjustified criminal investigation. *Id*. Although the Michigan State Police later conducted the investigation and conducted the unconstitutional search of plaintiffs' homes, the Sixth Circuit held that the alleged agreement and overt acts of fabricating evidence plausibly connected the fire officials to the resulting constitutional injury. *Id.* at 608. The complaint supported that connection with "specific and plausible facts regarding Defendants' conspiratorial conversation and agreement, in addition to the overt acts taken in furtherance of that conspiracy." *Id.* at 608.

Here, Partridge alleges that he had a protected property interest in continued employment and that Manuel and Petitti's plan deprived him of that interest without constitutionally adequate notice or an opportunity to respond. ECF No. 13, PageID.158. The November 15–17 Events connect Petitti not merely to the termination, but to the circumstances that rendered it constitutionally deficient. Petitti accepted Partridge's termination as a term of the agreement based on an uncorroborated accusation, and Manuel carried out that termination two days later "without even hearing [Partridge's] side of the story." *Id.* at PageID.169. Taken together, these allegations plausibly support the inference that Petitti knowingly joined the effort to terminate Partridge without affording him an opportunity to respond to the allegations against him. That Manuel performed the act of termination does not negate Petitti's participation in the plan. As in *Marvaso*, the Complaint identifies the agreement, the shared objective, and the overt act that ultimately produced the alleged constitutional injury. 971 F.3d at 606. Because Petitti joined Manuel, a state actor, in the plan causing the injury, the Complaint plausibly alleges the joint action necessary to subject Petitti to § 1983 liability.

**D. Partridge Plausibly Alleges Civil Conspiracy.**

A conspiracy is "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 486 N.W.2d 351, 358 (Mich. Ct. App. 1992). The agreement can be either

express or implied. *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 900 (W.D. Mich. 2010). The Complaint plausibly alleges such an agreement by identifying the exchange, its participants, and its terms. ECF No. 13, PageID.157. Petitti's characterization of the arrangement as an effort to resolve pending litigation fails to defeat the claim. ECF No. 24, PageID.296. Michigan law recognizes a conspiracy to accomplish either an unlawful purpose or a lawful purpose through unlawful means. *Admiral Ins. Co.*, 486 N.W.2d at 358. Thus, even if Petitti had a lawful objective, the Complaint alleges that he pursued it through legally actionable conduct: violating Partridge's due process rights, negligence, tortious interference with Partridge's employment relationship, and IIED. Those underlying claims supply the wrongful conduct necessary to support the derivative conspiracy claim. "The root principle upon which the law of conspiracy rests is a preconceived plan to unlawfully work some public or private wrong or injury by concerted action, originating in combination, either carried out by joint action, or, at least, pursuant to a joint arrangement and understanding." *El Camino Res.*, 722 F. Supp. 2d at 899. The Complaint therefore plausibly alleges that Petitti acted in concert with Manuel to accomplish his objective through unlawful means.

## CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendant Petitti's Motion to Dismiss.

Dated: September 8, 2026

Respectfully submitted,
ABDNOUR WEIKER LLP

*s/Elizabeth K. Abdnour*
Elizabeth K. Abdnour (P78203)
Mitchell D. Sickon (P82407)
Ashley A. Dylenski (P88208)
Mark A. Weiker (P85381)
Jessica N. Moore (OH: 0101098)

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2026, I filed this document by use of this Court's ECF system, which will serve copies to the Clerk of Courts and all counsel of record.

*/s/ Elizabeth K. Abdnour*
Elizabeth K. Abdnour