BIG TEN SINCE 1896

November 10, 2023

**VIA EMAIL**

Warde Manuel
Donald R. Shepherd Director of Athletics
University of Michigan
Stephen M. Ross Athletic Campus
1000 South State Street
Ann Arbor, MI 48109-2201
wmanuel@umich.edu

**Re: Notice of Disciplinary Action Against the University of Michigan**

Dear Warde,

The purpose of this letter is to provide formal notice that the Big Ten Conference (the "Conference") is imposing disciplinary action against member institution, the University of Michigan (the "University"), for violations of the Conference's Sportsmanship Policy (Agreement 10).

The Conference has reviewed the responses provided by the University and its Head Football Coach to our November 4, 2023 notice. That notice set forth the Conference's belief that the University violated the Sportsmanship Policy because a University football staff member engaged in an organized, extensive, years-long in-person advance scouting scheme that was impermissible. The goal of the scheme was to gain an unfair advantage by stealing the signs of teams that the University's football team was due to play later in the season. Such misconduct inherently compromises the integrity of competition. As the University is aware, the Sportsmanship Policy expressly provides that a member institution is responsible, and therefore may be held accountable, for the actions of its employees, coaches, student-athletes, general student body, and any other individual or group of individuals over whom it maintains some level of authority. Agreement 10 § 10.1.1.

As detailed in Sections I and II below, the extensive information obtained by the Conference has led me, in my capacity as Conference Commissioner, to conclude that the University violated the Sportsmanship Policy. That Policy requires the Commissioner to determine the appropriate discipline "as expeditiously as possible." Although the Conference was able to inform other Conference members before the October 21 games about the existence of an off-campus, in-person scouting scheme for the purpose of stealing opponents' signs (the

"impermissible scheme"), the effect on the opponents of the University's football team remains ongoing.

Notably, the University's November 8 response does not deny that the impermissible scheme occurred. Instead, it offers only procedural and technical arguments designed to delay accountability. The University also argues that because it believes that others are engaged in decoding signs, there must be nothing wrong with the University's activities. In addition to impermissible activities of others being currently unsupported by facts, the University's culpability is not dependent on the actions of other institutions. Those assertions are more fully addressed in Sections III and V below.

The integrity of competition is the backbone of any sports conference or league. That is especially true for sports contests between student-athletes. Athletes compete to win. Competition that is only about winning while disregarding the rules of fair play diminishes all of us, including our institutions. The *integrity* of the competition must be preeminent. Its value is fundamental and far exceeds the value of winning; indeed, it is the very source of any value in winning. Enforcing the Sportsmanship Policy with appropriate discipline *this season* in light of the University's established violations *this season* is thus of the utmost importance to protect the reputation of the Conference and its member institutions and to ensure that our competitions on the field are honorable and fair.

As described below, the existence of the impermissible scheme is proven. While other investigatory bodies continue to develop additional evidence of the scope, extent and individual knowledge of the scheme that may advise additional or enhanced penalties in the future, taking immediate action is appropriate and necessary under the Conference's Sportsmanship Policy.

Having determined that the University violated the Sportsmanship Policy, the Conference imposes on the University the following disciplinary action: Effective immediately, the University football team must compete without its Head Football Coach for the games remaining in the 2023 regular season. This disciplinary action shall not preclude the University or its football team from having its Head Football Coach attend practices or other football team activities other than the game activities to which it applies.

We impose this disciplinary action even though the Conference has not yet received any information indicating that Head Football Coach Harbaugh was aware of the impermissible nature of the sign-stealing scheme. This is not a sanction of Coach Harbaugh. It is a sanction against the University that, under the extraordinary circumstances presented by this offensive conduct, best fits the violation because: (1) it preserves the ability of the University's football student-athletes to continue competing; and (2) it recognizes that the Head Coach embodies the University for purposes of its football program.

The Conference recognizes that additional disciplinary actions may be necessary or appropriate if it receives additional information concerning the scope and knowledge of, or participation in, the impermissible scheme.

