# Exhibit A

KeyCite Yellow Flag
Distinguished by Salser v. Dyncorp Intl. Inc., E.D.Mich., March 16, 2016

2013 WL 3717799
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Rodney D. ELLIS, Plaintiff–Appellee/Cross–Appellant,
v.
DYKEMA GOSSETT PLLC, Defendant,
and
Lincoln National Life Insurance Company
And Lincoln Financial Advisors Corporation, Defendants–Appellants/Cross–Appellees.

Docket No. 301131.
|
July 16, 2013.

Kent Circuit Court; LC No. 07–010348–NO.

Before: SERVITTO, P.J., and WHITBECK and SHAPIRO, JJ.

**Opinion**

PER CURIAM.

***1** Lincoln National Life Insurance Company and Lincoln Financial Advisors Corporation (collectively "Lincoln") appeal as of right from the judgment on the jury verdict entered in plaintiff's favor on his claim of intentional infliction of emotional distress. Lincoln also appeals various pre- and post-trial rulings and plaintiff cross-appeals from the trial court's award of costs to Lincoln on plaintiff's unsuccessful malicious prosecution claim. We affirm.

I. FACTS

Plaintiff began working as an insurance agent for Lincoln Life Insurance Company in 1971. In 1976 he became part owner of Lucasse Ellis, Inc. ("LEI"), an agency that sold Lincoln insurance, as well as other Lincoln financial products, including investments. Both plaintiff and the agency became very successful Lincoln agents.

In 2001, an arbitration claim filed by a long-time Lincoln agent, Thomas Payne, against Lincoln went to hearing. Payne had alleged that Lincoln took his business, i.e., his clients, away from him when he separated from Lincoln, despite a company policy that the business was the agent's to sell or transfer when he left the company. Plaintiff was subpoenaed by Payne's counsel to testify at the hearing, and Payne was ultimately successful in his arbitration hearing, being awarded nearly $1.3 million dollars.

After the Payne arbitration, plaintiff alleged that his relationship with Lincoln changed dramatically and he became a marked man, incurring their wrath for giving truthful testimony about Lincoln's encouragement of its agents to leave their business with Lincoln when they left. Plaintiff alleged that over the next 18 months, LEI was repeatedly audited and harassed, although no wrong-doing on his or LEI's part was ever found.

By early 2003, plaintiff and one of the agents that had been working at LEI since the early 1990's had reached an agreement wherein the agent would purchase plaintiff's interest in LEI. Plaintiff sought approval for the transfer of commission payments for his clients to the agent. Plaintiff alleged that such arrangements were commonplace and generally approved. However, in his instance, Lincoln would not approve the arrangement. Plaintiff nevertheless sold his interest in LEI to the agent on February 20, 2004, albeit at a much reduced price due to the inability to transfer his commission rights to the agent. Plaintiff resigned as a Lincoln agent on March 30, 2004, and began building a new practice with another company, Raymond James Insurance Agency.

On April 13, 2004, Lincoln, by and through the Dykema Gossett law firm, filed a federal lawsuit against plaintiff and LEI. Lincoln's primary claims were that plaintiff had committed fraud related to his collection of commissions with respect to a large Lincoln client, breached his fiduciary duty to Lincoln by funneling clients to Raymond James, breached contracts by violating agent contracts, and tortiously interfered with Lincoln's contracts and economic advantages with its customers. These allegations stemmed from information uncovered during the audits of LEI and from information obtained from a former long-time employee

of LEI, Marilyn Kaye–Kibbey, who had contacted Lincoln and accused plaintiff of scheming to move business away from Lincoln to Raymond James prior to plaintiff leaving Lincoln.

***2** Kaye–Kibbey had worked at LEI since 1965, eventually becoming a licensed agent for and part owner of the company, while also serving as its office manager. Kaye–Kibbey left LEI in March 2002 and formed her own agency, becoming a Raymond James insurance broker. Kaye–Kibbey indicated that plaintiff directed her to leave Lincoln and directed her to become a Raymond James representative, and that plaintiff established and financed the business for selling Raymond James products. Kaye–Kibbey also explained how plaintiff had moved Lincoln clients to Raymond James and concealed the same from Lincoln, and how he had committed fraud related to a large Lincoln account. Kaye–Kibbey's affidavit attesting to the same was attached to the federal complaint against plaintiff and LEI.

Within a few days of filing the lawsuit, Lincoln filed forms U5 and U4 with the National Association of Securities Dealers (“NASD”), stating that plaintiff had been “permitted to resign” from Lincoln after having been accused of violating investment related statutes or rules and committing fraud. It also stated that plaintiff had violated the NASD rule that prohibits “selling away” (being involved with another broker's product when you are the agent of a different broker). Lincoln repeated these allegations to regulatory authorities in each state where plaintiff was licensed, such that plaintiff lost his license to sell investment products in each of those states. The NASD initiated an investigation, and ultimately found no proof that plaintiff was guilty of the allegations. Plaintiff's state licenses were restored, though the entire process cost plaintiff a substantial amount in legal fees. The U5 and U4 filings, however, remained.

Plaintiff sought to have the federal lawsuit against him dismissed and to compel arbitration with NASD dispute resolution. Lincoln refused to have the matter arbitrated. Plaintiff himself finally filed a statement of claims with NASD dispute resolution alleging breach of contract, fraud, tortious interference, business disparagement, and defamation against Lincoln in March 2006. In May 2006, Lincoln answered plaintiff's NASD claim and filed its own, separate NASD claim alleging fraud, breach of fiduciary duty, conversion, breach of contract, tortious interference, and economic advantage against plaintiff. The proceedings were consolidated, and the federal court stayed the litigation pending arbitration of the merits of the dispute before the NASD. The NASD arbitration took several months and the panel ultimately ordered Lincoln to pay plaintiff $373,000 in compensatory damages, plus interest, and $130,000 in attorney fees, and to correct the NASD forms U4 and U5. The panel denied all of Lincoln's claims against plaintiff and dismissed them with prejudice. On August 24, 2007, the federal court confirmed the NASD award and entered it as a final judgment; it also dismissed Lincoln's claims against LEI with prejudice.

Of relevance to the instant matter, toward the end of the NASD arbitration proceeding, during Lincoln's closing argument, Lincoln's attorney, Andrew McGuinness, was making a point and held up a binder containing exhibits. When plaintiff's counsel stated that it had not seen that particular binder, the NASD panel suggested that it be turned over to plaintiff for review. The binder contained, among other things, handwritten notes by T. Russell Strunk, an attorney and former in-house counsel for Lincoln, taken during meetings with persons in positions of power at Lincoln. The notes contained allegations that plaintiff sent business to Raymond James. The notes also contained statements such as “[plaintiff] owes Kaye–Kibbey $ in her view. She's mad;” “C. Brody sz [plaintiff] lied in the prior arbitration. *Payne* case;” “[Plaintiff's] sister, Mary Cates, in favor of getting her brother [plaintiff];” “Want to build a case v him. Fire him. But keep book of biz.;” “Bob & Carolyn want Russ & Howard to scare Holtrop; then [plaintiff].” The binder also contained a hotel reservation made for Kaye–Kibbey by Lincoln's travel agent in Florida, among other things. The documents, called PX 144, had never been turned over to plaintiff during discovery and served a significant role in the instant litigation. PX 144 was admitted as an exhibit at the end of the NASD arbitration without objection.

***3** Also of relevance to the instant proceedings, during the same time frame that plaintiff was being sued by Lincoln, he was involved in litigation with his sister, Mary Cates, in the probate court. Cates, who was allegedly friends with Kaye–Kibbey, had accused plaintiff of mishandling funds as the trustee of a family trust. To resolve the issue, plaintiff filed a probate action for an accounting of the trust and Cates filed counter-claims against him for, essentially, breach of fiduciary duties. When plaintiff saw Cates listed as a witness on Lincoln's witness list in the arbitration, then saw the statement in PX 144 that Cates was in favor of “getting” him, plaintiff questioned whether Cates's allegations of his mishandling the trust funds were somehow related to

Lincoln's actions toward him after the Payne arbitration. Lincoln was ordered to produce documents in the probate action concerning its contact with Cates.

Plaintiff initiated this action against defendants, Dykema Gossett and Lincoln, on October 2, 2007. Plaintiff alleged that in initiating and maintaining the federal court lawsuit and NASD proceeding against him, (1) both Dykema Gossett and Lincoln engaged in malicious prosecution, abuse of process, and conspiracy to commit malicious prosecution and to abuse process, and (2) Lincoln engaged in intentional infliction of emotional distress in pursuing the lawsuit and NASD proceeding and in fraudulently concealing evidence, and was vicariously liable for any actions of Dykema Gossett because Dykema Gossett was Lincoln's agent and was acting within the scope of its agency at all times. Only the malicious prosecution claim against Dykema Gossett and the malicious prosecution and intentional infliction of emotional distress claims against Lincoln proceeded to trial. During trial, the trial court granted Dykema Gossett's motion for directed verdict. The jury thereafter rendered a verdict finding in favor of Lincoln on plaintiff's malicious prosecution claim, and in plaintiff's favor on his intentional infliction of emotional distress claim against Lincoln. Plaintiff and Lincoln are the only parties involved in this appeal.

## II. ISSUES

### A. RES JUDICATA

Lincoln argues that summary disposition or a directed verdict should have been granted in its favor on plaintiff's intentional infliction of emotional distress (IIED) claim because the claim is barred by res judicata. Lincoln specifically asserts that plaintiff argued all of the elements of his IIED claim before the NASD panel and his current IIED claim arises from the same operative facts as his prior NASD action against Lincoln. We disagree.

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Washington v. Sinai Hosp of Greater Detroit,* 478 Mich. 412, 417; 733 NW2d 755 (2007). Summary disposition under MCR 2.116(C)(7) is appropriate when a claim is barred on the basis of a prior judgment. In reviewing a ruling pursuant to subrule (C)(7), this Court "consider[s] all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them." *Fane v. Detroit Library Comm,* 465 Mich. 68, 74; 631 NW2d 678 (2001). The applicability of the doctrine of res judicata is also reviewed de novo, *VanVorous v. Burmeister,* 262 Mich.App 467, 476; 687 NW2d 132 (2004), as is a trial court's decision on a motion for directed verdict. *Zantel Mktg Agency v. Whitesell Corp,* 265 Mich.App 559, 568; 696 NW2d 735 (2005).