## I. The Extraordinary Nature of the Offending Conduct and Information Obtained by the Conference

*A. The NCAA's Initial Call to the University and the Conference About the Scheme*

On October 18, the President of the National Collegiate Athletic Association (the "NCAA"), Charlie Baker, scheduled a call with me, other senior leadership from the Conference, and senior leadership from the University. During that call, the NCAA disclosed to both the Conference and the University that it had received highly credible evidence of a wide-ranging, multi-year in-person, off campus scouting scheme orchestrated by a noncoaching staff member of the University's football program.

There were several extraordinary aspects of this call. It is rare and outside the NCAA's typical protocols for the NCAA to disclose information about an active investigation to institutions other than the institution under investigation. However, the NCAA stated and believed that the disclosure was necessary due to the unprecedented scope of the then-alleged scheme, and because of the significant impact the impermissible scheme could have on competition during the current football season. It was also extraordinary that the NCAA President arranged for and participated in the call, underscoring not only the severity of the allegations but the immediate impacts. All of these circumstances were a clear statement from the NCAA that the nature and reliability of the evidence they had received indicated that the improper scheme relating to the University's football team was ongoing and created a substantial risk of compromising the integrity of football competitions *this season*. At that point, the University's football team had played seven games this season and had five more regular-season games remaining.

*B. The Conference's Actions to Protect the Integrity of Upcoming Competitions*

Later on October 18, two senior Conference staff members and I participated in a call with the University's President, Athletic Director, and General Counsel. During that call, I expressed my belief that disclosure of the impermissible scheme to the University's remaining 2023 football opponents was necessary to preserve player safety and protect the integrity of those competitions. After significant discussion and at my insistence, the Conference and the University agreed that the disclosures were necessary and appropriate. Also on October 18, the University obtained consent from the NCAA to inform its football coaching staff of the NCAA's investigation, a deviation from normal practice that was required in light of the extraordinary nature of the NCAA's description of the conduct and the in-season disclosures being provided to other Conference members.

That same evening, the Conference informed the University's next football opponent, Michigan State University, of the information disclosed by the NCAA regarding the impermissible scheme. On October 19, the Conference similarly informed the University's remaining 2023 football opponents. The Conference also consulted with U.S. Integrity, which confirmed the Conference's view that immediate transparency about the information the Conference had learned was important. Later that day, the Conference issued a press release stating that the Conference and the University had been notified by the NCAA that it was investigating allegations of improper sign stealing by the University's football program. In that press release, the Conference stressed that it "considers the integrity of the competition to be of the utmost importance" and that it would continue to monitor the NCAA's investigation.

*C. The NCAA Shares with the Conference the Master Spreadsheet Detailing the Extensive In-Person Sign-Stealing Activities*

Also on October 19, pursuant to my request to see first-hand the credible evidence in the NCAA's possession, another senior-level Conference staff member and I participated in a videoconference with the NCAA. During that videoconference, the NCAA presented and discussed what it called a "master spreadsheet" that the NCAA had received during its investigation (the "Master Spreadsheet"). It included a very large amount of detailed information regarding the impermissible scheme, including, without limitation:

- a large and detailed chart listing the names of various individuals assigned to attend past and future football games involving the University's scheduled football opponents;
- similar in-person attendance assignments for past and future games involving highly-ranked, non-Conference football opponents (presumably potential University football opponents in post-season games);
- notations showing whether in-person attendance at non-Conference games would be necessary depending on different win/loss scenarios;
- the 2023 game schedules of the University's scheduled football opponents;
- color-coding to reflect past games actually attended by assigned individuals and future games for which individual assignments were still needed;
- the names of individuals assigned to certain cities and locations; and
- monetary amounts associated with certain assigned games.

A separate worksheet within that Master Spreadsheet showed narrative translations of signs and signals that corresponded to specific team formations and plays. The name of the University staff member alleged to have orchestrated the scheme was prevalent in the Master Spreadsheet.