***4** The doctrine of res judicata is employed to prevent multiple suits litigating the same cause of action. *Adair v. State,* 470 Mich. 105, 121, 680 NW2d 386 (2004). It thus operates to give preclusive effect to a judgment by precluding the relitigation of a claim. The purpose of res judicata is to prevent inconsistent decisions, conserve judicial resources, and protect vindicated parties from vexatious litigation. *Pierson Sand & Gravel, Inc v. Keeler Brass Co,* 460 Mich. 372, 380; 596 NW2d 153 (1999). The elements of res judicata are (1) the prior action was decided on the merits; (2) the prior decision was a final judgment; (3) both actions contained the same parties or those in privity with the parties; and (4) the issues presented in the subsequent case were or could have been decided in the prior case. *Stoudemire v. Stoudemire,* 248 Mich.App 325, 334; 639 NW2d 274 (2001). The burden of establishing the applicability of res judicata is on the party asserting the doctrine. See *Richards v. Tibaldi,* 272 Mich.App 522, 531; 726 NW2d 770 (2006).

There is no dispute that the first three elements of res judicata are met. The NASD action was (1) decided on the merits; (2) a final judgment, and; (3) contained the same parties or those in privity with the parties. See *Stoudemire,* 248 Mich.App at 334. It is the fourth element, whether the issues presented in the subsequent case were or could have been decided in the prior case, that is at issue. As pointed out by Lincoln, with respect to this element, Michigan employs a "same transaction" test wherein res judicata bars claims arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not. *Adair,* 470 Mich. at 123. "The 'transactional' test provides that the assertion of different kinds or theories of relief still constitutes a single cause of action if a single group of operative facts give rise to the assertion of relief." *Id.* at 124 (citation and internal quotation marks omitted).

Plaintiff's statement of claims filed with the NASD sought actual and exemplary damages, setting forth several claims for resolution—breach of contract based upon Lincoln's promise that, when plaintiff sought to retire, Lincoln would transfer plaintiff's business in accordance with his plan for

succession and its failure to do so; tortious interference with contract and prospective business relations based on Lincoln's intentional interference with plaintiff's contract with LEI and with his prospective business relationship with his own agent; business disparagement based on statements Lincoln published in plaintiff's U4 and U5 filings that were false, that were allegedly published maliciously and without privilege; defamation based on Lincoln's statements made in the U4 and U5 filings and to various state departments which were defamatory and false, and that plaintiff alleged were made negligently or with actual malice; fraud based upon all of the previously asserted statements made by Lincoln concerning the transfer of plaintiff's business that constituted material representations of fact that were false and that were relied upon by plaintiff; promissory estoppel based upon promises that Lincoln made to plaintiff concerning the ability to transfer his business and upon which plaintiff reasonably relied to his detriment; and, unjust enrichment based upon a benefit that Lincoln obtained from plaintiff by means of fraud, duress, or taking undue advantage of plaintiff.

***5** In the present litigation, plaintiff brought two claims —malicious prosecution (which is not at issue on appeal) and intentional infliction of emotional distress. These claims were based on Lincoln's actions in initiating the federal lawsuit and the NASD proceeding against him. Plaintiff did mention in his NASD claims that Lincoln undertook several unnecessary audits of him after he provided testimony in the Payne arbitration, and that Lincoln appeared retaliatory. There is thus some overlap. However, the crux of plaintiff's NASD claims appeared to focus on Lincoln's failure or refusal to allow him to transfer his business to another agent, despite prior assurances that the business was his to transfer upon retirement. Plaintiff did not and could not have known whether Lincoln's true intent was to cause him distress or that Lincoln acted recklessly until he saw PX144 and notes taken by Strunk on March 22, 2004, which were produced only during the course of these proceedings. The March 22, 2004 notes (“the “Strunk notes”) were notes taken during interviews Strunk conducted with Kaye–Kibbey and plaintiff's sister, Mary Cates, in Florida on that date.

Throughout the lawsuit and arbitration, Lincoln maintained that it had a firm and substantial belief that plaintiff was engaging in fraud or selling away, and that was the basis for its actions. However, PX 144, the Strunk notes, and later deposition testimony indicate that the entire reason for its actions was to scare plaintiff, then to get rid of him somehow and to keep his book of business. While plaintiff may have suspected that Lincoln's actions were not aboveboard, lacking any proof of his suspicions until the revelation of PX 144 and the Strunk notes, he could not have signed a complaint for IIED that complied with Court rule requirements at the time of the NASD hearing. Plaintiff testified at his December 18, 2008 deposition, for example, that he did not realize that the audits he was subjected to arose out of retaliation for his role in the Payne case or that Lincoln's reluctance to approve the transfer of his business to another agent arose from anger with him until after he saw documents contained in the PX 144 exhibit, and that until he saw PX 144 he never connected actions toward him with the Payne case.

PX 144 placed Lincoln's actions against plaintiff in an entirely different context-one that supported plaintiff's theory and one that could be construed as extreme or outrageous. Until the discovery of PX 144, however, plaintiff could not have supported a claim of extreme or outrageous conduct on Lincoln's part. Plaintiff was unable to question witnesses about statements made and documented in PX 144 in the NASD proceeding because he was not even aware of them during the time he filed his NASD complaint or made his case in chief. And, there is no suggestion that plaintiff, exercising reasonable diligence, could have discovered PX 144 or the Strunk notes sooner. Plaintiff requested discovery from Lincoln during the NASD proceedings. Lincoln did not list the PX 144 documents as privileged material, yet did not disclose them to plaintiff until strongly encouraged to do so by the arbitration panel at the close of arbitration. The Strunk notes were not even produced until 2009, during the present matter. Until that time, Strunk was presented as a messenger boy who simply met with Kaye–Kibbey on one occasion to pick up computer discs containing allegedly relevant material and nothing more. His notes reveal, however, that he interviewed Kaye–Kibbey as well as Mary Cates. This information was significant to plaintiff's IIED claim and was not available to plaintiff prior to or during the NASD proceeding. Thus, res judicata does not bar plaintiff's IIED claim in the instant action.

***6** Lincoln also sought a directed verdict on the same basis at the close of plaintiff's proofs. Lincoln essentially renewed its motion for summary disposition based on res judicata. “A directed verdict is appropriate only when no factual question exists on which reasonable jurors could differ.” *King v. Reed,* 278 Mich.App 504, 522; 751 NW2d 525 (2008). “The appellate court reviews all the evidence presented up to the time of the directed verdict motion, considers that evidence in a light most favorable to the nonmoving party,

and determines whether a question of fact existed." *Id.* When reviewing a motion for directed verdict, "it is the factfinder's responsibility to determine the credibility and weight of trial testimony." *Id.,* quoting *Zeeland Farm Servs, Inc v. JBL Enterprises, Inc,* 219 Mich.App 190, 195; 555 NW2d 733 (1996).

Because res judicata did not bar plaintiff's IIED claim prior to trial, it also did not bar plaintiff's claim at the close of plaintiff's proofs.

B. EXTREME AND OUTRAGEOUS CONDUCT

Lincoln next alleges that the trial court erred in denying its motion for summary disposition on plaintiff's IIED claim where none of Lincoln's conduct qualified as "extreme and outrageous" under Michigan law. We disagree.

"To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Walsh v. Taylor,* 263 Mich.App 618, 634; 689 NW2d 506 (2004). The threshold for showing extreme and outrageous conduct is rather high. *VanVorous,* 262 Mich.App at 481. As stated in *Graham v. Ford,* 237 Mich.App 670, 674–675; 604 NW2d 713 (1999):

> Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. It is not enough that the defendant has acted with an intent that is tortious or even criminal ... or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort....The test is whether ... an average member of the community would ... exclaim, "Outrageous!" [ (citations and quotation marks omitted.) ]

Restatement Torts, 3d. § 46, Comment d, p 139 notes, "Whether an actor's conduct is extreme and outrageous depends on the facts of each case, including the relationship of the parties, whether the actor abused a position of authority over the other person, whether the other person was especially vulnerable and the actor knew of the vulnerability, the motivation of the actor, and whether the conduct was repeated or prolonged." Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery is a generally question of law for the court. *Lewis v. LeGrow,* 258 Mich.App 175, 197; 670 NW2d 675 (2003). However, if reasonable minds could differ on the subject, the issue becomes a question of fact for the jury. *Id.*

***7** The trial court properly found that plaintiff established a question of fact as to whether Lincoln's actions rose to the level of extreme or outrageous. As pointed out by Lincoln, it certainly had the right to pursue legal action against one of its agents if it suspected that agent of fraud or selling away. However, evidence presented by plaintiff indicated that at the time Lincoln initiated the federal lawsuit against plaintiff, it had audited him several times and, by its own admission, had found no wrongdoing. Additionally, while Lincoln had interviewed KayeKibbey and she had indicated that plaintiff had been engaging in wrongdoing with respect to Lincoln, there was no corroboration of these allegations. Despite the lack of proof, Lincoln proceeded with a federal lawsuit against plaintiff, filed U4 and U5 statements with the NASD which contained statements that plaintiff was permitted to resign rather than that he voluntarily left Lincoln's employment (which Lincoln was later required to correct), and filed statements with state regulating agencies that could be deemed untrue with respect to plaintiff. Further, statements purportedly taken by or for Lincoln's agents with respect to plaintiff that were revealed only at the very end of the NASD proceeding indicated the Lincoln wanted to, among other things, "scare" plaintiff and build a case against him to fire him, but keep his book of business. On the basis of the above, a jury could reasonably conclude that Lincoln did not, in fact, initiate the federal lawsuit against plaintiff for its stated purpose and that its conduct in initiating the lawsuit, engaging in several audits, and other associated conduct was, indeed, for the purpose of scaring plaintiff and attempting to get rid of him while keeping his book of business. Conduct that deprives a man of his livelihood, ruins his business reputation, and subjects him to a lengthy and intense legal process, could be viewed as beyond all possible bounds of decency and could be regarded as atrocious and utterly intolerable in a civilized community. The trial court thus properly denied Lincoln's motion for summary disposition of plaintiff's IIED claim based upon Lincoln's claim of a lack of outrageous or extreme conduct.