By October 20, that staff member's name began appearing in media reports about the impermissible scheme. That day, I called the University's Athletic Director to determine whether the University was going to take any actions in response to the information disclosed by the NCAA. Later that day, the University suspended the staff member.

*D. The Conference Receives Additional Information From Other Sources*

Between October 20 and November 4, the Conference received additional documentation from other Conference members regarding the impermissible scheme. That documentation indicates that during the 2021, 2022, and 2023 football seasons, the University staff member purchased tickets for off campus football games involving future University opponents, including at least four games in 2021, thirteen games in 2022, and five games during the first

seven weeks of the 2023 season. The tickets were strategically located near midfield, facing the future opponents' sidelines.

This documentation also showed that the staff member had forwarded certain tickets to a network of individuals, many of whose names matched those included in the Master Spreadsheet. The documents include game attendance information for forwarded and unforwarded tickets.

In addition, the commissioner of the Southeastern Conference informed the Conference that the University staff member had purchased tickets to the SEC football championship game in Atlanta.

The Conference has shared this information with both the University and the NCAA.

The Conference also reviewed photos and videos from the public domain (and thus available to the University) that show the staff member dressed similarly to University coaches standing adjacent to and communicating with coaches during games in timeframes in which the impermissible scheme occurred. One photo was taken from the staff member's since-deleted Instagram account showing him during the October 2, 2021 game at Wisconsin standing shoulder-to-shoulder with the University's then-defensive coordinator. The photo shows the coordinator focused on the field and the staff member looking intently in the direction of the opposing sideline. There is also video of the staff member watching the opposing sideline during the November 26, 2022 game at Ohio State and then gesturing to the Michigan defense in reaction to the signals being provided to the opposing offense. The Conference also reviewed a video of the staff member during the December 31, 2022 game against TCU standing shoulder to shoulder with the University's then-defensive coordinator and talking to him while intently watching what was happening on the field and/or on the TCU sideline.

*E. The NCAA Provides Its Evidentiary Conclusions to the University and the Conference About the Scheme*

On November 2, a senior Conference staff member and I participated in a call with NCAA President Baker, other senior NCAA staff members, and the University's Athletic Director, General Counsel, and outside counsel. During that call, the NCAA informed the Conference and the University that, based on its investigation and the evidence it had collected, the NCAA **"knew and could prove"** the following:

- the staff member participated in and coordinated a vast off campus, in-person advance scouting scheme involving a network of individuals;
- he purchased and forwarded tickets for games involving future University football opponents, and the tickets were for seats strategically located for stealing the future opponents' signs;
- he and others acting at his direction video recorded signs used by future University opponents while attending the opponents' games in person;

- information, including videos of future opponents' signs, was delivered back to the staff member by those who had attended the games and taken the videos at his direction; and

- during the time in question, including through the University's seventh game of the 2023 season, the staff member was present on the University's sidelines, dressed similarly to University coaches, in close proximity to University coaches, and he communicated directly with such coaches.

In light of this information, the NCAA informed the University and me that the existence of the impermissible scheme by this University football staff member was "uncontroverted." The NCAA indicated that it was continuing its investigation to determine, among other things, who else knew about and/or was involved in the scheme.

After this call, I held a call with the Conference's Athletic Directors to brief them on the meeting with the NCAA and the University. Concerns were expressed about the continuing disadvantage of the University's opponents because they could no longer rely on their previous system of signs. Concerns were also expressed that there remained a greater risk to safety if the University's football team had been more effective at stealing future opponents' signs through impermissible in-person scouting.

*F. My Meeting with the University President About the Scheme*

On the evening of November 2, an in-person meeting between myself and the University's President was scheduled for the following day. Despite the remarkable and definitive statements that the University and the Conference had just received from the NCAA about what its evidence proved, the University President responded to my meeting request with an email contending that "oral updates from NCAA enforcement staff do not and cannot constitute evidence." He further requested that the Conference stand pat and await the results of the NCAA investigation before imposing any disciplinary action.