C. JUDGMENT NOTWITHSTANDING THE VERDICT (JNOV) / NEW TRIAL BASED ON GREAT WEIGHT OF THE EVIDENCE ON PLAINTIFF'S IIED CLAIM

Lincoln next argues that the trial court erred in denying its motion for JNOV on plaintiff's IIED claim where the trial evidence failed to establish a claim for IIED as a matter of law. Lincoln also argues that the trial court abused its discretion in denying Lincoln's motion for a new trial where the great weight of the evidence on plaintiff's IIED claim favored Lincoln. We disagree.

This Court reviews de novo a trial court's decision on a motion for JNOV, viewing the evidence and reasonable inferences arising therefrom in a light most favorable to the nonmoving party to determine if the evidence supported the jury's verdict. *Alfieri v.. Bertorelli,* 295 Mich.App 189, 193; 813 NW2d 772 (2012). A trial court's decision to grant a new trial is reviewed for an abuse of discretion. *People v. Cress,* 468 Mich. 678, 691; 664 NW2d 174 (2003).

***8** MCR 2.611(A)(1)(e) provides that a new trial may be granted where the verdict was against the great weight of the evidence. Such motions are not favored and should be granted only when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result. *Ellsworth v. Hotel Corp of America,* 236 Mich.App 185, 194; 600 NW2d 129 (1999).

Again, there are four elements to a claim of intentional infliction of emotional distress: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Graham,* 237 Mich.App at 674. "The second element of the tort of intentional or reckless infliction of emotional distress may be proved in two ways. A plaintiff can show that a defendant specifically intended to cause a plaintiff emotional distress or that a defendant's conduct was so reckless that " 'any reasonable person would know emotional distress would result.' " *Haverbush v. Powelson,* 217 Mich.App 228, 236–237; 551 NW2d 206 (1996).

The jury in this matter specifically found that Lincoln did not lack probable cause for bringing or continuing the underlying federal lawsuit and arbitration claim. Thus, plaintiff's recovery for intentional infliction of emotional distress could not be based upon those actions. The verdict form also specifically contained an instruction that if the jury found in plaintiff's favor on the IIED claim, they were to find the date plaintiff discovered or should have reasonably discovered that Lincoln's conduct of inflicting emotional distress was intentional or reckless and if the date was any date prior to October 2, 2004 (for statute of limitation purposes), "this date need to be considered when assessing damages in connection with Ellis's intentional infliction of emotional distress claim. For the purpose of awarding damages on this claim, you cannot consider any conduct by Lincoln that occurred prior to this date. Damages can only be awarded for conduct by Lincoln occurring on or after October 2, 2004." Because the jury found that plaintiff did or should have discovered Lincoln's conduct on April 19, 2004, it could only award damages for conduct by Lincoln occurring on or after October 2, 2004.

Lincoln contends that the trial court erred in denying its motion for JNOV because the evidence upon which the jury based its verdict did not establish any of the required elements of an IIED claim. Lincoln first claims that none of the conduct by Lincoln that occurred on or after October 2, 2004, could be considered extreme or outrageous. Lincoln insists that only five specific actions occurring on or after that date could form the basis for plaintiff's IIED claim. Plaintiff responds that these are not the primary or only actions to be considered, and that all of Lincoln's actions must be considered in the aggregate. We will first address the specific actions raised by Lincoln.

(1) Continuation of the federal lawsuit. Lincoln contends that, because the jury expressly found that there was no absence of probable cause for bringing or continuing the federal lawsuit or NASD claim, it cannot, as a matter of law, be considered extreme or outrageous conduct and that expert testimony is necessary to point to specific actions during arbitration or litigation that is extreme or outrageous. Lincoln states (and supports) that in Michigan, filing and prosecuting even a groundless lawsuit in not extreme and outrageous conduct for purposes of an IIED claim. However, Restatement Torts, 3d. § 46 comment e, page 140, notes that "[a]lthough an actor exercising legal rights is not liable [for intentional infliction of emotional distress] merely for exercising those rights, the actor is not immunized from liability if the conduct goes so far beyond what is necessary to exercise the right that it is extreme or outrageous."

***9** Further, while Lincoln has offered authority to support a contention that expert testimony is necessary to establish the standard and breach of conduct in professional malpractice

actions, that is not the claim in the instant matter. Lincoln has presented no authority suggesting that expert testimony is necessary to establish the outrageousness of an action every time it occurs in the context of a legal proceeding. And whether expert testimony is necessary depends entirely on the specific action alleged by plaintiff to be outrageous. For example, plaintiff alleged that certain witnesses lied at the NASD hearing and that certain incriminating documents were not produced in response to discovery, were intentionally hidden, and were later ordered to be produced. Expert testimony is not necessarily required to assist the trier of fact in understanding whether lying under oath or hiding potentially incriminating documents are outrageous actions.

(2) Settlement negotiations. Lincoln contends that plaintiff provided no expert testimony suggesting that the settlement proposals and negotiations were improper and that there was no evidence the proposals were extreme and outrageous. Plaintiff testified that he and his counsel met with Lincoln's corporate counsel and Dykema Gossett to discuss possible settlement in October 2004. At that meeting, Lincoln proposed that plaintiff pay $1 million to Lincoln, give up all of his licenses, and get out of the industry altogether. Plaintiff rejected that offer. In late October 2004, Lincoln proposed a second settlement, this time suggesting that plaintiff pay it $437,400.00, release Lincoln and Kaye–Kibbey from all claims, and agree to a three-year non-compete agreement, during which plaintiff was apparently to stay out of the industry.

Because the federal lawsuit had only been filed a few months prior, Lincoln's primary claims against plaintiff were for fraud, breach of fiduciary duty, breach of contract, and tortious interference with contract and economic advantage, and the settlement proposals all appeared to be directed at or at least include provisions requiring plaintiff to get out of the industry, the jury could have concluded, without the assistance of expert testimony, that the settlement proposals were intended to get plaintiff out of the business or were so unrelated to the merits of Lincoln's claims and damages as to be outrageous.

(3) Certain communications between Lincoln's counsel, Andrew McGuinness (or Lincoln), and Cates or her counsel. Lincoln directs us to McGuinness's testimony that Cates or her attorney initiated contact with him and that he did not discuss Lincoln's case against plaintiff with her. Lincoln further states that there is no indication that McGuinness influenced or encouraged Cates in her relationship or case with plaintiff.

The jury could conclude, however, that Lincoln's actions in withholding information that Cates had told them that she was willing to assist them in "getting" plaintiff was outrageous, given that Cates was plaintiff's sister and that Lincoln was aware of and had been involved in a probate action wherein plaintiff's sister had accused him of wrongful actions pertaining to the administration of family trust. The jury could also conclude that while Cates may have initiated the contact with McGuinness after October 2, 2004, there was already a "relationship" between Lincoln and Cates, and that Cates would have had no reason to speak to Lincoln's attorney for any reason but for the Lincoln–Ellis case or probate case, which the jury could also find outrageous, given, again, that Cates was plaintiff's sister.

***10** (4) Lincoln attorney Eve Scott's alleged refusal to change the U5 form from "permitted to resign" to "voluntary termination." Testimony at trial indicated that when an agent separates from a broker, a U5 form must be filled out. Lincoln's expert, Paul Litteau, testified that Lincoln had an obligation to report what they knew about plaintiff at the time of his leaving as their agent. According to Litteau, even if Lincoln had checked "voluntary termination," it would not have changed Lincoln's reporting obligation. The U5 specifically asks, if the person voluntarily resigned, "was he at the time of the resignation, subject to an internal review or investigation?" According to Litteau, the same information would thus have been reported concerning plaintiff, just in a different place on the U5 form. That being the case, there would have been no reason for Lincoln to have checked "permitted to resign" rather than "voluntary resignation" on the U5. The jury could have found, then, that Lincoln's refusal to change the designation after October 2, 2004, was outrageous.

Litteau also testified, however, that according to the instructions on for the U5, only the residential address and the disclosure questions can be amended on a U5. The U5 can otherwise be supplemented, but the reason for termination could not be changed absent a court order or affirmed decision of an arbitration panel. Given that Lincoln could have still had whatever information it deemed pertinent included on the U5, there was no reason the parties could not, through stipulation in the pending federal court action, have entered a court order changing the designation on the U5.

(5) The filing of Sara Corbat's allegedly inaccurate affidavit with the probate court. In the probate case between plaintiff and his sister, Cates, Corbat, in-house counsel for Lincoln, was ordered to produce documents related to Mary Cates's involvement in the Lincoln–Ellis case to the court. Corbat submitted an affidavit swearing that all documents had been produced and that she "located one additional document with a four sentence entry," but that it was privileged and would not be produced. Corbat did offer, in the affidavit, to submit the document to the probate court for *in camera* inspection. This document turned out to be the March 22, 2004, notes of Strunk taken during his interviews of Cates and Kaye–Kibbey in Florida. The notes themselves were 12 pages, though not all of the notes referenced Cates.

The affidavit could be interpreted as stating that the document referenced contained four lines. It could also be interpreted to mean that a document was found that contained a four-line entry related to Cates. The jury was free to choose either interpretation and, if it found the first, could conclude that Corbat lied in her affidavit, which it could also determine was outrageous, as it appeared that a Lincoln attorney was dishonest in a court proceeding concerning plaintiff and his sister.

***11** Plaintiff also asserts that Lincoln engaged in outrageous acts, other than those outlined above, after October 2, 2004. He states that Lincoln generally continued on its course of punishing plaintiff for testifying at the Payne arbitration past the initiation of the federal and arbitration proceedings. Plaintiff points to Lincoln's selective prosecution of alleged selling away against him when Kaye–Kibbey testified at arbitration that she and another Lincoln agent, Jody Vanderweide, engaged in selling away and that Lincoln, to present date, has taken no action against Vanderweide. Plaintiff also states that both Eve Scott and other Lincoln management lied at the NASD hearing about Strunk's meetings with Kaye–Kibbey and Cates. Plaintiff further points out that in a letter from Corbat to plaintiff's counsel, prior to filing her affidavit, she wrote that Lincoln had no additional notes of Russell Strunk. Lincoln did have and later produced notes—the March 22, 2004 notes. These were not actually produced until 2009. Plaintiff further noted that Dykema Gossett represented at the NASD arbitration that all non-privileged documents had been produced but that, despite the fact that the documents in PX 144 were not listed in Dykema Gossett's privilege log, they were not produced until closing arguments at arbitration. As previously indicated, PX 144 contained Strunk's handwritten notes of meetings detailing that one of Lincoln's key employees said plaintiff lied during the Payne arbitration, that Cates was in favor of "getting" plaintiff, that Lincoln wanted to build a case against plaintiff and fire him but keep his book of business, and that Lincoln higher-ups wanted Strunk to scare plaintiff.