The next day, on November 3, I met at the University with its President, who was accompanied by the University's General Counsel and three members of the University's Board of Regents. I asked the Conference's General Counsel and Senior Vice President of Policy to join the meeting by videoconference. During that meeting, the University's General Counsel confirmed that the University had access to the Master Spreadsheet that the NCAA had presented to the Conference. Also during the meeting, I informed the University that the evidence the Conference had reviewed and collected caused me to believe that the University had violated the Conference's Sportsmanship Policy, but that I had not yet made any final determinations or disciplinary decisions.

*G. The Conference Notifies the University About Its Violation of the Sportsmanship Policy and Solicits Responses*

On November 4, the Conference provided its formal notice to the University that the Conference believed the University had violated the Sportsmanship Policy in connection with the impermissible scheme and that it was at risk of disciplinary action. The notice described specific

evidence underlying the Conference's belief. It stressed that "these were not isolated or haphazard incidents. The violations were pervasive, systemic, and occurred over multiple years." It also emphasized that "compromising the integrity of the competition violates one of the most fundamental elements of sportsmanship."

Pursuant to Section 10.3 of the Sportsmanship Policy, the Conference provided the University and its Head Football Coach with an opportunity to respond by November 7. The following day, the University requested an extension until November 8, and also requested certain additional documents and information. The Conference agreed to the extension and provided documents and information in response to the University's requests.

On November 8, the University and its Head Football Coach delivered their responses to the Conference's notice. The University's response did not deny that the impermissible scheme occurred but argued that the Conference did not have the authority to enforce its own rules. For instance, the University argued that a rule *authorizing* the Conference to impose additional penalties after an NCAA investigation based on the final results of that investigation actually *prohibited* the Conference from enforcing an entirely different rule (the Sportsmanship Policy) anytime the NCAA was conducting an investigation—even though the rule in question does not say anything of the sort. Finally, the University argued that it believed it had evidence of other Conference members engaging in impermissible in-person sign-stealing, and therefore urged the Conference to "act cautiously"—essentially an argument that violations of the Sportsmanship Rule should be overlooked if "everyone is doing it." These arguments are addressed below.

The University also asserted in its response that it "has not yet had an opportunity to review almost any of the evidence." This is a concerning statement to the Conference in light of the extensive evidence provided to the University by the NCAA. This issue is more fully addressed below.

*H. The NCAA Shares with the Conference the Evidence It Had Shared with the University, In Light of the University's Statement That It had Not Reviewed "Almost Any of the Evidence."*

Given the University's statement that evidence was scant and the Conference's assertions unsupported, the Conference made affirmative efforts to verify the University's prior knowledge of and access to relevant evidence. Accordingly, pursuant to the mandatory cooperation provisions in the Sportsmanship Policy, the Conference requested the University's consent to allow the Conference to obtain from the NCAA all documents and information that the NCAA had made available to the University in connection with the investigation into the impermissible scheme. The University initially refused to provide such consent, citing confidentiality provisions in the NCAA's bylaws. The University also asserted that "[h]istorically, the NCAA, to our knowledge, has not permitted disclosure." The Conference promptly obtained written confirmation from the NCAA that it did not object to providing such documents and information upon receiving the University's consent. The University ultimately provided its consent after receiving this written confirmation from the NCAA.

This additional evidence, including recorded interviews, photos, videos, and other documentation that had previously been provided to the University, confirms what the evidence

already reviewed by the Conference makes clear: the University football team staff member engaged in an organized and extensive in-person, off campus advance scouting scheme, and that the staff member was in close communications with at least some of the coaches on the University's football team. This evidence also revealed significant new information from interviews that the University attended, information that is covered by confidentiality under the NCAA's rules so as not discussed further here.