Considering the above as a whole, the jury could have found that Lincoln engaged in outrageous conduct during the course of the NASD arbitration and probate matter (particularly, it engaged in a cover-up of relevant documents that would show an ulterior motive for the lawsuit in the first place). While each act, separately, may not be outrageous, the jury was free to view the actions as a whole and see them as a continued course of conduct that together, was outrageous.

Lincoln also contends that the trial court should have granted its motion for JNOV because the evidence failed to establish that Lincoln acted with intent or recklessness. According to Lincoln, even if any of the events it listed above could be deemed extreme or outrageous, none of them could be deemed to have done with the requisite intent or recklessness. We disagree.

As previously indicated, "[t]he second element of the tort of intentional or reckless infliction of emotional distress may be proved two ways; a plaintiff can show that a defendant specifically intended to cause a plaintiff emotional distress or that a defendant's conduct was so reckless that " 'any reasonable person would know emotional distress would result.' " *Lewis,* 258 Mich.App at 197.

Strunk testified at deposition that the notes referencing Lincoln's wanting him to "scare" plaintiff meant that he was to confront plaintiff and tell him they knew what he was doing, i.e., selling away. However, that did not take place. And, the jury was free to disbelieve this testimony. They could have instead believed anything that they wanted to about this statement, including that Lincoln wanted to initiate a lawsuit against plaintiff and thereafter engage in activities that were intended to cause him emotional distress.

***12** In 2006 and 2007, as discussed above, Lincoln management and in-house counsel hid documents (or at least did not produce them) and allegedly lied under oath. The documents were not irrelevant or immaterial, but were inflammatory and suggested that Lincoln's entire course of conduct toward plaintiff, both before and after October 2, 2004, may not have been pure. The jury could have found that the only purpose in withholding documents, lying under oath,

engaging and communicating with Cates to assist in their case, and electing to go after plaintiff but not another agent for clear selling away is evidence that Lincoln acted with intent to cause plaintiff emotional distress, or acted recklessly, with deliberate disregard of a high degree of probability that emotional distress would follow.

Finally, Lincoln contends that JNOV should have been granted because the evidence failed to establish that plaintiff suffered severe emotional distress or damages caused by the purportedly extreme or outrageous conduct.

Restatement Torts, 3d. § 45 defines emotional harm as encompassing a variety of mental states including "fright, fear, sadness, sorrow, despondency, anxiety, humiliation, depression (and other mental illnesses), and a host of other detrimental—from mildly unpleasant to disabling—mental conditions." "[S]eeking medical treatment is not a condition precedent to satisfying the element of severe emotional distress." *Haverbush,* 217 Mich.App at 235. Comment j to Restatement Torts, 3d. § 46 notes that "the law intervenes only when the plaintiff's emotional harm is severe and when a person of ordinary sensitivities in the same circumstances would suffer severe harm." The intensity and the duration of harm are factors to be considered in determining severity but "in many cases, the extreme and outrageous character of the defendant's conduct is itself important evidence bearing on whether the requisite degree of harm resulted...." *Id.*

Plaintiff testified that when he first saw, during the NASD arbitration hearing, the notes indicating that Lincoln wanted to build a case against him and fire him but keep his book of business, he almost fainted. He testified that he was in absolute shock and it was a worst case nightmare to see his sister conspiring with Lincoln against him.

Plaintiff further testified that over the years, the actions of Lincoln have been the most incredible hell that he could imagine. He stated that it was an attack out of the blue, that it pushed him to the limit, and that he has sought psychiatric help for it. He testified that he has gone through depression and withdrawal. Plaintiff testified that there have been times of emotional despair and distress that have pushed him to thoughts of suicide. Plaintiff further testified that he had suicidal thoughts after September 2004. He testified that, throughout the arbitration, he kept visualizing jumping off a building. According to plaintiff, he still suffers from anxiety and depression, though he has not thought of suicide for about a year prior to trial. Plaintiff also testified that he does not have the confidence to sell product and meet new people in sales situations anymore.

***13** Plaintiff additionally testified that his family has been torn apart and that this matter absolutely destroyed his business. He was very close with his sister and now they do not even talk. It impoverished her and killed their relationship.

Lincoln's actions, which included hiding what could be construed as an ulterior motive for its conduct toward plaintiff and, apparently included inducing plaintiff's sister in its actions in trying to build a case against him and interfering with what was a previously good family relationship, and which were revealed only after a lengthy arbitration process in which he was accused of fraud, could cause a reasonable person to suffer severe emotional distress. The trial court thus did not err in denying Lincoln's motion or JNOV, nor did it abuse it discretion in denying Lincoln's motion or a new trial based upon the great weight of the evidence.

In reaching this conclusion, we want to be very clear that this is a very unique case with very particular facts and circumstances. It is not often that an IIED claim is successful and, we would hazard to guess, even less often that an IIED claim finding its genesis in a federal lawsuit and NASD arbitration would be successful. That plaintiff's claim of IIED arose in the context of legal proceeding in no way suggests or stands for the legal precedent that legal proceedings can or should give rise to IIED claims. It is simply in this specific case, under very specific facts and circumstances, that plaintiff's IIED claim survived.

### D. ADMISSION OF THE STRUNK NOTES

Lincoln contends that the trial court abused its discretion in admitting Exhibit 1, the Strunk notes, at trial. Lincoln further asserts that it was entitled to a new trial due to the erroneous admission of Exhibit 1. We disagree.

Generally, we review the grant or denial of a discovery motion for an abuse of discretion. *Linebaugh v. Sheraton Mich. Corp,* 198 Mich.App 335, 343; 497 NW2d 585 (1993). An abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes. *Saffian v. Simmons,* 477 Mich. 8, 12; 727 NW2d 132 (2007). Whether the attorney work product privilege applies is a question of law that is reviewed de novo. *Koster v. June's Trucking, Inc,* 244 Mich.App 162, 168; 625 NW2d 82 (2000).

We review the trial court's decision on a motion for a new trial for an abuse of discretion. *Shuler v. Mich. Physicians Mut Liab Co,* 260 Mich.App 492, 509; 679 NW2d 106 (2004).

Lincoln first contends that the Strunk notes were not properly authenticated, given that Strunk passed away prior to trial and no one else could or did offer personal knowledge that the Strunk notes were, in fact, taken by Strunk, and thus the notes were inadmissible. However, on March 12, 2009, Lincoln moved for a protective order concerning the notes at issue, asserting that they were protected by the attorney work product privilege. At the hearing on the motion, Lincoln represented that the notes were, in fact, taken by Strunk during his interviews with Kaye–Kibbey and Cates, and vigorously argued that the notes should be excluded from admission. When Lincoln's motion for a protective order was denied, Lincoln applied for leave to appeal that decision to this Court (Docket No. 292340), again representing to this Court that notes were taken on March 22, 2004, by Attorney Strunk during an interview with Kaye–Kibbey and Cates, and that Lincoln had withheld the notes on the basis of the work product privilege. This Court denied Lincoln's application. Lincoln ultimately produced the notes, dated March 22, 2004, on June 12, 2009, and identified them as the notes taken by Strunk on March 22, 2004. There are no other notes, aside from the ones ultimately produced and identified as Exhibit 1, dated March 22, 2004, and purported to be taken by Strunk on that date. From, the outset, then, Lincoln affirmatively attested that the notes at issue were written by Strunk. To now claim that the notes were not sufficiently authenticated to be admitted at trial is disingenuous.

***14** Lincoln also contends that the Strunk notes should not have been admitted because they were protected by the attorney work product privilege, having been taken by a Lincoln attorney interviewing witnesses in preparation for a lawsuit Lincoln anticipated filing. Again, we disagree.

MCR 2.302(B)(1) provides the general standard regarding the scope of discovery:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of another party, including the existence, description, nature, custody, condition, and location of books, documents, other tangible things....

"It is well settled that Michigan follows an open, broad discovery policy that permits liberal discovery of any matter, not privileged, that is relevant to the subject matter involved in the pending case." *Augustine v. Allstate Ins Co,* 292 Mich.App 408, 419; 807 NW2d 77 (2011), quoting *Reed Dairy Farm v. Consumers Power Co,* 227 Mich.App 614, 618; 576 NW2d 709 (1998). However, this Court has also recognized the common-law privilege protecting the disclosure of attorney work product. *Messenger v. Ingham Co Prosecutor,* 232 Mich.App 633, 638; 591 NW2d 393 (1998). The work-product doctrine protects from discovery the notes, working documents, and memoranda that an attorney prepares in anticipation of litigation. *Leibel v. General Motors Corp,* 250 Mich.App 229, 244; 646 NW2d 179 (2002).

Strunk testified at his February 11, 2009, deposition that he was sent to Florida on a diplomatic mission. Lincoln wanted to obtain possession of the computer and paper records that Kaye–Kibbey said that she had in her possession that would show plaintiff's wrongdoing and she would not simply send those records to Lincoln. He was thus sent down to see if he could interview Kaye–Kibbey and to "talk a lady out of her evidence." Strunk testified that he did not examine any of the documents provided by Kaye–Kibbey or Cates, and did not try to determine or explore whether they were being truthful because, according to Strunk, "this wasn't fundamentally my case." Strunk indicated that he just listened to what the women had to say and brought the documents back to Eve Scott, who did not go to Florida herself because she had other things to do. Strunk also agreed with Randy Hall's characterization of him as a messenger boy, testifying, "I did nothing more than what Randy Hall described. I went down and retrieved data. Other than that, what I, what I wrote down is what I was told. And that's it." He further testified that when he returned from Florida with the documents, his involvement in the Ellis matter was substantially over. "As I said, I went down and I interviewed two witnesses, collected information and returned to Fort Wayne. I would have debriefed with Mr. Bond and Ms. Brody and Ms. Scott what I had learned. Then I would have passed responsibility back to Ms. Scott for the legal activity."