## II. The University Committed Offensive Action Under the Sportsmanship Policy

The Sportsmanship Policy vests the Conference Commissioner with wide discretion. The Commissioner "has discretion to pursue, or choose not to pursue, an investigation as to whether an offensive action has occurred." § 10.3.1. He has the "*exclusive authority* to determine whether an offensive action . . . has been committed." *Id.* § 10.01 (emphasis added). And, as part of this determination, the Commissioner—in his sole discretion—"may consider any evidence that he or she deems relevant" and "may accept *any information provided by any source*." *Id.* § 10.2.1 (emphasis added). Other than an involved institution's response to a notice of risk of disciplinary action, the Commissioner "has no formal obligation" to consider any particular piece of evidence. *Id.*

If an offensive action has occurred, the Commissioner "shall have the authority to impose any disciplinary action in response to the offensive action" subject to Section 10.3.3.1. *Id.* § 10.2.2. Upon determination that an offensive action did occur, the Commissioner is required, "as expeditiously as possible," to determine whether and what disciplinary action should be imposed. *Id.* § 10.3.1. Disciplinary actions imposed pursuant to Section 10.3.3 "shall be final and are not subject to appeal." §§ 10.3.3.1; 10.3.3.2.

Under the standards and discretion set forth in the Sportsmanship Policy, and following careful review and consideration of the responses submitted by the University and its Head Football Coach in accordance with the Policy, I have determined that the University committed an offensive action. Specifically, based on the totality of the information and evidence received and reviewed to date, including but not limited to documents and information received from the University, other Conference member institutions, and the NCAA (including documents and information that the NCAA previously made available to the University that are now in the Conference's possession), I have determined that a football staff member employed by the University engaged in an extensive and impermissible in-person, off campus advance scouting scheme that compromised a fundamental element of sportsmanship, namely, the integrity of competition within the Conference. Under the express terms of the Sportsmanship Policy, the University is "responsible for, and therefore, may be held accountable for," the actions of its offending football staff member. *Id.* § 10.1.1.

To be clear, neither I nor the Conference reached this determination based on "rumor" or mere "summaries and descriptions" of evidence, as the University contends in its response.[1] As

[1] Neither the Conference Handbook nor the Sportsmanship Policy defines "evidence" or requires that the Commissioner rely on any specific form of evidence in order to make a determination. And the Policy certainly does not require that any such evidence meet the legal standards for admissibility at trial, as the University contends in its response. Univ. Resp. at 7. To the contrary, Section 10.2.1 of Policy expressly provides that, in determining whether

discussed above, the Conference has received and reviewed extensive documentation and information during the course of its investigation. This includes the Master Spreadsheet and other documents and information that the NCAA made available to the University and which the Conference now has in its possession, notwithstanding the University's initial refusal to consent to the Conference obtaining such materials from the NCAA.

The Conference takes exception to the University's suggestion in its response that any determination in this matter is based on "prejudgment and bias." The Conference does not play favorites among its members, nor does it take actions towards its members based on prejudgment or bias. *Failing* to act under the extraordinary circumstances here could lead other Conference members reasonably to conclude that the Conference has chosen to favor the University over all other members.

## III. The University's Procedural and Technical Arguments In An Attempt to Prevent the Conference from Enforcing Its Own Rules Are Not Persuasive

The responses from the University contend that the procedures in Rule 32 of the Handbook must be followed *whenever* there is an alleged violation of NCAA or Conference rules. That is wrong. The Conference Handbook has a set of procedures that govern actions that offend the elements of sportsmanship and another set of procedures that govern violations of NCAA and Conference rules. The procedures set forth in the Sportsmanship Policy are available to the Commissioner when, as here, the Commissioner has become aware of conduct that (among other things) offends the integrity of competition. In such circumstances, the Commissioner has the discretion to employ the summary procedures set forth in the Sportsmanship Policy rather than the slower-moving procedures set forth in Rule 32. That is true even where the offensive actions are premised on actual or potential violations of NCAA rules.