***15** Based on Strunk's testimony, any notes that he took during his interviews with KayeKibbey and Cates in Florida were simply recordings of words, not protected mental impressions. His role and task were not as an attorney interviewing witnesses in anticipation of litigation, but were by his own characterization, to act as a messenger boy sent to talk a lady out of her evidence and to simply write down what she said.

Even if the notes were determined to be work product, the trial court properly determined that the notes were discoverable under MCR 2.302(B)(3)(a). That rule provides:

> Subject to the provisions of subrule (B)(4), a party may obtain discovery of documents and tangible things otherwise discoverable under subrule (B)(1) and prepared in anticipation of litigation or for trial by or for another party or another party's representative (including an attorney, consultant, surety, indemnitor, insurer, or agent) only on a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Thus, if a party demonstrates the substantial need and undue hardship necessary to discover work product, "that party may discover only factual, not deliberative, work product." *Augustine,* 292 Mich.App at 421, quoting *Leibel,* 250 Mich.App at 247.

Again, Strunk testified that he simply wrote down what Kaye–Kibbey and Cates told him. He did not attempt to explore whether what they were telling him was true or try to draw them out. He simply listened and recorded. The notes do not present legal theories, mental impressions, conclusions, or opinions of Strunk. And, there would be no way to verify what Kaye–Kibbey and Cates said to Strunk during the March 22, 2004 meeting (or impeach them) to determine whether Lincoln and Dykema Gossett had cause to pursue litigation based on the information gleaned from the meetings or to determine their intent other than through the notes, since Strunk is now deceased. The March 22, 2004 notes were thus discoverable under MCR 2.302(B)(3)(a). Because the trial court did not abuse its discretion in admitting the Strunk notes at trial, it also did not abuse its discretion in denying Lincoln's motion for a new trial based upon the allegedly erroneous admission of the notes.

E. ADMISSION OF PX 144

Lincoln next asserts that the trial court abused its discretion in admitting Exhibit 2, PX 144, into evidence at trial, as it contains inadmissible hearsay. Specifically, Lincoln contends that Strunk's handwritten notes that are part of the exhibit reflect statements made by others. Lincoln further asserts that it was entitled to a new trial on the basis of the trial court's erroneous admission of this exhibit. We disagree.

***16** Notably, PX 144 was admitted *without objection* at the NASD arbitration and forms part of the basis for plaintiff's claims of malicious prosecution and IIED. In *Cooney v. Chase,* 81 Mich. 203, 207–208; 45 NW 833 (1890), a malicious prosecution case, our Supreme Court held that the complaints and warrants filed in underlying lawsuit were admissible as evidence in the plaintiff's claim for malicious prosecution because, "[t]he present suit was founded upon the complaint and warrant first made, and were properly a part of the plaintiff's case. The second complaint and warrant were admissible as tending to show malice." The same is true in the instant matter.

With respect to Lincoln's claim that PX 144 contains inadmissible hearsay, we note that hearsay is a "statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c); *People v. Fisher,* 220 Mich.App 133, 152; 559 NW2d 318 (1996), overruled in part on other grounds, *People v. Houthoofd,* 487 Mich. 568, 583; 790 NW2d 315 (2010). MRE 801(d)(2) provides that admissions by a party opponent, however, are not hearsay. An admission by a party opponent is defined as a statement that "is offered against a party and is (A) the party's own statement, in either an individual or representative capacity ..., or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement made by the party's agent or servant concerning a matter within the scope of the agency or employment...."

In his deposition testimony, Strunk, a Lincoln employee, testified that two pages of PX 144 were his handwritten notes from a February 17, 2004 meeting concerning plaintiff that was, he believed, attended by Bond, Brody, and Hall, all persons in high positions at Lincoln. He testified that at the meeting, people were passing information to him and he was simply writing it down. He did not recall who made a statement that he had written down that they wanted to build a case against plaintiff and fire him but keep his book of business, but indicated it was likely Bond, Brody, or Hall. He also testified concerning handwritten notes, dated March 5, 2004, taken during a phone call he had with Kaye–Kibbey.

He testified they were notes detailing what she was telling him about Ellis and about how Cates was in favor of "getting" plaintiff.

These statements were clearly offered against a party, Lincoln. They were made by Lincoln representatives, were statements of which Lincoln had manifested an adoption or belief in its truth, or were statements made by Lincoln's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. Strunk, a Lincoln employee and agent, appeared to be Lincoln's official note-taker on the plaintiff matter for a period of time. He was senior counsel in Lincoln's law department and took notes at meetings concerning plaintiff, then went down to Florida to collect evidence from Kaye–Kibbey at Eve Scott's (who was assigned to the case) request. After that, his involvement in the case ceased. Anything the Lincoln higher-ups were telling him during the meetings is an admission by a party opponent. He was their agent acting within the scope of his employment and all the statements were attributable to Lincoln agents acting within the scope of their employment. The only thing that could conceivably be hearsay is what Kaye–Kibbey told him. But, Lincoln acted on and used what Kaye–Kibbey told him, so they were statements of which Lincoln manifested an adoption or belief of its truth. The notes were thus not hearsay and the trial court did not abuse its discretion in admitting PX 144, nor did it abuse its discretion in denying Lincoln's motion for a new trial based upon the allegedly erroneous admission of Exhibit 2.

F. ADMISSION OF EXHIBITS 313, 314, 315 AND 316

***17** Lincoln contends that the trial court abused its discretion in admitting exhibits 313 (a motion to compel filed against Lincoln in the Cates probate case), 314 (a letter regarding Lincoln's response to a probate subpoena), 315 (a probate court order), and 316 (an affidavit filed with the probate court) into evidence at trial when the same were irrelevant. Lincoln also contends that 314 and 316 were not properly authenticated and that the trial court abused its discretion in denying Lincoln's motion for a new trial based upon the erroneous admission of these exhibits. We disagree.

During plaintiff's testimony, he detailed how he learned during the arbitration proceeding, at the conclusion of which PX 144 was revealed, that Lincoln had been talking with his sister, Cates. Plaintiff testified that Sara Corbat, counsel for Lincoln, was present during the NASD arbitration. Plaintiff also testified that after learning about Lincoln's communication with Cates, he went back to the probate court and his attorney filed a motion to compel discovery against Lincoln in the probate case he had pending with Cates. Exhibit 313 is the motion to compel filed against Lincoln in the Cates probate case. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. While Lincoln was not party to the Cates–Ellis probate case, plaintiff testified that the accusations by Cates came out of nowhere. His discovery that Lincoln had been communicating with Cates around the time the accusations began was relevant to plaintiff's claim of intentional infliction of emotional distress because it made Lincoln's intent more likely to be true. The fact that plaintiff filed a motion to compel discovery against Lincoln in the probate case set background for what ultimately occurred. The trial court did not abuse its discretion in admitting Exhibit 313.

Exhibit 314 is a September 6, 2007, letter from Sara Corbat, Lincoln's counsel, to plaintiff's attorney, in response to a subpoena issued in the Cates probate matter. Plaintiff testified that he was given the letter. In the letter, Corbat stated that as she had mentioned on the telephone, Lincoln has no additional notes of Russell Strunk. Plaintiff testified that he and his attorney were interested in getting notes from Strunk because they had learned at the arbitration and from PX 144 that Strunk had met with Cates in Florida. This letter is relevant, again, to set the stage for what occurred later (when the Strunk notes were discovered and produced in the instant matter contrary to Corbat's assertion that they had no notes) and to show Lincoln's course of conduct for purposes of establishing plaintiff's IIED claim. Again, they made the issue of Lincoln's intent more likely to be true.

As for Lincoln's claim that the letter was inadmissible because it was not properly authenticated, MRE 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "Testimony that a matter is what it is claimed to be" is one means of authentication. MRE 901(b)(1). Plaintiff testified that he was given the letter by his attorney, the addressee of the letter, who represented him in the probate matter. While Lincoln objected, indicating that plaintiff could not testify that the letter, in fact, came from Corbat, that could be stated of anyone who drafted a letter. Corbat was not required to testify that she drafted the letter

for it to be authenticated anymore than a criminal defendant would be required to testify that he drafted an incriminating letter to have it authenticated and admitted. The letter is essentially an admission of a party opponent and that Corbat failed to testify about it goes to the weight of the evidence rather than its admissibility.

***18** Exhibit 315 is a probate court stipulation and order whereby the trial court granted plaintiff's motion to compel discovery against Lincoln in the probate matter, and Corbat agreed to submit an affidavit to the probate court listing specifically what documents have been provided in response to the probate court subpoenas and court order, and additionally to state that no other responsive documents exist. This document is relevant to show what Lincoln agreed to provide to plaintiff and to show whether Lincoln's later actions were in conformity with its agreement and court orders, and to show a pattern of its actions toward plaintiff in support of his IIED claim.

Exhibit 316 is the Corbat affidavit filed with the probate court. In the affidavit, Corbat swears:

> With regard to the order requiring the production of documents, notes, or other memorialization related to communication with Mary Cates concerning her involvement with the investigation into Rodney Ellis, I have located one additional document with a four-sentence entry. Said document is protected by the attorney work product privilege but will be produced for the Court for an *in camera* inspection, if so ordered.
>
> (7) I have found no other documents responsive to the subpoenas other than those already produced or produced herewith.

Because Corbat had just written a letter to plaintiff's counsel stating that they had no notes from Strunk and the affidavit references notes from Strunk, the affidavit is relevant concerning a witness's credibility because it showed that Corbat's prior letter indicating that there were no additional notes of Russell Strunk was untrue.

As to the issue of authentication, plaintiff testified simply, “This is Sara Corbat's response and affidavit.” He did not testify who showed it to him or where he saw it before his testimony. Because it was a lawsuit that plaintiff had initiated and participated in and the affidavit was filed in that lawsuit, it is part of the probate court record. However, plaintiff did not properly authenticate it, and it should not have been admitted on his few words set forth above.