The plain language of the Conference Handbook and the Sportsmanship Policy, read together, makes this clear. It is true that Rule 32 sets forth procedures for adjudicating violations of NCAA and Conference rules. *See* Rule 32.2.2.C & D (discussion violations of NCAA and Conference Rules). But even before it details those procedures, Rule 32 expressly calls attention to "Agreement 10 for Policies and Procedures on Sportslike Conduct." This confirms that the procedures in Rule 32 are *not* exclusive. This is further confirmed by the plain text of the Sportsmanship Policy. The very first section of that Policy provides that all actions that "are *offensive to the integrity of competition*, actions that offend civility, and actions of disrespect are punishable *in accordance with the terms of this policy*." Agreement 10, § 10.01 (emphases added). This language could not be clearer: when sportsmanship issues, including the integrity of competition, are implicated by the offensive conduct, the Commissioner is authorized to use the procedures and authority prescribed by the Sportsmanship Policy, even if that offensive conduct *also* may involve a violation of NCAA or Conference rules. In other words, the Sportsmanship Policy is not implicated by *all* NCAA and Conference rule violations. However, rule violations that *do* compromise a fundamental element of sportsmanship—including the integrity of

---

an offensive action occurred, the Commissioner may consider "any evidence *that he or she deems relevant*," and "may accept any information *provided by any source*." *Id.* § 10.2.1.

competition—are considered so significant that the procedures in the Sportsmanship Policy are available to the Commissioner.

The University's response does not address the plain language of Rule 32 and the Sportsmanship Policy. Instead, the University reasons as follows: Rule 32 governs punishment for violations of NCAA or Conference rules; the Conference's notification of potential action "expressly premises the Sportsmanship Policy investigation on alleged violations of NCAA and Conference Rules"; therefore, the Commissioner must comply with Rule 32 before imposing on the University any punishment under the Sportsmanship Policy. But that argument has at least three fatal flaws.

*First*, it misreads the Conference's November 4 notice. It is true that the notice references violations of certain NCAA Rules and By-laws, specifically Bylaw 11.6.1, Football Rule 1-4-11-h, and Football Game Management Manual Section 14.A. And it is also true that the potential violation of these rules prompted the Commissioner's sportsmanship investigation. But the notice was clear that the risk of disciplinary action stems from a violation of the Sportsmanship Policy. I have concluded that the University engaged in the impermissible scheme resulting in unfair games on unequal terms and compromised player safety. Nothing offends the integrity of competition more than attempting to gain an unfair advantage through impermissible means. It does not matter whether the NCAA ultimately finds that violations of *its* rules occurred, though it has already communicated to the Conference that the fact of the impermissible scheme is uncontroverted. The Sportsmanship Policy applies to any conduct that affects the "integrity of competition." Such conduct undoubtedly occurred here.

*Second*, the University's argument treats Rule 32, and the actions of the NCAA, as disabling the Conference, acting through its Commissioner, to act expeditiously to preserve the integrity of competition. By its terms, Rule 32.2.2.C applies after the NCAA has concluded its investigation and permits the Conference to impose sanctions *in addition to* those leveled by the NCAA. *See* Rule 32.2.2.C.2 ("While the case will be processed through normal NCAA channels, the Conference Compliance and Reinstatement Committee shall review the case and may impose *additional penalties*, if warranted, *subsequent to* the NCAA action."). The University's reading treats the initiation of action by the NCAA as tying the Conference's hands. That would effectively neuter the Sportsmanship Policy, which takes great pains to repeatedly emphasize the importance of the Commissioner's discretion in ensuring compliance with the Conference's high standards of sportsmanship, which leaves no doubt that the Commissioner's determinations are not subject to appeal, and which repeatedly emphasizes the importance of the Commissioner's ability to act expeditiously in preserving those standards. *See* Agreement 10, §§ 10.01, 10.3.3.1-2, and 10.3.1. The University's reading is simply incorrect. The Sportsmanship Policy exists to allow the Commissioner to protect the integrity of competition in *real time*.