To the extent that Exhibit 316 was not properly authenticated and thus should not have been admitted, and were we to find that Exhibit 314 was also not properly authenticated, and thus should not have been admitted, the error was nevertheless harmless. As set forth in MCR 2.613(A), an error in the admission of evidence is not grounds for granting a new trial unless refusal to take this action is inconsistent with substantial justice. The fact of the matter is that the Strunk notes were not revealed until the midst of the present action. The jury was free to, and likely did, presume that Lincoln took great pains to keep these notes to itself. Whether Corbat, in her letter, did not know of the notes or was intentionally misrepresenting their existence to plaintiff's counsel is simply one piece of evidence in this case. Even absent Corbat's affidavit and letter, the evidence established that Lincoln clearly knew of the existence of the notes and did not provide them to plaintiff, nor did it reveal that it had interviewed Cates. Lincoln was free to assert, and did assert, that it did not feel it had to turn the notes over based on privilege. The jury was free to accept or reject this position. The trial court thus did not abuse its discretion in denying Lincoln's motion for a new trial based upon the allegedly erroneous admission of exhibits 313, 314, 315, and 316.

G. ADMISSION OF EXHIBITS 213, 214, 215, 327 AND 329

***19** Lincoln next claims that the trial court abused its discretion in admitting exhibits 213, 214, (both Carolyn Brody's handwritten notes of what Cates told her), 215 (fax from Cates to Brody), 327 (Cates probate counsel's letter to Brody) and 329 (Cates' probate counsel's letter to McGuinness) into evidence at trial because they all contain hearsay. Lincoln further asserts that it was entitled to a new trial based on the basis of the erroneous admission of the exhibits at trial. While some of the exhibits were hearsay and should not have been admitted, the error in the admission of these exhibits was harmless.

Hearsay is a “statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” MRE 801(c); *Fisher,* 220 Mich.App at 152. Unless the contested statements fall within one of the enumerated exceptions, the evidence is inadmissible. MRE 802. The proponent of evidence bears the burden of establishing its admissibility. *Gilbert v. DaimlerChrysler Corp,* 470 Mich. 749, 781; 685 NW2d 391 (2004).

Exhibit 215 was not hearsay and there was thus no error in its admission. Exhibit 215 was a fax from Cates that could be interpreted to implicate plaintiff in selling away. It would appear that this exhibit was not offered by plaintiff for the truth of the matter asserted (i.e., that plaintiff was selling away), but to show that Cates was participating in the investigation of plaintiff.

Exhibit 329 was also properly admitted as non-hearsay. Andrew McGuinness testified that the exhibit was a letter, addressed to him, giving him permission to speak directly to Cates about the Lincoln–Ellis litigation. The exhibit was not offered to prove the truth of the matter asserted, but offered to prove that Lincoln was involving or involved with Cates in its litigation.

Exhibit 327, a letter from Cates's probate attorney to Brody stating that Cates had submitted a box of records or documents to Brody concerning the matter involving plaintiff was offered, it could be argued, to prove the truth of the matter asserted, i.e., that Cates submitted said box. But it could also be reasonably argued, as plaintiff does, that the exhibit was offered to refute Lincoln's assertion that it was simply a passive third-party recipient of minimal information from Cates and in no way encouraged or was involved in her dispute with plaintiff. That Cates submitted an entire box of documents to Lincoln concerning "the matter involving Ellis" could serve as evidence tending to suggest that Lincoln engaged Cates as a much more active participant in its case against plaintiff or was much more actively engaged in Cates's probate case with plaintiff (which Lincoln also denied). Because either interpretation is valid, we cannot say it was an abuse of discretion to admit Exhibit 327 as non-hearsay.

Exhibits 213 and 214 were not statements made by a Lincoln agent and thus do not qualify as admissions by a party opponent, as argued by plaintiff. While Brody wrote the actual words down on paper, they were not statements by Brody or statements made by another Lincoln agent or another person authorized to make statements on Lincoln's behalf. The document consists of, for the most part, Cates' statements recorded by Brody, and there is no indication that the statements were adopted by Brody on behalf of Lincoln. Importantly, "[a] statement cannot be used as a party admission unless the party made the statement." *Merrow v. Bofferding,* 458 Mich. 617, 633; 581 NW2d 696 (1998). Exhibit 213 and 214 were hearsay and should not have been admitted.

***20** That being said, an error in the admission of evidence is not grounds for granting a new trial unless refusal to take this action appears to the court inconsistent with substantial justice. MCR 2.613. It is highly unlikely that the admission of Exhibit 214, wherein Brody noted that Cates told her that LEI's computer technician had HIV, had an effect on the jury's verdict. In addition, Exhibit 213, containing Brody's notes that Cates told her that $50,000 had gone missing from her Lincoln account and that she had boxes of information about her accounts, was unlikely to have affected the verdict. The jury had already heard testimony, through plaintiff and Andrew McGuinness, that Cates had been in contact with Lincoln, that Cates had accused plaintiff of mishandling the family trust monies, that plaintiff had a probate lawsuit against Cates involving the family trust, and that Cates had sued him in the probate matter for fraud and breach of fiduciary duties. The admission of exhibits 213 and 214 were thus harmless error. Because the trial court did not abuse its discretion in admitting exhibits 215, 327 and 329 and its erroneous admission of exhibits 213 and 214 were harmless, the trial court did not abuse its discretion in denying Lincoln's motion for a new trial based upon the allegedly erroneous admission of these exhibits at trial.

H. REMITTITUR

Lincoln next asserts that assuming the only error at trial was the amount of damages, the trial court abused its discretion in failing to grant it a remittitur because the jury's award of $990,000 was far beyond the limits of what reasonable minds would deem to be just compensation. We disagree.

When reviewing the trial court's decision concerning remittitur, we must afford due deference to the trial court's ability to evaluate the jury's reaction to the evidence, and only disturb the trial court's decision if there has been an abuse of discretion. *Palenkas v. Beaumont Hospital,* 432 Mich. 527, 533; 443 NW2d 354 (1989). In determining whether remittitur is appropriate, a trial court must view the evidence in the light most favorable to the nonmoving party and decide whether the evidence supported the jury award. *Silberstein v. Pro–Golf of America, Inc,* 278 Mich.App 446, 462; 750 NW2d 615 (2008); *Diamond v. Witherspoon,* 265 Mich.App 673, 692–693; 696 NW2d 770 (2005). In reviewing motions for remittitur, courts must be careful not to usurp the jury's

authority to decide what amount is necessary to compensate the plaintiff. *Freed v. Salas,* 286 Mich.App 300, 334; 780 NW2d 844 (2009). Analysis of this issue must necessarily start with the principle that the adequacy of the amount of the damages is generally a matter for the jury to decide. *Kelly v. Builders Square, Inc,* 465 Mich. 29, 35; 632 NW2d 912 (2001).

In determining whether remittitur is appropriate, the proper consideration is whether the jury award was supported by the evidence. *Clemens v. Lesnek,* 200 Mich.App 456, 464; 505 NW2d 283 (1993); MCR 2.611(E)(1). This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented. *Palenkas,* 432 Mich. at 532. The reviewing court should limit is consideration to:

> ***21** (1) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; (2) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and (3) whether the amount actually awarded is comparable with awards in similar cases both within the state and in other jurisdictions. [*Palenkas,* 432 Mich. at 532–533.]

If the award falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, the jury award should not be disturbed. *Frohman v. Detroit,* 181 Mich.App 400, 415; 450 NW2d 59 (1989).

Damages awarded for intentional infliction of emotional distress are somewhat akin to exemplary damages. As explained in *Veselenak v. Smith,* 414 Mich. 567, 573; 327 NW2d 261 (1982), exemplary damages are a class of compensatory damages that allow for compensation for injury to feelings and are recoverable as compensation, not as a punishment to the defendant. These damages compensate a plaintiff for feelings of humiliation, outrage, and indignity resulting from injustices caused by conduct on a defendant's part that is undertaken voluntarily and is malicious or "so willful and wanton as to demonstrate a reckless disregard of plaintiff's rights." *Id.* at 574–575. "As a practical matter, the conduct we have found sufficient to justify the award of exemplary damages has occurred in the context of the intentional torts, slander, libel, deceit, seduction, and other intentional (but malicious) acts." *Id.* at 575.

Plaintiff testified that when he first saw, during the arbitration hearing, the notes indicating that Lincoln wanted to build a case against him and fire him but keep his book of business, he almost fainted. He testified that he was in absolute shock and it was a worst case nightmare to see his sister conspiring with Lincoln against him. He further testified that over the years, the actions of Lincoln have been the most incredible hell he could imagine. He testified that it pushed him to thoughts of suicide. According to plaintiff, he still suffers from anxiety and depression.

Plaintiff also testified that his business was destroyed and he does not have the confidence to sell product and meet new people in sales situations anymore. He testified concerning having to spend thousands of dollars to get his state licenses back and having the U5 information about him being "permitted to resign" and Lincoln's beliefs about him committing fraud and violating Rule 3040 being on the NASD website for everyone to see for years.

Plaintiff also testified that his family was destroyed. He was very close with his sister and now they do not even talk. Plaintiff testified that the probate matter essentially impoverished her and killed their relationship. He testified about having been accused by her of mishandling the family trust and engaging in a lawsuit with her in 2005, and finding out that Lincoln was involved with her in some manner, which could be viewed as an attempt to deliberately destroy the relationship between he and his sister.

***22** Although plaintiff did not substantiate that he suffered depression and anxiety as a result of Lincoln's conduct through testimony other than his own or through medical documentation, it is not even essential to present direct evidence of an injury to the plaintiff's feelings to recover exemplary damages. *Unibar Maintenance Services, Inc v. Saigh,* 283 Mich.App 609, 631–632; 769 NW2d 911 (2009). Instead, "the question is whether the injury to feelings and mental suffering are natural and proximate in view of the nature of the defendant's conduct." *Id.* Because of the similarity between exemplary damages and the damages at issue, the same question would be relevant here.

Plaintiff's testimony about Lincoln's conduct and the effect it had on him was consistent and relayed that he was depressed, anxious, and suicidal for a period of years. He testified to embarrassment and humiliation concerning his licensing standings and the posting of his U5 information. These feelings would be natural considering the conduct. He did testify as to a loss of his ability to retire and his loss of confidence in the field he had occupied his entire life, as

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

well as the loss of a formerly close relationship with his sister. These feelings would also be a natural result of the complained-of conduct. And, the NASD arbitration, federal lawsuit, probate matter with his sister and the current matter, dragged on for years and Lincoln's allegedly outrageous actions occurred at varying points throughout those years. It would be natural for anyone engaged in a lengthy legal battle brought against him by his employer for fraud, where documents purportedly detailing a scheme to fire him and keep his book of business were hidden, would feel angry, upset, highly distressed, etc. Keeping in mind that intangible injuries or injuries to feelings are not quantifiable in monetary terms (*Ray v. Detroit,* 67 Mich.App 702, 704–705; 242 NW2d 494 (1976)), and viewing the evidence in a light most favorable to plaintiff, it is not inconceivable that the jury could find that plaintiff suffered a significant amount of noneconomic injuries over an extended period of time and awarded him the $990,000.00 award on that basis. The trial court thus did not abuse its discretion in denying Lincoln's motion for a new trial or remittitur based on excessive damages.