*Third*, the University's position that Rule 32's procedures apply to violations of the Sportsmanship Policy is also inconsistent with the Policy's history. The Sportsmanship Policy in effect before 2013 provided a different set of procedures for investigating and punishing sportsmanship violations. Effective in the fall of 2013, the Conference amended the policy to address concerns that it was poorly suited for operating in an environment of constant and instantaneous coverage of athletics because investigations could stretch out for weeks or months. In contrast to the lengthy, drawn-out process for investigating and adjudicating sportsmanship

violations, the amended Sportsmanship Policy vested the Commissioner with the authority to address potential violations quickly under a set of streamlined procedures. Although institutions had an opportunity to be heard, the newly-enacted Sportsmanship Policy provided that the Commissioner's decisions would be final and not subject to appeal.

The University's arguments regarding the Sportsmanship Policy's "purpose and traditional use" also lack merit. Univ. Resp. at 4. The type and scope of the University's impermissible conduct at issue here is *unprecedented*. Furthermore, while the types of Sportsmanship Policy investigations referenced by the University involve other aspects of sportsmanship described in Section 10.01, *id.*, none of that conduct involved the fundamental element of integrity of competition.

Every member of the Conference, including the University, has agreed to the Sportsmanship Policy. And the Commissioner is bound to follow and apply it. Under the terms of the Policy, the Commissioner has the "exclusive" authority to determine whether an offensive action has occurred and to determine whether disciplinary action is appropriate.[2]

## IV. The University's Claim That It Had Reviewed Almost No Evidence

The Conference is highly concerned about the University's statements in its November 8 response that it "has not yet had an opportunity to review almost any of the evidence" and that "[f]rom what we can tell, your [notice] largely relies on rumor." Univ. Resp. at 1, 7. We know from the evidence provided to the Conference by the NCAA on November 9 that the University had been provided the Master Spreadsheet, numerous other corroborating documents, photographs, and videos, and significant interview recordings, all of which confirm the existence of the impermissible scheme. This includes, as early as October 31 and November 1, at least three University officials attending NCAA interviews during which details of the impermissible scheme were revealed. That knowledge preceded the above-referenced November 2 call with the NCAA, in which the University participated, during which the NCAA stated it **knew and could prove** the existence of the impermissible scheme.

We assume the University's first comment did not mean that it and its counsel had not taken the time to review the documents and other information upon receiving them. The University appears to suggest that imposition of discipline is inappropriate because the University claimed it had seen almost no evidence. But given the extensive evidence the University was in fact provided by the NCAA, it cannot possibly be true that the University had not seen "almost any of the evidence." The evidence the University had should have allowed it to determine for itself the clear basis for concluding that the impermissible scheme occurred. And the combination of (i) the extensive evidence the University had, and (ii) the Conference's reference in its November 4 notice to specific categories of evidence that it had reviewed surely allowed the University to know that the Conference was not "largely rel[ying] on "rumor."

---

[2] The Sportsmanship Policy includes checks and balances on the Commissioner's exercise of this exclusive authority. Indeed, Section 10.3.4 provides for an internal Conference review procedure, which requires the Conference's Joint Group, on an annual basis, to review any case for which the Commissioner has pursued an investigation, regardless of whether any disciplinary action has been imposed. The express purpose of the annual review is to "ensure the Commissioner is administering the policy in a reasonable, fair, and consistent manner."

## V. The JGEC and I Have Determined that This Disciplinary Action Against the University is Appropriate

Under Section 10.2.2 of the Sportsmanship Policy, if the Commissioner determines that an offensive action has occurred, the Commissioner has authority to impose "*any* disciplinary action in response to the offensive action," subject to the provisions of Section 10.3.3. *Id.* § 10.2.2. Section 10.3.3.1 authorizes the Commissioner to impose certain enumerated "Standard Disciplinary Actions" without prior approval. Section 10.3.3.2 provides that disciplinary actions that exceed those listed in Section 10.3.3.1 must receive prior approval by the Conference's Joint Group Executive Committee. Review and action by the JGEC must occur "as expeditiously as possible," and its decisions are final and not subject to appeal. *Id.* § 10.3.3.2.