I. JURY INSTRUCTIONS

Lincoln next contends that the trial court abused its discretion when it failed to instruct the jury that Lincoln could not be held liable for actions taken solely by Dykema Gossett after Dykema Gossett was awarded a directed verdict, and that Lincoln was entitled to a new trial based upon the failure to so instruct the jury. We review a trial court's decision regarding jury instructions for an abuse of discretion, *Alfieri,* 295 Mich.App at 196, and conclude that the trial court did not abuse its discretion in this instance.

Any actions alleged by Lincoln to have been undertaken solely by Dykema Gossett that pre-date October 2, 2004, are irrelevant, as the jury was only to consider actions taken after that date in awarding damages. As to other actions, Lincoln directs us to general agency law, wherein a principal cannot be held liable to a party if the agent having primary responsibility is found not liable to the party. Lincoln contends that because Dykema Gossett, as Lincoln's agent, was found not liable to plaintiff, Lincoln, as Dykema Gossett's principal, cannot be held liable for any of Dykema Gossett's actions and the jury should have been so instructed. However, the two cases Lincoln cites in support of its position, *Lincoln v. Gupta,* 142 Mich.App 615, 621–622; 370 NW2d 312 (1985) and *Al–Shimmari v. Detroit Med Ctr,* 477 Mich. 280, 295; 731 NW2d 29 (2007) stand for the proposition that where the claim against the principal is based *solely* upon respondeat superior or vicarious liability, dismissal of the claims against the agent operates as a dismissal of the claims against the principal. That is not the case we have before us.

***23** Plaintiff brought separate claims against Lincoln and Dykema Gossett claiming that they engaged in certain actions that caused him damages. He essentially alleged that they were joint tortfeasors. Where a master or principal does not actively participate in the negligent conduct of the servant or agent, and the master or principal's liability is based solely on the doctrine of *respondeat superior,* the master or principal and servant or agent are not joint tortfeasors. *Willis v. Total Health Care of Detroit,* 125 Mich.App 612, 617; 337 NW2d 20 (1983). “Joint tort-feasors may be sued individually or jointly,” and “[w]here the wrong is committed by an agent or the principal under circumstances which make the principal liable, there are two actors, the principal and the agent. The injured party may sue either or both.” *Cascarella v. National Grocer Co,* 151 Mich. 15, 18; 114 NW 857 (1908). In particular, “[a]ll concerned in originating and carrying on a malicious prosecution are jointly and severally responsible.” *Id.,* quoting 1 Cooley Torts, 3d. p 342. Thus, Lincoln can be held liable for both its and Dykema Gossett's actions as a joint tortfeaser.

More importantly, the jury was well aware that the only party involved in the trial at the end was Lincoln and that the case involved only Lincoln and plaintiff. The jury instructions made it clear that Lincoln was the only defendant, and made it clear that the elements of each cause of action that plaintiff needed to establish pertained exclusively to Lincoln. For example, the trial court instructed as to the elements of intentional infliction of emotional distress, “Ellis has the burden of proving each of the following: A. Lincoln engaged in extreme and outrageous conduct; B. Lincoln's conduct was intentional or reckless ...” The trial court further instructed that conduct is intentional or reckless if “A. Lincoln desired to inflict severe emotional distress, and knew that such distress was certain or substantially certain to result from its conduct ...”

“It is well established that jurors are presumed to follow their instructions.” *People v. Graves,* 458 Mich. 476, 486; 581 NW2d 229 (1998). Where, as here, the jury was instructed as to only Lincoln and specifically advised that the plaintiff must prove that Lincoln engaged in the specified conduct in order to be liable to plaintiff, the trial court did not abuse its

discretion in declining to also specifically instruct the jury that Lincoln could not be held liable for the conduct of Dykema Gossett.

J. COSTS TO LINCOLN ON PLAINTIFF'S MALICIOUS PROSECUTION CLAIM

On cross-appeal, plaintiff contends that the trial court erred in awarding costs to Lincoln as the prevailing party on plaintiff's malicious prosecution claim, when the facts and damages related to the claim were identical to the IIED claim upon which plaintiff prevailed. We disagree.

The determination of whether a party is a "prevailing party" under MCR 2.625 is a question of law that is reviewed de novo. *Klinke v. Mitsubishi Motors Corp,* 219 Mich.App 500, 521; 556 NW2d 528 (1996). Similarly, the interpretation and application of court rules presents a question of law subject to review de novo. *Peters v. Gunnell, Inc,* 253 Mich.App 211, 225; 655 NW2d 582 (2002).

***24** The prevailing party in an action is entitled to the taxable costs of litigation unless prohibited by statute or court rule, or unless the trial court directs otherwise for reasons stated in writing and filed in the action. MCR 2.625(A)(1); *McMillan v. Auto Club Ins Ass'n,* 195 Mich.App 463, 466; 491 NW2d 593 (1992). The court rules provide specific rules for determining who the prevailing party is:

(B) Rules for Determining Prevailing Party.

> (1) *Actions With Several Judgments.* If separate judgments are entered under MCR 2.116 or 2.505(A) and the plaintiff prevails in one judgment in an amount and under circumstances which would entitle the plaintiff to costs, he or she is deemed the prevailing party. Costs common to more than one judgment may be allowed only once.
>
> (2) *Actions With Several Issues or Counts.* In an action involving several issues or counts that state different causes of action or different defenses, the party prevailing on each issue or count may be allowed costs for that issue or count. If there is a single cause of action alleged, the party who prevails on the entire record is deemed the prevailing party.
>
> (3) *Actions With Several Defendants.* If there are several defendants in one action, and judgment for or dismissal of one or more of them is entered, those defendants are deemed prevailing parties, even though the plaintiff ultimately prevails over the remaining defendants. [MCR 2.625.]

In *Klinke,* 219 Mich.App at 519–520, quoting 3 Martin, Dean & Webster, Michigan Court Rules Practice, pp 723–724, a panel of this Court explained how to determine whether multiple causes of action are present:

> [MCR 2.625] does involve a problem of interpretation, depending upon the definition used for "cause of action." For example, if a plaintiff joins together claims for negligence and breach of warranty, relating to a single injury, is there only a single cause of action in the case, or has the plaintiff stated different causes of action? If there is only a single cause of action, plaintiff can prevail on one theory, lose on the other, and still be the prevailing party on the entire record. But if these are different causes of action, within the meaning of MCR 2.625(B)(2), the plaintiff will be allowed costs only as to the cause upon which he prevailed, and the defendant will recover costs upon the other cause of action.
>
> Traditionally the definition of "cause of action" in Michigan has been broad and functional, in terms of the transaction or occurrence giving rise to the claim for relief. See Authors' Comment to MCR 2.203. Thus, where alternative theories or claims might be stated, if they arise out of the same transaction or occurrence, there is only a single cause of action, even though each alternative claim or theory might involve technically different liabilities and duties and slightly different factual elements. This definition of cause of action appears to serve the purposes of MCR 2 .625(B)(2).... If recovery by the plaintiff on any one of the claims would bar a recovery on all of the other claims, it should be concluded that there was only a single cause of action for purposes of allowing costs. If, however, recovery on one of the claims would not bar recovery on the others, different causes of action are involved, within the meaning of MCR 2.625(B)(2), and costs should be allowed to the prevailing party in each cause.

***25** In the present case, plaintiff's complaint asserted two claims against Lincoln—malicious prosecution and intentional infliction of emotional distress. The jury specifically found that Lincoln had probable cause to bring and maintain the federal court action against plaintiff, thus finding in Lincoln's favor on the malicious prosecution claim. The malicious prosecution and IIED claims did not arise *entirely* out of the same transaction. Plaintiff's claim of malicious prosecution required that Lincoln initiate a legal


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

action against him, without probable cause, for a malicious purpose, and the proceeding terminated in plaintiff's favor. Plaintiff essentially claimed that Lincoln initiated a legal action against him for the malicious purpose of getting rid of him and keeping his book of business. Plaintiff's claim for intentional infliction of emotional distress, on the other hand, focused on the actions of Lincoln that occurred primarily *during* the federal lawsuit and later NASD arbitration (lying under oath, hiding incriminating notes, having his sister assist them in their case, etc.). His claim for intentional infliction of emotional distress was not based upon whether Lincoln had cause to sue him in the first place. Certainly, plaintiff argued that, but his argument was more that Lincoln engaged in actions in its pursuit of him that were outrageous, underhanded, and intended to cause him emotional distress. While the actions of Lincoln were claimed to be a continued course of conduct, the focus *had* to be on Lincoln's specific actions after the lawsuit was filed and, indeed after October 2, 2004, due to statute of limitations issues.

And, it is possible that plaintiff could have prevailed on both theories. They were not alternative theories of liability. That is, his claims were neither interdependent, nor mutually exclusive, as evidenced by the jury verdict. While plaintiff could not recover duplicate damages, as he was seeking the same type of damages for each claim, prevailing on his claim of malicious prosecution would not bar recovery for his claim of intentional infliction of emotional distress and vice versa. The verdict form was simply set up such that plaintiff would only receive a single award, regardless of which theory (or both) he prevailed upon. Thus, we conclude that the trial court properly determined that plaintiff stated two different causes of action against Lincoln and it did not err in awarding costs to Lincoln as the prevailing party on plaintiff's malicious prosecution claim.

K. EXPERT FEES AND EXPENSES OF PAUL J. LITTEAU

On cross-appeal, plaintiff contends that the trial court erred in awarding costs to Lincoln for expert fees and expenses of Paul J. Litteau when he offered no opinions on the malicious prosecution claim and because his invoices and affidavit provided an insufficient basis upon which to award costs. Lincoln, on direct appeal, also challenges the trial court's award of costs with respect to Litteau, contending that the trial court abused its discretion in denying Lincoln reimbursement for the time Litteau spent reviewing trial testimony.