In deciding whether to impose disciplinary action, Section 10.2.3 provides a non-exhaustive list of factors that the Commissioner may consider. One of those factors is the "general nature or severity of the action." Here, I have determined that the offending action is severe. As stated above, protecting the *integrity* of competition must be of the utmost importance to the Conference. Using impermissible means to obtain a competitive advantage is inherently unfair to Conference members bound by the rules, and winning at any cost to the integrity of the game is unacceptable.

The Conference is unmoved by the University's attempt to downplay its impermissible conduct by asserting that other Conference members may have engaged in sign decoding. As the University readily admits in its response, it does not know the exact methods that it alleges other teams used to decode its own signs. The Conference has not received any information that any other members schools engaged in impermissible advance in-person scouting, let alone a scheme of the size and scale like the one at issue here. The Conference is unaware of any active NCAA investigations into impermissible advance scouting involving other members of the Conference. Should the Conference become aware of such impermissible conduct, it will take appropriate action. However, the Conference vehemently rejects any defense by the University or any other Conference member that cheating is acceptable because other teams do it too.

Another factor that the Commissioner may consider is "any injury or damage that results from the offensive action." Separate from both the damage to the reputational integrity of the Conference and its member institutions and damage from past and ongoing competitive disadvantage, physical injury is also a significant concern here. While the Conference is currently not aware of any physical injuries that resulted from the impermissible scheme, numerous coaches and athletic directors from other member institutions expressed concerns to me about the increased risks of injury to student-athletes resulting from the scheme. I have a responsibility to give serious consideration to those concerns. I find it credible that impermissible advance scouting increases the risk of injury to student athletes because if you know what play your opponent is running, then you also know where your opponents' players will be on the field. Although the University attempted to downplay and disregard these safety concerns in its response, I am not willing to do so.

Another factor that the Commissioner may consider is "the response of and/or any action taken by any other entity that may have jurisdiction over the offensive action." As discussed above, the Conference's investigation began when the NCAA's President took the extraordinary

step of notifying the Conference and the University of its active investigation expressly because of the unprecedented scope of the impermissible scheme and the significant impact it could have on competition this season. The NCAA has also communicated to the Conference that it knows and can prove that the impermissible scheme occurred, and the evidence it has provided to the Conference and the University supports that statement.

Because the University's impermissible conduct impacted the integrity of competition *this season*, I have determined that the resulting disciplinary action should be imposed *this season* in order to protect the integrity of the Conference and its competition. Numerous coaches have informed me that signs and signals cannot be quickly or easily changed, and I find those statements credible. Thus, the inherent and unfair advantage gained from the impermissible scheme may still exist, which further justifies punishment this season.

For the reasons expressed herein, I have determined that the following disciplinary action against the University is appropriate: Effective immediately, the University football team must compete without its Head Football Coach for the games remaining in the 2023 regular season. This disciplinary action shall not preclude the University or its football team from having its Head Football Coach attend practices or other football team activities other than the game activities to which it applies. For clarity, the Head Football Coach shall not be present at the game venue on the dates of the games to which this disciplinary action applies.

The Conference provided the University's and the Head Football Coach's responses to the JGEC and asked it to confirm whether the Sportsmanship Policy may be used in these circumstances. On November 10, the JGEC confirmed by vote that the Conference may rely upon and enforce the Sportsmanship Policy in the circumstances presented by this investigation.

Because this disciplinary action constitutes "Major Disciplinary Action" under the Sportsmanship Policy, on November 10, 2023, I sought and received approval for such discipline from the JGEC. Pursuant to Section 10.3.3.2 of the Sportsmanship Policy, the JGEC's decision to approve the disciplinary actions imposed herein is final and not subject to appeal.

Respectfully submitted,

Tony Petitti

Tony Petitti
Big Ten Conference Commissioner