***26** We review a trial court's ruling on a motion for costs under MCR 2.625 for an abuse of discretion. *Gentris v. State Farm Mut Auto Ins Co,* 297 Mich.App 354, 365; 824 NW2d 609 (2012). The prevailing party in an action is entitled to the taxable costs of litigation unless prohibited by statute or court rule, or unless the trial court directs otherwise for reasons stated in writing and filed in the action. MCR 2.625(A)(1); *McMillan,* 195 Mich.App at 466. Expert witness fees may be taxed as part of the taxable costs to the prevailing party in any given case. *Rickwalt v. Richfield Lakes Corp,* 246 Mich.App 450, 466; 633 NW2d 418 (2001); MCL 600.2552; MCL 600.2164. It is proper to tax as cost fees paid to the expert in connection with his or her preparation for trial. *Id.* at 466–467.

Litteau was offered as an expert in NASD compliance and licensing. He testified that he read transcripts of the recorded telephone conversations of former and current Lincoln clients who had been represented by Ellis. One of whom indicated that he had moved his account to Raymond James, following Ellis, when, at the time, Ellis still worked for Lincoln. The other indicated that Ellis had encouraged her to invest with Raymond James. Litteau testified that evidenced selling away.

Litteau also testified that he read some of the documents in this case, such as e-mails between Kaye–Kibbey and Ellis, Cookie and Ellis, and staff meeting minutes that appear to be joint between LEI and Summit, and believes they are concerning and confusing. He testified that individuals appear to be working for both companies and that accounts appear to be established at Raymond James and involve Ellis, which would indicate selling away.

Because Lincoln's claims in the federal court and in the NASD included fraud and breach of fiduciary duty, Litteau appears to be testifying, albeit indirectly, that Lincoln's claims were based upon reasonable evidence of selling away. Litteau also specifically testified that based on his review of the files, he saw no malice on the part of Lincoln, which is an element of malicious prosecution. Thus, Litteau arguably provided testimony concerning the malicious prosecution claim.

Litteau also provided testimony concerning the reasonableness of Lincoln's designation of Ellis's separation status as “permitted to resign” on his U5 and its report to other state regulation authorities of its investigation into Ellis's activities. Plaintiff contended that the NASD investigation that resulted due to the U5 designation and that his other state licenses were revoked due to Lincoln's reports constituted

"special injuries" for purposes of his malicious prosecution claim, such that this testimony could also be construed as pertaining to the malicious prosecution claim. The trial court thus did not abuse its discretion in awarding costs for the expert testimony of Litteau in relation to the malicious prosecution claim.

Furthermore, Litteau's bill of costs and affidavit formed a sufficient basis upon which to award his costs and fees. Significantly, plaintiff asserts that the affidavit and invoices detailing Litteau's work are imprecise and nonspecific and do not meet the standards necessary to support an award of the requested fees under MCR 2.625(G). However, MCR 2.625(F)(1) provides that costs "may be taxed by the court on signing the judgment, or may be taxed by the clerk as provided in this subrule." MCR 2.625(F)(2)(a) provides that when costs are to be taxed by the clerk, the party entitled to costs must present a bill of costs conforming to subrule (G). There is no such requirement of conformity when costs are taxed by the court on signing the judgment, as occurred in this case. Thus, Lincoln was not required to file a bill of costs that conformed with the requirements of MCR 2.625(G).

***27** In any event, we are satisfied that Litteau's invoices and affidavit are sufficient to support and award of his fees. Litteau's submitted invoices at times detail very specific hours spent on very specific tasks and at times detail specific hours spent on more generalized tasks such as reviewing documents or reviewing transcripts. In his affidavit, Litteau does not provide clarification as to what specific document he was reviewing at any given document, but swears that the hours were spent reviewing and analyzing the trial transcripts and documents related to the case and were required to prepare for his testimony as an expert in this matter.

As indicated by the trial court in its opinion awarding Litteau's fees, "[t]he documentation related to this action is extensive and includes not only the thirty-six volume plus court file, but also the federal litigation file, the NASD arbitration file and record, and the fruits of vigorous discovery efforts by all parties." We, like the trial court, are cognizant of the fact that any expert opinion as to whether Lincoln intentionally inflicted emotional distress upon plaintiff or maliciously prosecuted him would necessarily be predicated on the facts reflected in the federal case, the NASD arbitration hearing and the evidence submitted in those cases, the depositions that took place in the underlying matters, and the evidence provided in the instant matter. To comb though the thousands of pages of testimony and documentation to familiarize oneself with the background and to arrive at a conclusion would take a substantial amount of time. The claims in the federal lawsuit, the NASD arbitration, and this matter are based on thousands of pages of deposition testimony, e-mails, contracts, handwritten notes, letters, and a multitude of other documents. The trial court noted that it "has carefully compared the invoices and explanatory affidavit submitted by Litteau ..." in rendering its opinion, then rejected some of the requested hours of Litteau's time (approximately 30). Given the trial court's review of the affidavit and invoices, the length and complexity of the case, and the fact that plaintiff has directed us to no authority requiring specificity in Lincoln's request for expert costs, we cannot find that the trial court abused its discretion in awarding the amount of Litteau's fees that it did.

To the extent that plaintiff challenges fees awarded for Litteau's meetings with Lincoln's attorneys or preparation or those meetings on the April 7, 2009 invoice, April 3, 2010 invoice, May 10, 2010 invoice, and May 31, 2010 invoice, Lincoln clearly excluded from its request the challenged fees from the April 7, 2009, April 3, 2010, and May 31, 2010 invoices. The challenged entry on the May 10, 2010 invoice is for a 2.5 time entitled "Phone JW/review docs." This is not an unrecoverable "meeting" as claimed by plaintiff, but a telephone call and Litteau's review of documents.

Finally, we find no abuse of discretion in the trial court's refusal to award Litteau's costs incurred in reading the instant trial transcripts. The trial court declined to award Lincoln Litteau's fees charged for his hours spent reviewing trial testimony in the instant matter, a total of 32.6 hours. The trial court opined, "[c]onsideration of trial testimony, while useful for preparation for cross-examination, was not relevant to the formation of Litteau's opinions." Lincoln briefly argues that Litteau's thorough understanding of the trial testimony was needed to provide a complete opinion about the propriety of Lincoln's actions, pointing out that Litteau testified that he reviewed plaintiff's trial testimony and noted that plaintiff spoke of making files available to Kaye–Kibbey if an account was being transferred to Raymond James, which was inappropriate.

***28** While Litteau did make this statement, the singular reference to the trial transcript does not establish that reading the entire trial transcript in which he was to give testimony was necessary to form an opinion as to whether Lincoln maliciously prosecuted plaintiff by bringing the federal action of NASD proceeding against him, or whether Lincoln

intentionally inflicted emotional distress upon him. He was retained to provide an opinion on Lincoln's actions, which were already completed at the time Litteau was retained. All of the evidence concerning whether Lincoln maliciously prosecuted plaintiff was completed by the time trial started and Litteau had it all at his disposal for review. There was thus nothing "new" on which to form his opinion.

L. DR. MUNIR'S FEES AND EXPENSES

Plaintiff next asserts on cross-appeal that the trial court erred in awarding costs to Lincoln for the fees and expenses of Dr. Munir, plaintiff's former psychiatrist, when he offered fact testimony rather than expert opinions. We disagree.

MCL 600.2164(1) authorizes a trial court to award expert witness fees as an element of taxable costs. *Rickwalt,* 246 Mich.App at 466. MCL 600.2164(3) provides, however, that "[t]he provisions of this section shall not be applicable to witnesses testifying to the established facts, or deductions of science, nor to any other specific facts, but only to witnesses testifying to matters of opinion."

Lincoln listed Dr. Munir, a psychiatrist who treated plaintiff from September 2003 to September 2004, as an expert witness on its witness list and presented Dr. Munir's deposition testimony at trial. During his testimony, Dr. Munir was asked to review his progress notes from his contact with plaintiff. The basic way the testimony progressed was that Dr. Munir was asked about a specific sentence in his notes then asked to elaborate on that particular sentence or statement; to provide any independent recollection he may have. When asked, for example, about a statement in his notes about plaintiff having difficulty concentrating, Dr. Munir testified that plaintiff did not tell him that but "that is my evaluation as I'm trying to focus on the symptoms of depression, and those are some of the symptoms of depression ... and my note goes for why I'm treating him." Dr. Munir was then asked, "were you able to tell from your conversation with him that he was having difficulty concentrating?" Dr. Munir responded that he was. Dr. Munir was also asked about a note that plaintiff was quite anxious. Dr. Munir testified that plaintiff was visibly anxious and was asked what he observed that led him to conclude that plaintiff was visibly anxious. Dr. Munir responded that plaintiff "was tense. He was preoccupied, as I mentioned. He was having difficulty with concentration ..."

Dr. Munir was asked about the diagnosis he had written, that being major depressive disorder, and whether he had an opinion as to the cause of plaintiff's major depressive disorder. Dr. Munir testified that he said he looked at the environmental issues of plaintiff's relationship with his female co-worker and his relationship with his wife as the main factors in his assessment. Dr. Munir testified that he prescribed plaintiff an anti-depressant and an anti-anxiety medication.

***29** Dr. Munir's credentials as a psychiatrist have not been challenged, nor his qualifications as a proposed expert in that field. His testimony was provided for the purpose of establishing or refuting whether, as claimed by plaintiff, plaintiff was clinically depressed and, if so, whether the cause of his depression was the actions of Lincoln or the pending federal lawsuit. Dr. Munir was asked for and provided a professional opinion as to whether plaintiff did present as anxious or depressed. Dr. Munir was also asked for and provided an opinion as to the cause of plaintiff's diagnosed major depressive order. An expert would be the only one who could diagnose plaintiff as having major depressive order, testify as to what he observed that caused him to come to such diagnosis, and opine as to what, from his interactions or observations, appeared to have caused the disorder. Dr. Munir did not, as plaintiff alleges, merely regurgitate his notes from his sessions with plaintiff. He referenced them, and then elaborated upon them as medical experts typically do. He was called to and did testify concerning a matter of opinion, not fact. Thus, his costs were taxable as expert costs and the trial court did not abuse its discretion in awarding costs associated with Dr. Munir to Lincoln.

Affirmed.

**All Citations**

Not Reported in N.W. Rptr., 2013 WL 3717799

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.